**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

ANDREW BARR, on behalf of himself and all others similarly situated,
502 S Linn Ave
Belle, MO 65013

Plaintiff,

v.

STEPHEN K. BANNON,
210 A Street NE
Washington, D.C. 20002

BORIS EPSHTEYN,
3131 Connecticut Ave NW Apt 2503
Washington, D.C. 20008

SARAH ABDUL a/k/a Sarah Abdul Razzaq a/k/a Sarah Abdulrazzi a/k/a Sarah Abdul Williams a/k/a Sarah Abdul Elliott,
3443 S Joshua Tree Ln
Gilbert, AZ 85297

GRANT TRAGNI,
3009 Loso Ter
Charlotte, NC 28217

LET'S GO BRANDON COIN LLC,
A Registered Agent, Inc.
8 The Green, Ste A
Dover, DE 19901

PATRIOT PAY LLC,
A Registered Agent, Inc.
8 The Green, Ste A
Dover, DE 19901

WARROOM LLC,
United Corporate Services, Inc.
1912 Capitol Ave Ste 500
Cheyenne, WY 82001

Case No. 1:26-cv-00452

354 NOD HILL LLC, and
210 A Street NE
Washington, D.C. 20002

TWINDS LLC,
3131 Connecticut Ave NW Apt 2503
Washington, D.C. 20008

Defendants.

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS


INTRODUCTION ........ 1

PARTIES ........ 4

I. NAMED PLAINTIFF ........ 4

II. DEFENDANTS ........ 4

JURISDICTION AND VENUE ........ 6

I. SUBJECT-MATTER JURISDICTION ........ 6

II. PERSONAL JURISDICTION ........ 6

III. VENUE ........ 7

GENERAL ALLEGATIONS ........ 8

I. FJB'S ORIGINS AS A "MEME" COIN AND DEFENDANTS' UNDISCLOSED ACQUISITION OF IT ........ 8

A. Creation of Let's Go Brandon Coin and Initial Structure ........ 8

B. The Founders Secretly Transferred Control of $FJB to Bannon and Epshteyn Through an Undisclosed Sale Agreement Funded by Investor Fees ........ 10

II. DEFENDANTS RE-LAUNCH FJB AS A UTILITY TOKEN PERSONALLY BACKED BY BANNON AND EPSHTEYN ........ 13

A. Bannon Publicly Promotes $FJB While Concealing His Ownership and the Investor-Funded Nature of His Involvement ........ 13

B. Bannon and Epshteyn Announce a "Partnership" with FJB and Promote It as a Means of Avoiding Political and Financial Persecution ........ 15

C. Defendants Continued to Present Themselves as "Partners" to FJB, When Really They Owned and Controlled It ........ 17

D. Bannon and Epshteyn Stress Their Personal Commitment to FJB's Success and Promote It as an Inflation-Resistant, Alternative Store of Value ........ 20

E. $FJB Is Rebranded and Promoted as a "Safe," "Decentralized" "Alternative" to the Dollar and a "Utility Token" with "Real-World Applications" ........ 22

F. Despite Being Billed as "Decentralized" and a Pathway to "Independence," Defendants Built in a Backdoor to Let Them Freeze Investors' Wallets ........ 24

III. DEFENDANTS BARELY MARKET $FJB BUT ASSURE INVESTORS THEY REMAIN COMMITTED TO ITS SUCCESS ........ 25

A. Erik Finman Makes His First and Last Appearance for $FJB in April 2022 ....... 25

B. Defendants Put Out a Press Release Announcing $FJB's "First Phase" in August 2022........ 27

IV. FUNDS IN THE "MARKETING" AND "CHARITY" WALLETS GO "MISSING" OR ARE WASTED IN UNDISCLOSED RELATED-PARTY TRANSACTIONS............. 28

A. Defendants Reassure Investors They Are Working on $FJB "24/7"................... 28

B. Defendants Barely Donated to Charity and Spent the "Marketing" Fee on Self-Interested Transactions that Did Not Actually Go to Promoting the Token......... 29

C. Defendants Could Not Account for Even the Minimal Amounts Purportedly Spent on Charity........ 33

D. Funds in the "Marketing" and "Charity" Wallets Went "Missing" and Were Never Accounted for by Defendants ........ 35

V. BANNON AND EPSHTEYN SEEMINGLY ABANDON $FJB WITHOUT NOTICE, ONLY TO RETURN TO THE PROJECT AFTER INVESTOR BACKLASH ............. 38

VI. DEFENDANTS FREEZE INVESTORS' WALLETS AND RE-BRAND (AGAIN) TO PATRIOT PAY........ 39

A. Defendants Freeze Investors' Wallets and Re-Brand to Patriot Pay ................... 39

B. The "New" Website Repeated the Same False and Misleading Statements as the Old Website ........ 44

C. Defendants (Again) Barely Promote $PPY and, When They Did, Repeated the Same Misleading and False Statements as $FJB Promotions.............................. 46

VII. DEFENDANTS STRING INVESTORS ALONG UNTIL THE VERY END, WHEN THEY PULLED THE RUG ON THE PROJECT........ 52

A. Defendants Again Paint a Rosy Picture of $PPY's Future................................. 52

B. Defendant Abruptly and Permanently Freeze Investors' Wallets and Abandon $PPY with False Promises of Refunds ........ 53

VIII. ABDUL ORGANIZES TAX-FREE, OVER-THE-COUNTER SALES OF $FJB/$PPY FOR SELECT INVESTORS ........ 55

IX. THE TOKEN'S PRICE AND TRADING VOLUME ROSE AND FELL IN DIRECT RESPONSE TO DEFENDANTS' PROMOTIONAL CONDUCT ................................ 59

A. Immediate Price and Volume Reaction to Defendants' Initial Promotions .......... 60

B. Continued Promotional Statements Drove Short-Term Price Support ................. 60

C. Prolonged Silence and Broken Promises Caused Sustained Price Decline .......... 61

D. Whipsawing Statements and False Reassurances Exacerbated Losses ................ 61

E. Rebrand to Patriot Pay Repeated the Same Cycle of Inflation and Collapse ....... 62

X. DEFENDANTS' CONCEALMENT ........ 62

CLASS ALLEGATIONS ........ 64

I. NUMEROSITY ........ 64

II. TYPICALITY ........ 65

III. ADEQUACY ........ 65

IV. COMMONALITY AND PREDOMINANCE ........ 65

V. SUPERIORITY ........ 66

VI. CLASS ACTION IS APPROPRIATE ........ 66

D.C. LAW APPLIES TO THE ENTIRE CLASS ........ 66

$FJB/$PPY TOKENS ARE SECURITIES SUBJECT TO THE SECURITIES LAWS ............. 68

I. INVESTMENT OF MONEY ........ 68

II. COMMON ENTERPRISE ........ 68

A. Horizontal Commonality ........ 68

B. Vertical Commonality ........ 69

III. REASONABLE EXPECTATION OF PROFITS ........ 69

A. Dollar Collapse Messaging ........ 69

B. Promotion as Inflation-Resistant Store of Value ........ 69

C. Marketing and Development Promises ........ 70

D. Price Reactions to Promotion ........ 70

IV. PROFITS DERIVED FROM THE EFFORTS OF OTHERS ........ 70

A. Centralized Control ..... 70

B. Marketing and Influence ..... 70

C. Operational Development ..... 71

D. Insider Advantages ..... 71

LOSS CAUSATION ..... 71

I. ARTIFICIAL INFLATION INTRODUCED THROUGH DEFENDANTS' PROMOTIONAL CONDUCT ..... 71

II. PARTIAL CORRECTIVE DISCLOSURES REVEALED THE TOKEN'S TRUE RISK PROFILE ..... 72

III. FEBRUARY 13–14, 2023: CLASSIC CORRECTIVE DISCLOSURE AND PRICE COLLAPSE ..... 73

IV. WALLET FREEZES AND REBRAND UNDERMINED CLAIMS OF "DECENTRALIZATION" ..... 73

V. FEBRUARY 12, 2025: TRADING DISABLED AND COLLAPSE OF REMAINING PRICE SUPPORT ..... 74

VI. CAUSAL CONNECTION BETWEEN MISCONDUCT AND LOSS ..... 74

OVERVIEW OF FRAUD AND NON-FRAUD CLAIMS ..... 75

I. NON-FRAUD-BASED SECURITIES AND STATE LAW CLAIMS ..... 76

II. FRAUD-BASED SECURITIES AND STATE LAW CLAIMS (PLED IN THE ALTERNATIVE) ..... 77

A. Defendants Knew They Controlled the Token While Representing Themselves as Mere "Partners" ..... 78

B. Defendants Structured the Acquisition to Be Funded by Investor Fees ..... 78

C. Defendants Knew the Token Was Not Decentralized ..... 79

D. Defendants Repeatedly Reassured Investors While Concealing Material Facts ..... 79

E. Defendants Had Clear Motive and Opportunity ..... 80

F. The Abrupt Shutdown Supports Conscious Misconduct ..... 80

G. At Minimum, Defendants Acted With Severe Recklessness ..... 81

CAUSES OF ACTION ........................................ 81

PRAYER FOR RELIEF ........................................ 99

DEMAND FOR JURY TRIAL ........................................ 100

Plaintiff Andrew Barr ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), brings this class action lawsuit against Defendants Stephen Bannon, Boris Epshteyn, Sarah Abdul, Grant Tragni (collectively, the "Executive Defendants"), Let's Go Brandon Coin, LLC, Patriot Pay, LLC, Warroom LLC, 354 Nod Hill LLC, and TWinds LLC (the "Entity Defendants," and together with the Executive Defendants, "Defendants"). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's undersigned counsel, which included, without limitation: review and analysis of press releases, news articles, websites, state corporate filings, and other publicly available information concerning Defendants and the cryptocurrency known as Let's Go Brandon Coin, and later Patriot Pay.

## INTRODUCTION

1. This action arises from the unregistered offer and sale of a cryptocurrency to retail investors by Defendants Steve Bannon and Boris Epshteyn, who leveraged their prominence, credibility, and loyal following to market a digital token as a stable, secure, and functional alternative to traditional currency—while concealing material facts about the token's true risks, governance, and economics.

2. From late 2021 through early 2025, Defendants promoted a digital token initially branded as Let's Go Brandon Coin ("FJB" or "$FJB") and later rebranded as Patriot Pay ("PPY" or "$PPY") (the "Token") as a serious financial project with real-world utility, charitable purpose, and resilience against inflation, debanking, and financial censorship. Defendants repeatedly emphasized that the Token was not a meme coin or speculative novelty, but a decentralized payment ecosystem that would protect users from economic instability and institutional control.

3. Defendants deliberately targeted a politically aligned and deeply loyal audience—individuals who trusted Defendants' judgment, motives, and commitment to shared values—and encouraged them to invest in the Token as a means of participating in a broader movement. Defendants' conduct was particularly insidious because it exploited that trust to induce purchases of an unregistered, highly speculative asset under the guise of financial independence and community membership.

4. Central to Defendants' pitch was the representation—explicit and implicit—that Bannon and Epshteyn had entered into a strategic partnership with the project's founders and would lend their support and influence to help the Token succeed. Defendants repeatedly framed their role as that of partners or advocates, rather than as controlling insiders.

5. In reality, Defendants owned and controlled the project. Through a private, undisclosed transaction, Defendants acquired governance and administrative control of the Token without paying any purchase price, while investors—through embedded transaction fees—effectively financed Defendants' acquisition. Defendants did not disclose that purchasers of the Token were, in substance, funding the very transaction that placed Defendants in control.

6. Defendants further failed to disclose that the Token was centrally controlled; that insiders retained authority over the Token's smart contract and wallets; that Defendants could and did freeze investor wallets; that select purchasers were offered over-the-counter ("OTC") sales outside public markets; and that transaction-based "marketing" and "charity" fees were not used exclusively—or transparently—for the purposes investors were led to believe.

7. Defendants also misrepresented the Token as decentralized, "uncancellable," and immune from the types of account freezes and restrictions imposed by traditional financial institutions. In reality, Defendants retained—and exercised—centralized authority to restrict

trading, manage supply, and control liquidity, while exempting insider wallets from those same constraints.

8. Throughout the Class Period, Defendants promoted the Token as a safer alternative to fiat currency, invoking economic collapse, inflation, and financial crisis to create urgency and induce purchases. Defendants warned that the existing financial system was "hurtling towards" catastrophe and represented that participation in the Token was necessary to preserve value, transact freely, and maintain economic sovereignty.

9. At the same time, Defendants failed to build any functioning payment ecosystem, failed to deliver the promised utility, and devoted minimal and declining effort to promoting or developing the project—despite repeatedly reassuring investors that they remained committed and would double down.

10. When investors raised concerns about missing funds, liquidity, and price collapse, Defendants responded with reassurances and delay, including statements that "investigation is ongoing" and "[i]t's definitely not getting brushed under the rug," while continuing to conceal material information about insider control, fee usage, and preferential sales practices.

11. In February 2025, Defendants abruptly disabled trading of the Token, announced the project's closure, and promised a liquidity distribution that never occurred—leaving investors holding illiquid tokens after years of reliance on Defendants' misleading statements.

12. Registration would have required Defendants to disclose ownership, insider compensation, fee arrangements, wallet control, conflicts of interest, and risk factors—information Defendants instead concealed while continuing to solicit retail investors.

13. Having used their prominence and credibility to induce loyal followers to purchase an unregistered and misleadingly marketed digital asset—while concealing its true governance,

risks, and economics—Defendants can no longer evade accountability. The securities laws exist precisely to prevent influential insiders from exploiting trust, obscuring material facts, and shifting risk onto retail investors without transparency or registration. This action seeks to make Defendants answer for their conduct, restore what was taken from investors, and deter the misuse of public platforms and personal influence.

## PARTIES

### I. NAMED PLAINTIFF

14. Plaintiff Andrew Barr is an individual residing in Missouri. Mr. Barr invested in $FJB/$PPY Tokens during the Class Period (as defined herein) and suffered a net loss of approximately $58,730.98 on those investments, as set forth in detail in his accompanying certification.

### II. DEFENDANTS

15. Defendant Stephen (Steve) K. Bannon ("Bannon") is an individual residing in Washington, D.C. In February 2025, he pleaded guilty in the Supreme Court of New York, New York County, to scheming to defraud donors to a non-profit—a felony.

16. Defendant Boris Epshteyn ("Epshteyn") is an individual residing in Washington, D.C. In April 2024, he was indicted in Arizona on nine counts related to election interference, including fraud and forgery—felonies. The case is pending trial.

17. Defendant Sarah Abdul ("Abdul") is an individual who, on information and belief, resides in Arizona. Abdul has operated under a number of aliases, including Sarah Abdul Razzaq, Sarah Abdulrazzi, Sarah Abdul Williams, and Sarah Abdul Elliott. Abdul acted as an agent of the Company and the Executive Defendants, with authority to speak to investors, manage wallets, coordinate sales, and implement operational decisions. She represented herself to investors as the "sole proprietor" of Patriot Pay LLC.

18. Defendant Grant Tragni ("Tragni") is an individual who, on information and belief, resides in North Carolina. He created the $FJB Token, and continued to be involved with its management and operation after its sale to Bannon's and Epshteyn's LLCs, 354 Nod Hill and TWinds.

19. Defendant Let's Go Brandon Coin LLC is or was a limited liability company organized under the laws of Delaware. It was the issuing and controlling entity for the $FJB Token. Bannon and Epshteyn owned, controlled, and operated Let's Go Brandon Coin LLC out of their Washington, D.C., homes.

20. Defendant Patriot Pay LLC is or was a limited liability company organized under the laws of Delaware. It was the issuing and controlling entity for the $PPY Token. Bannon and Epshteyn owned, controlled, and operated Patriot Pay LLC out of their Washington, D.C., homes. On information and belief, Patriot Pay LLC is the successor-in-interest to Let's Go Brandon Coin LLC. Accordingly, they are referred herein collectively as the "Company."

21. Defendant Warroom LLC ("War Room") is a media company organized under the laws of Wyoming, with its principal place of business in Washington, D.C. Bannon owns, controls, and operates War Room, and produces and broadcasts its podcast episodes out of his Washington, D.C., home.

22. Defendant 354 Nod Hill LLC ("354 Nod Hill") is a limited liability company organized under the laws of Delaware. Bannon owns, controls, and operates 354 Nod Hill out of his Washington, D.C., home. On information and belief, Bannon controlled and operated the Company through 354 Nod Hill.

23. Defendant TWinds LLC ("TWinds") is a limited liability company organized under the laws of Delaware. Epshteyn owns, controls, and operates TWinds out of his Washington, D.C.,

home. On information and belief, Epshteyn controlled and operated the Company through TWinds.

## JURISDICTION AND VENUE

### I. SUBJECT-MATTER JURISDICTION

24. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77l(a)(1), 77o, and under Sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t. In addition, this Court has subject-matter jurisdiction over the Securities Act claims under Section 22 of that Act, 15 U.S.C. § 77v. This Court has subject-matter jurisdiction over the Exchange Act claims under Section 27 of that Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act.

25. This Court also has subject-matter jurisdiction over this dispute in the alternative pursuant to 28 U.S.C. § 1332(d)(2) because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one plaintiff and defendant are citizens of different states.

26. This Court has supplemental subject-matter jurisdiction over the state-law claims asserted in this action under 28 U.S.C. § 1367(a).

### II. PERSONAL JURISDICTION

27. Defendants Let's Go Brandon Coin LLC, Patriot Pay LLC, 354 Nod Hill, and TWinds are subject to this Court's general personal jurisdiction because, at all relevant times, they maintained their principal place of business in Washington, D.C., and because they conceived, authorized, and directed from within this District the conduct giving rise to Plaintiff's claims, including the offer and sale of the $FJB/$PPY Tokens.

28. Defendants Bannon and Epshteyn are subject to this Court's general personal jurisdiction because they reside in Washington, D.C.

29. Defendants Abdul and Tragni are subject to this Court's specific personal jurisdiction because, as managing agents for Let's Go Brandon Coin LLC and/or Patriot Pay LLC, they directed, controlled, and substantially participated in the LLCs' operations centered in Washington, D.C., including decisions regarding Token issuance, promotion, and distribution.

30. In addition, this Court has specific personal jurisdiction over all Defendants because they purposefully availed themselves of the privilege of conducting activities in Washington, D.C., in connection with the offer and sale of unregistered securities alleged herein, and with the related fraud and other misconduct also alleged herein. Defendants further purposefully availed themselves of this District by using podcasts, websites, social media, and digital wallets operated from Washington, D.C., to offer and sell securities nationwide.

31. This Court also has specific personal jurisdiction over Defendants pursuant to D.C. Code §§ 13-423(a)(1) and (a)(3) because Defendants transacted business in the District of Columbia and caused tortious injury in the District by offering and selling unregistered securities to District residents, and Plaintiff's claims arise directly from that conduct.

## III. VENUE

32. Venue lies in this District under 15 U.S.C. § 77v(a) because one or more Defendants is found or transacts business in this District and because offers and sales at issue in this action took place in this District.

33. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the conception, authorization, and dissemination of promotional messaging through the *War Room* platform; the direction and coordination of Token promotion and investor

communications; and the management of wallets, transaction-fee routing, and over-the-counter sales. Defendants' conduct was purposefully directed to consumers and investors in the District of Columbia, and Defendants knew or reasonably should have known that their acts would cause harm in this District.

## GENERAL ALLEGATIONS

### I. FJB'S ORIGINS AS A "MEME" COIN AND DEFENDANTS' UNDISCLOSED ACQUISITION OF IT

#### A. Creation of Let's Go Brandon Coin and Initial Structure

34. Let's Go Brandon Coin (FJB) was created in or about October 2021 by Grant Tragni, Nicholas Smith, and Caleb Benedict (collectively, the "Founders"), who organized, operated, and promoted the project through Let's Go Brandon Coin LLC.

35. At inception, FJB was branded and marketed using overtly political messaging, including the name "Let's Go Brandon," a phrase widely understood to be a euphemism for the profane political slogan, "Fuck Joe Biden." The Token's ticker symbol—"FJB"—was initially promoted in connection with that slogan.

36. As the project developed, promoters began referring to FJB as standing for "Freedom. Jobs. Business."—a backronym intended to present the Token in a more professional and legitimate light to try to appeal to a broader array of investors, despite its origins as a "meme" coin.

37. From the outset, the Founders structured FJB to include transaction fees embedded in the Token's smart contract, including fees designated for marketing and charity. As represented to investors, each Token transaction triggered an automatic fee, a portion of which was routed to wallets designated for those purposes.

38. From the outset, the Founders structured FJB to include transaction-based fees embedded in the Token's smart contract. Specifically, each transaction in FJB charged an eight percent (8%) transaction fee (sometimes referred to as a "tax"), comprised of a three percent (3%) "marketing fee" and a five percent (5%) "charitable donation." This transaction fee was significantly higher than what other cryptocurrencies charged, and it was emphasized as a defining feature of the Token's economics and community.

39. The 3% marketing fee was routed to a dedicated "marketing wallet," where it was purportedly to be reinvested to promote the Token, grow adoption, and increase the Token's value. The 5% donation fee was routed to a dedicated "charity wallet," from which donations were purportedly to be made to charities supporting veterans and first responders.

40. The Founders controlled and administered the Token's smart contract on the Binance Smart Chain (BEP-20) blockchain, as well as the associated treasury, marketing, and charity wallets. The Founders also controlled the Token's branding and messaging and directed the Token's promotion and sale to the public through the project's website (FJBCoin.org), social media, and online communities.

41. Defendant Grant Tragni was the original lead developer of the Token and its smart contract, and he retained technical authority over the Token's code, including features governing transaction fees, wallet permissions, and other operational parameters.

42. Although Defendants later characterized FJB as decentralized and community-driven, control during this early period remained centralized in the hands of the Founders. With that power, the Founders exercised unilateral authority over key aspects of the Token's operation, including smart-contract administration, fee allocation, wallet control, and governance decisions.

43. During this period, FJB was offered and sold to retail purchasers nationwide without any registration statement filed with the Securities and Exchange Commission; without audited financial statements; and without meaningful disclosures concerning governance, conflicts of interest, insider compensation, or the risks associated with the Token.

44. These early structural features—including centralized control of the smart contract and wallets, the unusually high embedded transaction tax, reliance on promoter-driven marketing, and the absence of regulatory disclosures—established FJB as a project whose value depended on the managerial and entrepreneurial efforts of insiders.

45. As described below, these same features were later concealed, reframed, or affirmatively misrepresented when Defendants Steve Bannon and Boris Epshteyn acquired control of the project and began promoting the Token to a significantly larger and more trusting retail audience.

46. Defendants' later statements describing the Token as decentralized, self-governing, and insulated from insider control were misleading in light of FJB's original structure, which vested control over the smart contract, fee routing, treasury wallets, and branding in a small group of insiders who never meaningfully relinquished that control.

47. Defendants' statements touting the marketing and charity taxes as investor-benefiting features were misleading to the extent Defendants failed to disclose who controlled the marketing and charity wallets, how those wallets were actually used, and whether fees collected under those labels were in fact used for marketing and charitable donations as represented.

**B. The Founders Secretly Transferred Control of $FJB to Bannon and Epshteyn Through an Undisclosed Sale Agreement Funded by Investor Fees**

48. In or about December 2021, the Founders entered into a written agreement transferring Let's Go Brandon Coin LLC and two billion (2.0 billion) $FJB Tokens to 354 Nod

Hill LLC and TWinds LLC, which are owned and controlled by Steve Bannon and Boris Epshteyn respectively. Bannon and Epshteyn assumed "full legal" "ownership of the Coin," "control, administration, and governance of the Coin," and "[c]ontrol of the LLC [and] smart contract private keys." On information and belief, Bannon and Epshteyn evenly split the Tokens between them, with each taking 1 billion Tokens.

49. As Tragni privately acknowledged, Defendants, through Epshteyn, acquired and retained control of the bank account associated with FJB's Coinbase account:




50. Critically, Bannon and Epshteyn did not pay cash or other consideration to acquire $FJB. Instead, the agreement structured the transaction so that Defendants' acquisition would be

financed through ongoing transaction fees paid by retail investors, rather than through capital contributions by Defendants themselves.

51. Specifically, the agreement provided that the Token's embedded 3% "marketing fee"—collected from every transaction—would be paid to the Founders for a defined period following the transfer of control.

52. The agreement further stated that the Founders would receive these marketing-fee payments without any obligation to perform marketing services, regardless of whether Defendants modified, terminated, or failed to carry out any marketing efforts.

53. As a result, the so-called "marketing fee" was not, in fact, tied to marketing activity, performance, or expenditures. Instead, it functioned as a mechanism to compensate the Founders for transferring control of the Token to Bannon and Epshteyn—using funds generated from retail investor transactions.

54. The agreement also provided that the 2 billion Tokens transferred to Defendants or their affiliates would be whitelisted or otherwise exempted from transaction fees, allowing Defendants to transact without paying the same fees imposed on retail investors.

55. None of these terms were disclosed to investors.

56. At no time did Defendants disclose that retail investors were, in effect, financing Defendants' acquisition and control of the project through transaction fees that were purportedly earmarked for marketing and growth.

57. Instead, Defendants publicly characterized their involvement as a "strategic partnership" or collaborative effort, creating the misleading impression that Bannon and Epshteyn were contributing value, capital, and effort to the project on the same terms as other participants.

58. In reality, the agreement ensured that Defendants assumed total control of FJB with minimal financial risk, while retail investors bore the economic burden of funding the acquisition through transaction fees extracted from their trades.

59. The existence and terms of this agreement were material to investors because they revealed that:

a. Defendants' incentives were misaligned with those of retail investors;

b. marketing fees were not being used for marketing as represented;

c. Defendants were not required to provide ongoing promotional or operational support; and

d. the Token's economics were structured to benefit insiders regardless of project success.

60. Defendants' failure to disclose the agreement rendered their statements about marketing, partnership, alignment of interests, and long-term commitment materially false and misleading when made.

61. This undisclosed transfer of control marked a fundamental shift in the Token's governance and risk profile and set the stage for the subsequent misrepresentations, omissions, and investor harm described below.

## II. DEFENDANTS RE-LAUNCH FJB AS A UTILITY TOKEN PERSONALLY BACKED BY BANNON AND EPSHTEYN

### A. <u>Bannon Publicly Promotes $FJB While Concealing His Ownership and the Investor-Funded Nature of His Involvement</u>

62. After the transfer of ownership and control to Bannon and Epshteyn, Tragni continued to be heavily involved with the management and operation of the Token.

63. Around that same time in late 2021, and no later than January 2022, the other Defendants brought on Sarah Abdul as a senior administrator, spokesperson, and operational

representative for the FJB project, communicating directly with investors and participating in decisions regarding marketing, vendors, remediation efforts, and project governance.

64. In December 2021, shortly after Defendants Bannon and Epshteyn acquired control of FJB pursuant to a private, undisclosed agreement, Bannon began publicly promoting the Token while failing to disclose his ownership interest or control.

65. On December 7, 2021, Bannon appeared on *The Culture War* podcast hosted by Tim Pool to discuss the Token. In response to the podcast host's skepticism that FJB was yet another "scam crypto," Bannon emphasized how he "think[s]" a portion of FJB's transaction fee "goes to veterans," presenting himself as a neutral observer. Bannon then added that he "think[s] things like FJB … have to be looked at" and "you owe it to yourself to look at your own digital sovereignty, your own data sovereignty, your own ability to participate in not just cryptocurrencies but other stores of value," because the government "destroyed the U.S. Dollar" with its "printing machine up in Capitol Hill" and spending "$7 trillion."

66. At no point during that appearance did Bannon disclose that he had already acquired ownership and control of $FJB, that he stood to profit directly from increased trading volume, or that retail investors were funding his acquisition through transaction-based "marketing" fees embedded in the Token's smart contract.

67. Instead, Bannon spoke as if he were an outside commentator or advocate, rather than a controlling insider. This omission was material because reasonable investors would have viewed his statements differently had they known he was promoting a Token he owned, controlled, and economically benefited from.

**B. <u>Bannon and Epshteyn Announce a "Partnership" with FJB and Promote It as a Means of Avoiding Political and Financial Persecution</u>**

68. Approximately two weeks later, on December 23, 2021, Epshteyn made a guest appearance on Bannon's *War Room* podcast, during which the pair jointly announced their involvement with FJB.

69. Bannon pitched FJB Coin as a means of avoiding political and financial persecution by President Biden and a Democrat-led federal government. Through FJB, Bannon stated, investors would "very quickly have non-reliance on their financial system," such that "[t]hey're not going to be able to disappear you like the Chinese Communist Party, like the Bolsheviks, like the Nazis" who "try to … get rid of the good people." Instead, investors would "have platforms and institutions that are going to have your back." Through $FJB, he said, investors would "very quickly have non-reliance on their financial system" and "total and complete independence."

70. Bannon also emphasized that "over $50,000, $60,000 now" had been donated to veterans and first responders, and that he and Epshteyn were going "to add to the charities that some of the fees go to," including supporting "the political prisoners of January 6th."

71. Epshteyn added that purchasing FJB Coin was joining a "movement" led by true patriots who "love America," that he and Bannon were going to "build" a "community specifically for holders of these tokens" through "media, parts of shows, videos, et cetera," and that "exciting information" was coming down the pipe such that investors will want to "make sure you're a member of that community."

72. The Token was advertised on the podcast alongside War Room branding, with the two logos appearing side by side:




73. In that same or another appearance on *War Room* on or around December 23, 2021, Epshteyn named the Wounded Warrior Project, Tunnels To Towers, Semper Fi, and Patriot Freedom Project as donation targets to be paid from the FJB charity wallet.

74. Defendants' December 23, 2021 statements created the impression that purchasing and holding $FJB would allow investors to achieve meaningful financial independence from banks and traditional institutions; that $FJB was a decentralized, censorship-resistant means of avoiding political retaliation such as "de-banking," "disappearing," or being cut off from the financial system; and that Defendants were building a parallel financial infrastructure that could not be controlled by centralized actors.

75. This was false and misleading because $FJB was not decentralized in any meaningful sense: control over the Token's smart contract, fee routing, and key wallets remained centralized in the hands of insiders, and Defendants and their agents retained the practical ability to control liquidity, dictate the Token's operational parameters, and—ultimately—disable trading. Investors therefore did not obtain protection from political persecution or financial exclusion; instead, their ability to access liquidity and realize value depended on Defendants' discretionary control and continued cooperation.

76. Further, because FJB utilized a mobile app on the Apple and Google App Stores, it relied on Apple and Google for approvals in order to function, which is contrary to Defendants' purported development of a resilient parallel economy.

### C. <u>Defendants Continued to Present Themselves as "Partners" to FJB, When Really They Owned and Controlled It</u>

77. On December 23, 2021, Epshteyn promoted the Token through his Twitter account as "the way to protect yourself and not be cancelled," "[w]ith Biden crashing the dollar." The tweet painted Bannon's and Epshteyn's involvement with FJB as a "strategic partnership," when in fact Bannon and Epshteyn wholly owned and controlled the Token's smart contract and tax wallets.




78. The Token was repeatedly promoted as affiliated with and backed by War Room. For example, on December 24, 2021, Epshteyn posted the following on his Twitter account:




79. Epshteyn repeated the misleading depiction of his and Bannon's role in a tweet he posted on December 25, 2021:




80. That tweet linked to an article on conservative news site *Gateway Pundit*, dated December 25, 2021, which was one of many press releases Defendants put out. The press kit

Defendants sent out included the following promotional image, announcing a "Strategic Partnership" between Bannon, Epshteyn, and War Room on the one hand, and FJB on the other. It also highlighted Bannon's and Epshteyn's ties to President Trump, experience, and credentials, including that Bannon is a Harvard Business School graduate who worked as an investment banker at Goldman Sachs and Epshteyn is a graduate of Georgetown Law School.




81. Bannon and Epshteyn repeatedly tied their personal brands to FJB's. For example, on December 30, 2021, Epshteyn posted the following on his Instagram account—an image of

Bannon and Epshteyn flanking a cartoon bald eagle with the text "$FJB" prominently displayed in the center:




**D. <u>Bannon and Epshteyn Stress Their Personal Commitment to FJB's Success and Promote It as an Inflation-Resistant, Alternative Store of Value</u>**

82. On January 6, 2022, in a promotional video posted to FJB's official YouTube channel, Bannon publicly endorsed FJB as a serious, functional digital currency and alternative financial system, expressly tying the Token to his own experience and credibility as an investor and business executive. Bannon stated that he had been "very involved in digital currencies," that he had "spent many years investing in companies" in the digital currency space, and that he believed it was "the right time to get involved in a digital currency" because Americans were being "forc[ed] … into alternative currencies" for transactions and as "alternative stores of value."

83. In the video, Bannon further represented that he and Epshteyn were actively building FJB as a usable currency, stating that "Boris and I, 24 hours a day, are talking to people about using this currency as a means of transaction," that they were in discussions with "major people" and "all types of verticals," and that FJB would be "used for transactions," offer "discounts," and be supported by "market makers, exchanges," and a "robust, liquid, deep capital

market." Bannon also represented that Defendants were "commit[ted]" to "putting our shoulder to the wheel," bringing in "smart, tough people," and committing their ongoing efforts to ensure that FJB would be "a currency we can count on" with real "value" and "use[]." He promised investors that Defendants are "bringing every ounce" to the project of "[a]ll the skills I've learned throughout my life—as a Naval officer, at Harvard Business School, at Goldman Sachs, all my years as an entrepreneur and investor, and now in … media or politics."

84. In the video, Bannon repeatedly invoked imminent economic collapse to induce purchases of FJB, warning that the United States was "hurtling towards an economic financial crisis" due to what he described as an "out-of-control regime" and a corrupt network spanning Wall Street, central banks, and global financial institutions. Bannon asserted that since the 2008 financial crisis, elites had "forced fiat currency into the system" through zero and negative interest rates and quantitative easing, creating artificial asset bubbles while shifting the economic burden onto ordinary Americans. That is why, Bannon said, FJB was "absolutely essential … [f]or the survival of sovereignty and the patriot movement."

85. These statements conveyed that traditional financial systems were on the brink of failure and that immediate participation in alternative currencies like FJB was necessary to protect wealth, transact outside the system, and preserve economic sovereignty. Defendants did not disclose that FJB lacked any functioning payment infrastructure, liquidity support, or safeguards that would allow it to serve as a viable alternative during a financial crisis, nor that the Token's value depended overwhelmingly on continued promotion and insider effort rather than on any intrinsic economic resilience.

86. On January 10, 2022, Epshteyn posted a video of himself and Bannon on Rumble in which they described FJB Coin as a "new economy—an economy that cannot be deflated, an

economy that cannot be copied, an economy that is unique." They promised that there is "a lot of new information coming" and "a lot of developments coming" that are "very exciting." They directed the audience to FJBCoin.org to learn more.

87. Defendants' economic doomsaying created the impression that $FJB would function as a safer alternative to fiat currency during periods of inflation and monetary instability; that it could serve as a stable store of value to protect ordinary Americans' savings from the alleged destruction of the U.S. dollar; and that it possessed the liquidity, infrastructure, and durability necessary to serve as a reliable medium of exchange in the event of financial crisis.

88. This was false and misleading because $FJB lacked independent utility, meaningful adoption, or intrinsic economic safeguards, and its price and liquidity were overwhelmingly dependent on speculative trading and Defendants' continued promotion and management. Defendants also failed to disclose that insiders maintained centralized control over key wallets and liquidity and could restrict or disable trading—risks fundamentally inconsistent with Defendants' portrayal of $FJB as a stable refuge from fiat-currency decline.

### E. <u>$FJB Is Rebranded and Promoted as a "Safe," "Decentralized" "Alternative" to the Dollar and a "Utility Token" with "Real-World Applications"</u>

89. In or about early 2022, Defendants disseminated, including through FJBCoin.org, an official "FJB App Whitepaper," which described a new iteration of FJB—denoted as "V2"—as a "safe, decentralised crypto wallet and payment app," where investors "can safely store their digital assets." The whitepaper represented that the project would enable the Token to function as "an alternative or a near-replacement to fiat currencies," "traditional banking," and "centralized institutions," users of which run the risk of being "de-banked." The whitepaper promised that "[t]he FJB wallet will not only promote individual wealth, it will also ensure individual freedom at various levels such as economic, social, political, and otherwise."

90. The whitepaper repeatedly described FJB as a "utility token" that would support "real-world applications" such as peer-to-peer payments, retailer payments, a payment gateway, and a fully developed wallet ecosystem, and included detailed architectural diagrams, mockups, and a multi-quarter roadmap. The whitepaper assured that "[t]he FJB wallet will ensure that all these features are implemented."

91. The whitepaper further represented that FJB "is designed with a deflationary burning mechanism whereby 1% of FJB Wallet surcharges will be used to repurchase FJB from the available supply of the Pancake Swap liquidity pool to be permanently burnt … until only 5% of the total FJB available supply is left" and "the available supply reaches its desired levels."

92. These representations conveyed to reasonable investors that Defendants were actively developing, funding, and executing a functional payment ecosystem, that the Token's value would be driven by Defendants' ongoing managerial and technical efforts, and that the Token would be a safer alternative to fiat currencies like the U.S. Dollar.

93. In reality, Defendants failed to build or deploy the promised ecosystem, failed to devote meaningful resources to development, failed to implement the functionality described in the whitepaper, and failed to adequately disclose the risks associated with investing in a new, unproven cryptocurrency.

94. The whitepaper also identified Defendants Steve Bannon and Boris Epshteyn as key team members and advisors, highlighting their ties to President Trump, experience, and credentials, including that Bannon is a Harvard Business School graduate who worked as an investment banker at Goldman Sachs and Epshteyn is a graduate of Georgetown Law School.

95. Erik Finman was also listed as a key team member and advisor, and touted as "the youngest Bitcoin millionaire." Finman was seen as a crypto whiz kid who could lend further credibility to the project.

96. Defendants intended for, and investors reasonably understood, these representations to signal that Bannon and Epshteyn were actively overseeing the project and would use their influence, resources, and platforms to promote and develop the Token.

97. In truth, Defendants failed to meaningfully promote or develop the project, while continuing to reassure investors that the project would be revived or expanded.

98. These omissions rendered the whitepaper's statements materially false and misleading.

**F. Despite Being Billed as "Decentralized" and a Pathway to "Independence," Defendants Built in a Backdoor to Let Them Freeze Investors' Wallets**

99. When promoting $FJB as "decentralized," Defendants failed to disclose that its smart contract allowed its operators to manually lock an investor's Token balance—something that has been described by experts as an "unusual practice" for a cryptocurrency.

100. If the manual lock were activated, Defendants could restrict or freeze Token transfers by one or more wallet addresses, including by imposing a global or wallet-specific freeze that prevented affected investors from selling their Tokens. At the same time, the smart contract permitted Defendants and other privileged-status wallets to retain the ability to transfer Tokens and to transact without fees, creating a system in which insiders could continue to sell or move Tokens while ordinary investors faced transfer restrictions.

101. For example, if $FJB's price were to begin to drop, Defendants could freeze investors' wallets to prevent further decline while at the same time liquidating their holdings. By the time locked investors regained access, their Tokens would be worth significantly less.

102. While locks are sometimes written into cryptocurrency codes as an "anti-whale" feature to mitigate against the influence of big investors, the locks typically come in the form of triggers that automatically apply to holders trying to carry out large transactions. With $FJB, Defendants had the power to manually pick and choose whose wallets to lock and when, for any reason or for no reason at all.

103. This was no mere hypothetical possibility, but something Defendants frequently did throughout the Class Period, arbitrarily and without notice to investors.

## III. DEFENDANTS BARELY MARKET $FJB BUT ASSURE INVESTORS THEY REMAIN COMMITTED TO ITS SUCCESS

### A. Erik Finman Makes His First and Last Appearance for $FJB in April 2022

104. Despite their promise of "exciting" developments to be revealed soon and their commitment to work on the project "24 hours a day," Defendants largely fell silent for approximately eight months after FJB's re-launch.

105. A rare exception was a single appearance Erik Finman made on *War Room* on April 18, 2022, to promote the new FJB Coin App alongside Bannon. On the podcast, Finman and Bannon both describe Finman as a "Senior Strategic Advisor" to FJB who helped build the app.

106. Finman stated that "the goal of FJB Coin is to get crypto and this un-cancelable financial system" in the hands of "as many conservatives and patriots as possible." He notes that he designed it so even his "parents and grandparents" could use it.

107. Bannon jumped in to note that whereas gold functions simply as a store of value but not a means of transactions, crypto functions as "an alternative store of value and transactions." Finman similarly noted that FJB has "an actual utility to it," as you can "send it to friends" and "merchants and small businesses can accept it."

108. Finman, with Bannon expressing agreement, explained that FJB was a response to "the fall of the dollar empire" caused by President Biden's "using the techniques that they used on Iran on the American people," namely "sanctions" targeting conservatives like MyPillow CEO Mike Lindell and Lieutenant General Michael Flynn so they "can't have a bank account." FJB, Finman said, is a means "to get free from it."

109. Directing a message to "the American people," Bannon warns "you're having a rolling devaluation on your net worth if you hold dollars" because of the government's deficit spending, which is "just going to crush the dollar even more." That is why listeners "need to find out about crypto" and "you owe it to yourself" to learn about FJB.

110. That same day, Epshteyn put out the following tweet describing FJB as a "safe, secure, and easy to use financial alternative" to the "[b]anks and payment processors" that "don't care about you or your values":



111. Despite being initially trumpeted as a "key" team member and advisor for $FJB, this would be Finman's first and only public appearance on behalf of the Token.

### B. Defendants Put Out a Press Release Announcing $FJB's "First Phase" in August 2022

112. On August 2, 2022, after months of inactivity, Defendants sent some conservative news sites and social media influencers—including Chuck Callesto, *Infowars*, *The Post Millennial*, and *CharlieKirk.com*—a press release announcing the "first phase" of a "parallel financial system" and "New Financial System for Conservatives" in the form of FJB. The press release linked to FJB's new website, FreedomJobsBusiness.org.

**The Freedom Jobs Business Organization launches its own 'Conservative Crypto-Wallet' as part of 'New Financial System' for Conservatives**

UNITED STATES, August 2nd, 2022 - - Freedom Jobs Business Organization, the blockchain-focused project that centers itself on increasing freedom, jobs, and business for Americans, has announced the beginning a "new financial system" for conservatives, with the first phase being the launch of its own easy-to-use app and platform that aims to be the "conservative crypto-wallet." The team sees their new cryptocurrency and wallet app as an essential tool for truckers, conservatives, small business owners, and anyone else who is being banned from payment processors and traditional financial services.

Former White House Chief Strategist under the Trump Administration, **Stephen K. Bannon**, had previously signaled his desire to create a "deplorables coin" to help conservatives build their own financial system. Now he is involved in the Freedom Jobs Business Organization and has been announcing it as not only the realization of this idea of a new financial system, but also an entirely new community for Americans.

"We're building a community that you can be a part of. We will never back down, ever. They're trying to destroy this country [...] We are going to fight it every day. We are going to stand up," said **Bannon**.

The Freedom Jobs Business Organization team's efforts to create a parallel financial system have been lauded by conservative icons and cryptocurrency entrepreneurs alike, who see this as a unique way to bring millions of new people into the crypto economy. For example, **Erik Finman**, who has joined the project as a Senior Strategic Advisor, has acknowledged their intention to lean into the culture wars and make their position well known. **Erik Finman** had previously announced his intention to sway the 2022 midterms in conservatives' favor by injecting millions of dollars across different races. He appears to be using the Freedom Jobs Business Organization to upscale these efforts, saying:

"This is a crucial moment not just for the Freedom Jobs Business Organization, but for anybody who cares about freedom and economic opportunity. We've seen far too many good, honest Americans silenced for fear of losing access to the traditional financial system. Big Tech cannot be allowed to keep a stranglehold on America. This is a real conservative alternative to coinbase. This marks the moment we build a new financial system, and the moment we take the muzzle off everyday Americans. We are tired of hiding, tired of being backed into a corner, and tired of being silent. Money talks, and the Freedom Jobs Business Organization gives Americans a loud voice to say what they've really been feeling - without having to worry about losing access to a financial system. It's time to put your cards on the table and show where you stand, no more pretending."

This full-court press to make a new financial system has been echoed by **Stephen K. Bannon,** saying, **"We're building institutions: credit cards, banks, all of it across the board."**

113. The release pitched the Token as backed by Bannon and Finman, and part of a "full-court press to make a new financial system." The Token was characterized in the release as "a real conservative alternative to coinbase"—a major cryptocurrency exchange with over 100 million users.

114. The press release also painted the Token as "essential" for "conservatives … being banned from payment processors and traditional financial services," and a means of securing freedom of speech for "good, honest Americans," "far too many" of whom have been "silenced for fear of losing access to the traditional financial system."

115. Defendants' statements in the press release were false and misleading because they materially overstated the risk that conservatives, as a class, were being banned from payment processors or traditional financial services based solely on political views.

116. By framing isolated incidents as proof of an imminent, systemic threat, Defendants created a false sense of urgency designed to override ordinary investor caution and to position the Token as a necessary safeguard rather than a speculative crypto asset.

## IV. FUNDS IN THE "MARKETING" AND "CHARITY" WALLETS GO "MISSING" OR ARE WASTED IN UNDISCLOSED RELATED-PARTY TRANSACTIONS

### A. Defendants Reassure Investors They Are Working on $FJB "24/7"

117. At some point, Defendants created an official Telegram community for $FJB investors, which was in addition to a Discord group for investors formed around the time $FJB was created. Beginning in the summer of 2022, Abdul and Tragni would host weekly "status calls" in the $FJB Telegram group, which Defendants treated like investor updates. Abdul and Tragni would not use their real names in their Discord and Telegram communications but instead went by anonymized usernames to conceal their true identities from investors.

118. During the status calls that summer, $FJB investors began expressing concerns about the Token's declining value caused by a lack of promotion by Defendants, as well as the lack of transparency over donations to veterans that were supposed to be made from the Token's charity wallet. For weeks, investors pled with Abdul and Tragni for Bannon to promote the Token on War Room, where it could reach a wider audience. In response, investors were told that Bannon and Epshteyn were busy with the 2022 midterms.

119. On September 17, 2022, Bannon and Epshteyn for the first time joined one of the status calls to reassure investors and make additional pledges about the future of the coin. Epshteyn boasted that the coin is "expanding to Europe" and Bannon reassured buyers that "it's going to be a MAGA coin." Bannon added, "I'm available 24/7 on this," and "I'm working on this all the time."

120. Despite conveying that concrete steps toward European exchange listings or operations were already underway, no such expansion was occurring at the time and $FJB was never listed on a European crypto exchange.

### B. Defendants Barely Donated to Charity and Spent the "Marketing" Fee on Self-Interested Transactions that Did Not Actually Go to Promoting the Token

121. On October 20, 2022, Tragni (who went by the username "Sammy Paradise") privately shared with the Token's operators a breakdown of how Defendants were allegedly spending the 8% tax on each $FJB transaction, 3% of which was earmarked for "marketing" and 5% for "charity." He revealed that since Bannon and Epshteyn acquired the Token, Defendants only spent an additional $15,000 on charity—despite millions of dollars' worth of transactions having taken place by that time. In other words, significantly less than 5% of each transaction was being spent on donations. Further, the total transaction-fee spend was significantly less than 8% of $FJB sales up to that point.




122. Among the various expenditures Tragni listed, $120,000 ($10,000 per month) was spent paying the vendor VFT Solutions. This was for "supposedly SEO" services, according to Abdul. Defendants did not disclose to investors that VFT Solutions was not selected for the quality of its services, but because it was led by Epshteyn's friends, to whom he may have owed money. As Abdul (who went by the username "sundevil28") admitted, VFT Solutions did nothing other than send some Google analytics "one time."




123. As Tragni privately acknowledged, Defendants understood that Epshteyn financially benefited from the related-party transactions with VFT Solutions. In addition, Epshteyn was separately collecting $10,000 a month in "consulting fees" for making appearances on behalf of $FJB—something that was never disclosed to investors.



124. Both Abdul and Tragni privately recognized that Bannon and Epshteyn had grossly mismanaged investor funds, leaving "no funds for the coin":




125. As a result of Defendants' mishandling of investor funds, $FJB representatives told investors during status calls that the project was in debt and was making back-payments to its developer and to cover other overhead.

126. Chase Bailey ("Bailey"), who was responsible for updating $FJB's code (and who went by the username "Speshled") confirmed that Epshteyn had pilfered over $100,000 tax funds under the guise of paying a vendor:




## C. **<u>Defendants Could Not Account for Even the Minimal Amounts Purportedly Spent on Charity</u>**

127. When asked how exactly the alleged $15,000 was spent on charity, Abdul and Tragni could only cite a $500 donation to St. Jude Children's Research Hospital, and an unknown amount to an unnamed organization purportedly supporting 9/11 first responders. When asked for proof of even those donations, Defendants did not provide any.

128. Even the public blockchain does not provide clarity, as any donations were not made directly from charity wallets, but were first transferred to intermediary wallets that are difficult to track. For example, some of $FJB's charity-wallet funds went to an intermediary wallet that sends money to *another* wallet that makes high-risk investments in obscure crypto tokens.

129. Although one wallet appeared to be designated for donation to the Wounded Warrior Project, the non-profit confirmed that it never received any donation from $FJB after November 2021 (*i.e.*, after Bannon and Epshteyn took over).

130. As investors increasingly questioned the use of funds flowing from the Token's "charity" wallet—particularly after substantial transaction-based fees had been collected under Defendants' ownership—Defendants were pressured to produce proof of charitable donations. In response, Defendants shared what was initially a cropped image of a donation confirmation email, presented as evidence that charitable contributions were being made consistent with the Token's publicly advertised 5% charity tax.

131. When the uncropped version was later obtained, it revealed that the referenced donation was in the amount of just $100.00, and was made to The Folded Flag Foundation on November 4, 2021—*i.e.*, before the transfer of ownership and control of the project to Defendants. Further, the donation was made by Defendant Tragni from personal funds rather than from the Token's charity wallet, as Defendants' "advisor" Erik Finman (who went by "FIN" in the FJB Discord channel) revealed on September 27, 2022:



132. The presentation of a cropped image of a $100 pre-acquisition donation as purported proof of post-acquisition charity-wallet activity—omitting both the nominal amount and the pre-transfer date—underscores the lack of transparency and supports a strong inference that Defendants knowingly sought to create a misleading impression regarding the use of transaction-based "charity" taxes.

### D. Funds in the "Marketing" and "Charity" Wallets Went "Missing" and Were Never Accounted for by Defendants

133. Also in October 2022, Abdul revealed on a status call that an unknown amount of money in the marketing and charity wallets had gone "missing."

134. Defendants were in control of the wallets holding the transaction fees.

135. When pressed by investors to account for the missing funds, Abdul declined to provide any more information, citing an "internal investigation" and "legal action."

136. On or about November 11, 2022, Abdul privately disclosed to Bailey that Defendants apparently conducted an "audit" and found that the VFT Solutions self-dealing by Epshteyn was "drops in the bucket" compared to the total amount of malfeasance that occurred, describing "what we've found" as "unbelievable" and "worse than i ever imagined." The findings of this "audit" were never disclosed to investors but were known only to insiders.



101 @ Speshled

wouldn't have made that announcement without 100% rock solid info...lots of it

**sundevil28** Today at 8:11 AM
Sunday, in case we get in too late Saturday? Topgolf or Valle Luna?
Are you truly in the dark, like I was, or messing with me?

**Speshled** Today at 8:34 AM
Sarah you're the only reason I haven't mentioned things like social media monitoring in gen lol

**sundevil28** Today at 8:34 AM
drop in the bucket spesh
a tiny fucking drop
what we've found is unbelievable
and i know you know defi
but worse than i ever imagined

**Speshled** Today at 8:35 AM
No I'm saying I genuinely like you too and it's a shame we haven't gone to have drinks yet
Just trust me when I say
That we need to meet up for you

Message @Speshled



99 @ Speshled

**Speshled** Today at 10:19 PM
wen honesty
when mention boris's social media monitoring company

**sundevil28** Today at 10:20 PM
Drops in the bucket, that the audit found
Do you honestly not know, or are you covering up for them?

**Speshled** Today at 10:26 PM
I have no idea the details of it but I can say I have 100% faith that Grant wouldn't do something like that
even if I didn't know Grant I'd have a very very hard time believing that 3 people in the united states would steal money from a high profile lawyer in a fully traceable way (edited)
this looks sooooo neglegent like there's some big ass details missing

NEW MESSAGES

**Speshled** Today at 11:16 PM
wen drinks
wifey and kids out of town this weekend and I finally have free time to be able to

Message @Speshled

137. "We," here, meant the FJB Advisory Council—a select group of insiders Defendants selected from the broader community to advise on the project. These insiders were given the opportunity to trade on material, non-public information gleaned from Defendants in advance of disclosure to investors—if there was any disclosure at all.

138. During a status call on November 29, 2022, in response to investor backlash about the missing funds, Abdul assured investors that "[t]here is an ongoing investigation with an entire team working on this," "[i]t's definitely not getting brushed under the rug," and investors would be notified once "legal proceedings toward regaining missing funds commenced." Investors were threatened that if they "accuse anybody" or even "reach out to anybody," in the meantime, it could constitute "defamation."

139. During another status call on December 7, 2022, Abdul was coy with investors about the missing funds but confirmed that they were misappropriated: "We are not claiming the money has been stolen. We're saying the funds are missing. They did not go to the purpose they were intended for, and that's as far as we'll speak on."

140. On August 16, 2023, Abdul revealed that "time is running out" to recover the approximately $2.7 million in "missing" transaction fees:



141. Defendants never disclosed the results of Epshteyn's purported work to recover the misappropriated funds. An estimated $2.7 million in transaction fees remains unaccounted for. On information and belief, Defendants directly or indirectly misappropriated the funds to their own personal benefit.

142. Defendants' representations concerning both the "charity" and "marketing" transaction fees were false and misleading because Defendants failed to disclose that funds routed to wallets labeled and promoted as charitable or marketing-related were not necessarily used for those stated purposes, but were instead used, at least in part, for insider-directed Token sales and other project uses unrelated to charity or promotion.

143. These misrepresentations and omissions were material because reasonable investors would have considered it important to know whether amounts represented as charitable contributions would in fact be donated to qualified charitable organizations. By misleading investors into believing that a portion of each transaction constituted a charitable contribution, Defendants deprived investors of the ability to accurately assess the nature of their transactions and, to the extent investors believed they were making charitable contributions, exposed them to the risk that such payments would not qualify for a charitable tax deduction.

## V. BANNON AND EPSHTEYN SEEMINGLY ABANDON $FJB WITHOUT NOTICE, ONLY TO RETURN TO THE PROJECT AFTER INVESTOR BACKLASH

144. On February 13, 2023, after months of silence, Abdul announced to the $FJB Discord community that "Epshteyn and Bannon have [] decided to transfer and assign the rights and obligations of $FJB, Let's Go Brandon Coin," adding that she had sold some of her own Tokens to "have some funds readily available."

145. On February 14, 2023, in response to investors' furor over Bannon's and Epshteyn's seeming abandonment of the Token, War Room's CFO Grace Chong posted on GETTR that the pair "haven't sold" and continue to "back it 100%."




146. On February 15, 2023, in an episode of *War Room*, Bannon reassured investors that he and Epshteyn remain "huge supporters of the $FJB project and the community" and have "not only never sold a coin," but "only bought coins."

147. On February 17, 2023, Abdul, in an about-face, told investors that she, Bannon, and Epshteyn "remained committed to the coin and organization, and look forward to the future."

148. Despite these reassurances, Defendants largely went silent again in the months that followed.

## VI. DEFENDANTS FREEZE INVESTORS' WALLETS AND RE-BRAND (AGAIN) TO PATRIOT PAY

### A. Defendants Freeze Investors' Wallets and Re-Brand to Patriot Pay

149. In December 2023, Defendants activated the code's backdoor locking mechanism to freeze everyone's wallets except their own.

150. Defendants announced that they had decided to rebrand "Freedom. Jobs. Business." ($FJB) to Patriot Pay ($PPY), and would be making edits to ("forking") the code so that it was now on the Polygon (Matic) blockchain network instead of Binance. On information and belief, Defendants were forced to fork the code because Abdul accidentally, permanently froze the FJB contract, locking Defendants out of their ability to centrally control the Token.

151. In connection with the fork from $FJB to $PPY, Defendants further entrenched centralized control by deploying the Token through a proxy smart-contract architecture. Under this structure, a static read-only proxy contract merely references a separate, amendable implementation contract that Defendants could modify after deployment. This design permitted Defendants to change core Token functionality—including transfer restrictions, fee mechanics, and control permissions—without redeploying the Token or obtaining holder consent.

152. Defendants did not disclose this architecture to investors. By using a proxy contract, Defendants effectively removed the immutability and transparency safeguards that investors reasonably expect from blockchain-based assets, while simultaneously promoting $PPY as decentralized, secure, and resistant to insider control. The proxy structure gave Defendants ongoing unilateral authority to alter the Token's behavior and rules, materially contradicting Defendants' representations regarding decentralization and financial autonomy and exposing investors to undisclosed risks of arbitrary modification and control.

153. In February 2024, after two months during which investors had no access to the Tokens in their wallets, the fork was completed and the lock lifted. "Freedom. Jobs. Business." became Patriot Pay; $FJB became $PPY; and FJBCoin.org became PatriotPay.org.

154. Defendants updated $FJB's social media pages to match the new branding, which now billed the Token as "by Steve Bannon & Boris Epshteyn," using their name and likeness:







155. The "Freedom. Jobs. Business." (now Patriot Pay) app was also updated to reflect the new branding, although the app itself remained largely unchanged in terms of substance:




156. $PPY advertisements continued to tie the brand personally to Steve Bannon and Boris Epshteyn, and to War Room, such as this one on February 23, 2024:




157. As of the time of filing of this Complaint, Bannon's GETTR profile continues to list $FJB/$PPY's website alongside War Room's:




158. In connection with the rebranding of $FJB as "Patriot Pay," Defendants failed to conduct a trademark clearance for the new name. Defendants applied to register "Patriot Pay" as a trademark, but the application was rejected by the U.S. Patent and Trademark Office due to the existence of a prior, conflicting trademark. Defendants did not appeal the Office Action, seek an alternative mark, or otherwise remedy the defect.

159. Defendants did not disclose to investors that the "Patriot Pay" name was subject to an unresolved trademark conflict, that their application had been rejected, or that they had abandoned efforts to secure trademark protection for the brand under which they were actively soliciting investment. This omission was material because Defendants were simultaneously promoting the rebrand as a professional, stable, and long-term financial ecosystem, while

concealing that the project's core branding faced unresolved legal risk and that Defendants had failed to exercise basic diligence in executing the rebrand.

### B. <u>The "New" Website Repeated the Same False and Misleading Statements as the Old Website</u>

160. Following the rebrand from "Freedom. Jobs. Business." ($FJB) to Patriot Pay ($PPY), Defendants launched and maintained a new website, PatriotPay.org, which repeated—and in several respects escalated—the same false and misleading representations previously made about $FJB.

161. PatriotPay.org promoted $PPY as a "secure," "decentralized," and "uncancellable" financial alternative to traditional banking, repeatedly assuring users that Patriot Pay placed "control back in YOUR hands—no banks, no middlemen, no freezing of your account."

162. The website expressly claimed that Patriot Pay was "more secure than the bank you trust," and that, unlike traditional financial institutions, Patriot Pay users could not have their accounts frozen or access restricted by any centralized authority.

163. These representations were materially false and misleading. As Defendants knew, $PPY was not decentralized in any meaningful sense. Defendants retained centralized control over the Token's smart contract and wallets and had already exercised their authority to freeze investors' wallets arbitrarily and without notice, while exempting their own wallets from those restrictions.

164. PatriotPay.org further represented that $PPY was a functional "utility token" with real-world applications, including the ability to "buy, sell, and donate with confidence," to "use your money freely," and to support "causes you believe in."

165. The website reassured prospective purchasers that "crypto like Patriot Pay is safe," that users' "money is protected and easy to access," and that Patriot Pay provided "security, control, and privacy."

166. These representations conveyed that $PPY functioned as a usable payment system and reliable store of value, suitable even for unsophisticated users. In reality, $PPY lacked any functioning payment infrastructure, merchant adoption, or operational safeguards, and its value depended almost entirely on continued promotion by Defendants.

167. PatriotPay.org also emphasized charitable giving, representing that transaction fees would be used to support charitable causes and encouraging users to donate through the Patriot Pay ecosystem.

168. Defendants failed to disclose that wallets labeled or described as "charity" wallets were under insider control, were used for token sales, and did not consistently fund charitable donations in the amounts represented. Defendants further failed to disclose that charity-wallet funds were routed through intermediary wallets and, in some cases, used for purposes unrelated to charity.

169. PatriotPay.org omitted any disclosure that Defendants conducted over-the-counter ("OTC") sales of $PPY from insider-controlled wallets, including tax and charity wallets, at negotiated prices for select purchasers, while publicly representing that trading occurred through open, decentralized markets.

170. PatriotPay.org likewise failed to disclose that the Token's embedded "marketing fee" did not solely fund marketing, but instead had historically been diverted pursuant to undisclosed arrangements and insider-controlled spending decisions, including payments to related-party vendors.

171. By continuing to promote $PPY as decentralized, secure, and immune from freezing or insider manipulation—while omitting Defendants' centralized control, OTC sales practices, and misuse of fee wallets—PatriotPay.org presented a materially misleading picture of the Token's risk profile, governance, and economics.

### C. Defendants (Again) Barely Promote $PPY and, When They Did, Repeated the Same Misleading and False Statements as $FJB Promotions

172. After an initial spate of advertising activity following the re-brand, it again petered out. This again led investors to openly question Defendants' commitment to the Token, and again prompted a response from Defendants reiterating that they were still committed to the Token's success. For example, on April 20, 2024, Abdul posted the following on $PPY's Telegram channel:




173. On June 27, 2024, Defendants posted a promotional video on Patriot Pay's Instagram page featuring various videos of Bannon stating he was "working on tokens for the populist movement on a worldwide basis," there was a need to use "cryptocurrency to fight against being debanked and controlling our own money where they can't print 6 thousand, billion, trillion

dollars," and declaring "this is why I support Patriot Pay." During the video, the words "DONATE" and "UNCANCELLABLE" flashed across the screen.

174. The caption of the post declared that "[t]he dollar will continue depreciating," and included the call to action, "It's time you take control!" It described Patriot Pay as "secure" and that lets users "support … causes you believe in, and take control of your finances!"




175. There was another spate of promotions that took place in September and October 2024, before the promotions again abruptly ended.

176. On September 7, 2024, a broadcaster on the Right Side Broadcasting Network (RSBN) did an ad-read for Patriot Pay with an overlay image describing it as "Decentralized" and "Steve Bannon's Movement" alongside an image of Bannon:




177. The broadcast featuring the ad was uploaded to YouTube, where it has accumulated nearly 500,000 views.

178. On September 13, 2024, Patriot Pay's Instagram page reposted a post by conservative influencer Anthony Raimondi (who goes by "Conservative Ant"), in which he described Patriot Pay as "so easy that my grandma . . . can do it" and "a great way to do donations." Raimondi has over 1 million followers on Instagram.

179. On September 27, 2024, Patriot Pay's Instagram page made a promotional post addressing individuals who were "[u]nsure about digital currency." The post, which exclusively featured $PPY, claimed that "It's more secure than the bank you trust," and "That's why President Trump and many patriots are turning to crypto." The post explained that "Decentralized currency like Patriot Pay puts control back in YOUR hands—no banks, no middlemen, no freezing of your account." "With the dollar losing value," the post said, "it's time to reclaim your financial freedom" by buying $PPY.




180. The post also included an ad describing cryptocurrency as "just digital money, instead of paper cash" that you can use to "buy stuff with" or "donate to causes you believe in." The ad reassured viewers: "Don't worry, it's safe." That is because, "with apps like Patriot Pay, your money is protected and easy to access."

181. On October 4, 2024, the same Patriot Pay account made a similar promotional post addressing the question, "Is crypto safe?" The post answered: "Absolutely!" It claimed that "crypto is more secure than traditional banking," because "[u]nlike centralized banks, decentralized currencies protect your assets by spreading out control, meaning no single entity, like a bank or government, can freeze or track your funds." Again, the post exclusively featured $PPY, adding that "[w]ith the Patriot Pay App, you can buy, sell, and donate with confidence, knowing your financial freedom is safe."




182. The post also featured an ad making similar claims in the context of "busting myths" about crypto. The ad rejected the idea that "crypto isn't safe," claiming that "digital currencies like Patriot Pay" are "incredibly secure." The ad also rejected as "myth" the notion that "banks are more secure than digital currency," claiming that "actually, it's the opposite." Banks are "easier to hack," it said, whereas with crypto, "you have full control of your funds." "Don't let this stop you from joining the future of money," the ad claimed, adding that "with Patriot Pay, you get security, control, and privacy." The ad ends with: "It's so easy, even your grandma can do it," revealing that Defendants were targeting lay, retail investors who were not sophisticated.

183. Defendants' social-media posts and advertisements were false and misleading because they portrayed $PPY as simple, safe, decentralized, and more secure than traditional

banking, and as a means of maintaining control over one's money free from freezing, tracking, or insider interference, when in reality $PPY lacked those characteristics.

184. Contrary to Defendants' claims, $PPY was not decentralized: Defendants and their agents retained centralized control over the Token's smart contract, transaction-fee routing, associated wallets, and trading functionality, and possessed the ability to restrict transactions, control liquidity, and disable trading altogether.

185. Defendants also failed to disclose that every transaction was subject to substantial fees routed to insider-controlled "marketing" and "charity" wallets, that these wallets were not independently governed, and that funds were not necessarily used for marketing or donations as implied.

186. Nor was $PPY "more secure than the bank you trust," "protected," or a stable alternative to a depreciating dollar; it was a highly volatile speculative asset whose value depended largely on Defendants' continued promotion and discretionary actions. By presenting $PPY as safe, easy, suitable for unsophisticated users, and immune from centralized control—while omitting these risks—Defendants materially misled reasonable investors, particularly lay retail purchasers, about the nature of the Token, the risks of loss, and Defendants' control over their funds.

187. These misrepresentations and omissions were material because a reasonable investor deciding whether to purchase $PPY as a secure means of transacting, donating, or preserving value would have considered it important to know that the Token was centrally controlled, fee-laden, subject to insider discretion, and incapable of providing the financial security, autonomy, or stability Defendants promised.

## VII. DEFENDANTS STRING INVESTORS ALONG UNTIL THE VERY END, WHEN THEY PULLED THE RUG ON THE PROJECT

### A. Defendants Again Paint a Rosy Picture of $PPY's Future

188. On December 3, 2024, Abdul updated investors on Telegram that Bannon and Epshteyn were "finalizing everything" necessary to begin regular promotions of $PPY on *War Room* and that "everything's going better than I expected":




189. During what would be the final investor status call on January 31, 2025, Abdul announced that $PPY would have weekly "marketing scheduled with *War Room*." During "weeks 1 to 2 we will do 2 mentions a week in the *War Room* Telegram channel, then weeks 3 and 4 we will add 2 mentions a week on the *War Room* social media accounts as well, then on week 5 and onward we will begin to have Steve Bannon promote $PPY on his show once a week from there on out."

190. None of that came to fruition. Abdul's assurance that the marketing would commence on a defined timetable implied that arrangements with *War Room* had already been finalized and secured. On information and belief, no such finalized arrangements existed.

191. Defendants' repeated promises that Bannon and Epshteyn would promote $PPY to a wider audience through *War Room* were material. A reasonable investor would have found it important to know whether the main promoters of the Token, whose value they purposefully tied to their own personal brands and promotional efforts, would continue to market the Token and the extent to which they would do so.

**B. <u>Defendant Abruptly and Permanently Freeze Investors' Wallets and Abandon $PPY with False Promises of Refunds</u>**

192. On February 12, 2025, Abdul, out of the blue, announced the "closure" of $PPY and that its trading has been "disabled":



193. She alluded to "significant challenges" she faced "in securing the necessary resources and support to continue operations," and felt "let down by the lack of support" from Bannon and Epshteyn.

194. Abdul promised investors on behalf of Defendants that "[w]e will be distributing the liquidity pool (LP) equally among all holders (with Matic), ensuring that everyone receives their rightful share." She added that "everything will be completed within the next 7 days."

195. Defendants unequivocally represented that the liquidity pool would be distributed within seven days, without qualification or contingency, despite lacking any operational plan to execute such a distribution.

196. On February 14, 2025, after receiving enormous backlash from investors, Abdul reassured them that Defendants were "working on a solution" for them:




197. The $PPY liquidity pool was never distributed to investors, and their wallets remain permanently locked. Investors have not heard from Defendants since Abdul's promise of a forthcoming "solution" on February 14, 2025, leaving them no choice but to seek recourse from this Court.

## VIII. ABDUL ORGANIZES TAX-FREE, OVER-THE-COUNTER SALES OF $FJB/$PPY FOR SELECT INVESTORS

198. On or about December 15, 2022, an administrator in the official $FJB/$PPY Discord revealed that Abdul was supportive of the idea of offering over-the-counter sales to "OG" ("original gangster") members of the group (*i.e.*, those who have been there since the start of $FJB) directly out of the $FJB tax wallets.




199. Abdul was not only supportive of the idea, but soon thereafter made over-the-counter sales herself. As one member of the Discord confirmed, he bought $FJB from Abdul over the counter on December 31, 2022:




200. Another administrator of the Discord confirmed that Abdul had been making over-the-counter sales, potentially from "multiple wallets":




201. On February 28, 2024, she told another member of the Discord to refer his friend to her "if your friend is looking to buy," as she'd "like to empty the tax wallets before they buy," which "gives them a cheaper price and helps us too":




202. Abdul's statement reflects coordination of insider-controlled Token supply and the timing of sales to facilitate off-market or preferential transactions. By proposing to "empty the tax wallets" before a contemplated purchase, Abdul indicated that insiders would first sell tokens under their control to affect market pricing, after which a favored purchaser could acquire Tokens at a reduced price, benefitting both the purchaser and the project's insiders. Defendants did not disclose the existence of such preferential sales practices or the role of insiders in managing token supply and pricing.

203. Indeed, as another member of the Discord revealed, Abdul had been selling directly from the charity wallets "for a while," as a sale from the tax wallets "doesn't dump on the price" of the Token.




204. This admission reflects that Defendants actively managed the timing and manner of token sales from insider-controlled wallets to minimize price impact, rather than allowing market forces to operate transparently. Defendants did not disclose to investors that wallets represented as charitable were being used in this manner or that insiders exercised such control over supply and price dynamics.

205. Defendants' conduct and statements were false and misleading because, while representing $FJB/$PPY as fairly traded, decentralized, and governed by transparent market

forces, Defendants failed to disclose that insiders—including Abdul—were conducting undisclosed over-the-counter sales directly from insider-controlled marketing and charity wallets, coordinating the timing and source of those sales to influence price and liquidity. Defendants also failed to disclose that wallets labeled as "charity" and "marketing" were used as sources of token supply for insider sales, or that insiders actively managed token distribution to avoid price impact, confer preferential pricing on favored purchasers, and benefit themselves and the project.

206. These omissions were material because a reasonable investor would have considered it important to know that insiders were selling tokens off-market, selectively draining tax and charity wallets, and manipulating the timing and manner of token sales to manage price and liquidity. Had investors known that purportedly charitable or marketing-designated wallets were being used to facilitate insider and preferential sales, and that token pricing did not reflect transparent market forces, they would have viewed the Token as riskier, less fair, and less suitable for investment, and would not have purchased $FJB/$PPY at the prices they did, or at all.

## IX. THE TOKEN'S PRICE AND TRADING VOLUME ROSE AND FELL IN DIRECT RESPONSE TO DEFENDANTS' PROMOTIONAL CONDUCT

207. From the outset, Defendants Bannon's and Epshteyn's own words made clear that the value of $FJB/$PPY was tied not to decentralized adoption or independent utility, but to their personal involvement, credibility, and promotional efforts.

208. Defendants repeatedly told investors that they were "putting [their] shoulder to the wheel," that they were "available 24/7," that they were "working on this all the time," and that they would personally drive adoption, partnerships, listings, and ecosystem development.

209. As Defendants well knew, retail investors purchased $FJB/$PPY precisely because of Bannon's and Epshteyn's prominence, influence, and promises of sustained involvement—

making the Token's market price acutely sensitive to their public statements, appearances, and perceived commitment.

**A. <u>Immediate Price and Volume Reaction to Defendants' Initial Promotions</u>**

210. The most dramatic market reaction occurred on December 23, 2021, when Bannon and Epshteyn jointly announced $FJB on *War Room*, explicitly associating the Token with themselves, their movement, and a "parallel economy."

211. On that date, $FJB's closing price increased by approximately 267% in a single day, while trading volume increased by approximately 739%, reflecting a surge of retail buying directly following Defendants' promotional statements.

212. The following days saw sustained elevated trading volume and price volatility as Defendants continued to promote $FJB across War Room, social media, and affiliated platforms, reinforcing the market's perception that Defendants were actively backing and building the project.

**B. <u>Continued Promotional Statements Drove Short-Term Price Support</u>**

213. On January 6, 2022, Bannon released a YouTube video in which he stated that he had been "very involved in digital currencies," that he and Epshteyn were working "24 hours a day" on $FJB, and that the Token would become a usable currency with liquidity, market makers, exchanges, discounts, and real-world utility.

214. Bannon further framed $FJB as a safer alternative to fiat currency amid an impending economic and financial crisis, again encouraging investors to view the Token as both a medium of exchange and a store of value.

215. Following that appearance and similar statements by Epshteyn in early January 2022, $FJB experienced renewed bursts of trading volume and price stabilization, reflecting investors' reliance on Defendants' assurances of ongoing development and support.

216. Throughout 2022, similar patterns repeated: when Defendants appeared publicly, promised expansion, or reassured holders, trading volume spiked and price declines slowed or temporarily reversed.

### C. Prolonged Silence and Broken Promises Caused Sustained Price Decline

217. By mid-2022 and into early 2023, Defendants dramatically reduced their promotional efforts despite having repeatedly promised sustained involvement and expansion.

218. During periods when Bannon and Epshteyn were largely silent, $FJB's trading volume steadily declined, liquidity dried up, and the Token's price fell precipitously.

219. By February 2023—after months in which Defendants failed to deliver promised promotions, partnerships, or ecosystem development—$FJB had lost approximately 95% of its value from its post-announcement highs.

220. Investors repeatedly pleaded with Defendants to promote the Token, explicitly stating that price and liquidity depended on Defendants' continued involvement—an understanding Defendants never corrected.

### D. Whipsawing Statements and False Reassurances Exacerbated Losses

221. On February 13, 2023, Defendant Abdul announced in a community channel that Bannon and Epshteyn were "walking away" from the project.

222. That announcement triggered a near-immediate market collapse, with $FJB's price falling approximately 67% in a single day, accompanied by a massive spike in trading volume as investors rushed to exit.

223. Later that same day—and again in the days that followed—Defendants reversed course, with Epshteyn and Bannon publicly reaffirming their support for the Token and denying that they had disengaged.

224. These contradictory statements caused extreme volatility, whipsawing investors between panic selling and renewed hope, and preventing the market from accurately pricing the Token's true prospects.

225. Rather than correcting earlier misrepresentations, Defendants continued to reassure investors that they remained committed, prolonging the artificial inflation of the Token's price and delaying full market correction.

**E. <u>Rebrand to Patriot Pay Repeated the Same Cycle of Inflation and Collapse</u>**

226. In 2024, Defendants rebranded $FJB as Patriot Pay ($PPY) and renewed promotional efforts, again featuring Bannon's name, image, and statements about fighting de-banking, controlling currency, and building a parallel financial system.

227. Following renewed promotions—including social media advertisements, influencer posts, and platform endorsements—$PPY again experienced sharp spikes in price and volume, including single-day price increases exceeding 25% accompanied by volume surges of several hundred percent.

228. As before, once promotional efforts waned and promised initiatives failed to materialize, $PPY's price resumed its decline.

229. By early 2025, after Defendants disabled trading and announced closure without delivering promised liquidity distributions, $PPY's value collapsed to near-zero levels, rendering most investors' holdings effectively worthless.

## X. DEFENDANTS' CONCEALMENT

230. Defendants' misconduct was inherently self-concealing. Defendants exercised exclusive control over the Token's smart contracts, tax wallets, charity wallets, and OTC sales practices, and they did not publicly disclose the internal arrangements governing those accounts.

231. Although certain aspects of the Token's operation were implemented through smart-contract code recorded on the blockchain, that code was not meaningfully accessible or intelligible to ordinary retail investors, who lacked the technical expertise and information necessary to discern Defendants' centralized control, wallet permissions, fee exemptions, and transactional practices from raw on-chain data alone.

232. Defendants affirmatively concealed material facts from investors, including that transaction-based "marketing" fees were used as undisclosed consideration for Defendants' acquisition of control; that insiders were exempt from transaction taxes; that insiders conducted preferential OTC sales; that wallets labeled as "charity" wallets were used for insider sales; and that Defendants retained unilateral authority to freeze investor wallets.

233. Defendants further lulled investors into inaction by repeatedly assuring them that issues were being investigated or resolved, including statements that "[i]t's definitely not getting brushed under the rug," that funds were being recovered, and that Defendants remained committed to the project and would double down on promotion and development.

234. Plaintiff and the Class exercised reasonable diligence under the circumstances. Investors repeatedly sought transparency during status calls and through community channels, requested proof of charitable donations, and requested additional promotion and disclosure. Defendants responded with reassurances, delay, and concealment.

235. Even so, critical facts concerning Defendants' control, fee diversion, OTC sales, and wallet manipulation were known only to Defendants and insiders and were not discoverable by Plaintiff through reasonable diligence, particularly given Defendants' use of pseudonymous accounts, intermediary wallets, and non-public over-the-counter transactions.

236. Plaintiff did not discover, and could not reasonably have discovered, the full scope of Defendants' misconduct until after February 12, 2025, when Defendants froze wallets, announced the project's closure, and failed to deliver the promised liquidity distribution.

237. Plaintiff commenced this action promptly after discovering Defendants' misconduct.

238. Accordingly, any applicable statutes of limitation were tolled under the doctrines of fraudulent concealment and equitable tolling until Plaintiff's discovery of Defendants' misconduct.

## CLASS ALLEGATIONS

239. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Let's Go Brandon Coin ($FJB) and/or Patriot Pay ($PPY) during the period from December 6, 2021, when Defendants Steve Bannon and Boris Epshteyn acquired control of the Token and began promoting it to the public, through February 12, 2025, when Defendants disabled trading and announced the project's closure (the "Class Period").

240. Excluded from the Class are Defendants; members, managers, and officers of Defendants, including members of the FJB Advisory Counsel; members of Defendants' immediate families; Defendants' legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

### I. NUMEROSITY

241. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Defendants sold $FJB/$PPY Tokens to thousands of individual retail investors nationwide through websites, social media, podcasts, livestreams, messaging platforms, and over-the-counter transactions.

242. Members of the Class can be readily identified through Defendants' records, blockchain transaction data, and exchange and wallet records.

## II. TYPICALITY

243. Plaintiff's claims are typical of the claims of the Class. Plaintiff purchased $FJB/$PPY Tokens during the Class Period and was injured by the same course of conduct that injured other Class members, including Defendants' unregistered offering, materially false and misleading statements, omissions, and deceptive scheme.

244. Plaintiff was exposed to the same uniform misrepresentations and omissions disseminated by Defendants through common channels and suffered losses as a result.

## III. ADEQUACY

245. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of the Class and has retained counsel experienced in securities, consumer protection, cryptocurrency, and class action litigation.

## IV. COMMONALITY AND PREDOMINANCE

246. Questions of law and fact common to the Class predominate over any questions affecting only individual members. Common questions include, but are not limited to:

a. whether $FJB/$PPY constituted securities;

b. whether Defendants offered and sold unregistered securities;

c. whether Defendants made materially false or misleading statements or omissions;

d. whether Defendants falsely represented the Tokens as decentralized, safe, and immune from freezing;

e. whether Defendants exercised centralized control over wallets and trading;

f. whether Defendants conducted undisclosed OTC sales and insider

transactions;

g. whether Defendants engaged in a deceptive scheme in violation of Rule 10b-5(a) and (c);

h. whether Defendants acted with scienter;

i. whether Plaintiff and the Class suffered damages; and

j. the proper measure of damages or rescission.

247. These questions are susceptible to class-wide proof and do not depend on individualized issues.

**V. SUPERIORITY**

248. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class members are relatively modest in comparison to the expense and burden of individual litigation, making individual actions economically impracticable.

249. Concentrating the litigation in a single forum will avoid inconsistent rulings and promote judicial economy.

**VI. CLASS ACTION IS APPROPRIATE**

250. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

251. In the absence of a class action, Defendants will be permitted to retain the proceeds of their unlawful conduct to the detriment of Plaintiff and the Class and contrary to public policy.

**D.C. LAW APPLIES TO THE ENTIRE CLASS**

252. Washington, D.C.'s substantive laws apply to every member of the Class, regardless of where in the United States the Class members reside.

253. Washington, D.C.'s substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. Washington, D.C. has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating state interests that ensure that the choice of Washington, D.C. law is not arbitrary or unfair.

254. Two of the four Executive Defendants reside in Washington, D.C., and all of the Executive Defendants operated the Company's headquarters and principal place of business located in Washington, D.C. The decision of Executive Defendants and the Company to reside in Washington, D.C. and avail themselves of Washington, D.C.'s laws, and to engage in the challenged conduct from and emanating out of Washington, D.C., renders the application of D.C. law to the claims herein constitutionally permissible.

255. Washington, D.C. is also the state from which the Executive Defendants' misconduct emanated. On information and belief, the decision-making regarding the parameters of the Company marketing strategy and related sale of Tokens occurred in and emanated from Washington, D.C. As such, the conduct complained of herein emanated from Washington, D.C. This conduct similarly injured and affected Plaintiff and all other Class members.

256. The application of D.C. law to the Class is also appropriate under Washington, D.C.'s choice of law rules because Washington, D.C. has significant contacts to the claims of Plaintiff and the proposed Class, and Washington, D.C. has a greater interest in applying its laws here than any other interested state.

**$FJB/$PPY TOKENS ARE SECURITIES SUBJECT TO THE SECURITIES LAWS**

257. The Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") define "security" to include an "investment contract." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). Under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), an investment contract exists where there is: (1) an investment of money; (2) in a common enterprise; (3) with a reasonable expectation of profits; (4) to be derived from the efforts of others.

258. The $FJB/$PPY Tokens meet each element of the *Howey* test and therefore constitute securities within the meaning of the securities laws.

## I. INVESTMENT OF MONEY

259. Purchasers of $FJB and later $PPY invested money or other valuable digital assets in exchange for Tokens.

260. Retail investors paid consideration to acquire the Tokens on public markets and through over-the-counter sales. Every purchase required the transfer of value to obtain the Token. In addition, each transaction was subject to an embedded 8% transaction fee (3% "marketing" and 5% "charity"), meaning investors paid even more than the nominal purchase price to acquire and hold the asset.

261. This constitutes an "investment of money" under *Howey*. Courts uniformly hold that payment in cryptocurrency or digital assets satisfies this element.

## II. COMMON ENTERPRISE

262. A common enterprise existed because investors' fortunes were tied to each other and to Defendants' success in operating and promoting the Token.

### A. Horizontal Commonality

263. Investor funds were pooled through transaction fees embedded in the smart contract; liquidity pools; and "marketing" and "charity" wallets funded by every trade.

264. All investors' returns rose and fell together based on: Token price; trading volume; liquidity; and the use (or misuse) of pooled marketing and treasury funds.

265. Price charts and trading volume demonstrate that the Token's value moved in direct response to Defendants' promotional conduct and periods of silence. Investors' fortunes were therefore interdependent.

### B. <u>Vertical Commonality</u>

266. Defendants' fortunes were directly linked to investor purchases. They: acquired 2 billion Tokens through a private transfer; controlled smart contract keys and treasury wallets; benefited from transaction volume; and structured the project so investor-paid marketing fees financed their acquisition.

267. Defendants' financial gain depended on increasing demand and trading activity. Investors' gains likewise depended on Defendants' success in promoting and sustaining the Token ecosystem.

## III. REASONABLE EXPECTATION OF PROFITS

268. Investors had a reasonable expectation of profits based on Defendants' statements and conduct.

### A. <u>Dollar Collapse Messaging</u>

269. Defendants repeatedly warned that: the U.S. Dollar was being "destroyed"; government spending would lead to collapse; investors needed "digital sovereignty"; and the Token would serve as an alternative store of value. These statements framed the Token as an investment vehicle designed to preserve and grow wealth in anticipation of economic crisis.

### B. <u>Promotion as Inflation-Resistant Store of Value</u>

270. Defendants described the Token as: "inflation-resistant"; a "safe alternative" to fiat currency; a path to "financial independence"; and a hedge against debanking and censorship. Such

representations signaled an expectation that the Token would appreciate or at least preserve purchasing power relative to traditional currency.

### C. Marketing and Development Promises

271. Defendants repeatedly promised: aggressive marketing efforts; partnerships; ecosystem development; a functioning payment network; and "real-world utility." They assured investors, including in weekly investor updates, they were working "24/7" and personally committed to the project's success.

### D. Price Reactions to Promotion

272. The Token's price and trading volume rose sharply following Defendants' promotional appearances and statements, and declined during extended silence or broken promises. This pattern confirms that investors were buying in anticipation of price appreciation driven by Defendants' efforts.

## IV. PROFITS DERIVED FROM THE EFFORTS OF OTHERS

273. Investors' potential profits depended almost entirely on Defendants' managerial and entrepreneurial efforts.

### A. Centralized Control

274. Despite marketing the Token as "decentralized," Defendants: controlled the LLC; controlled smart contract private keys; controlled treasury, marketing, and charity wallets; controlled liquidity; had the ability to freeze investor wallets; and exercised authority to disable trading entirely. Investors had no voting rights, governance power, or ability to influence the project's direction.

### B. Marketing and Influence

275. The Token's success depended on: Bannon's *War Room* platform; Bannon's and Epshteyn's political network; their credibility and public influence; and continued public

promotion. Investors could not increase Token value through their own efforts. Only Defendants' actions moved the market.

### C. Operational Development

276. Defendants promised: a payment ecosystem; partnerships; utility expansion; and technical upgrades. These were managerial functions exclusively within Defendants' control.

### D. Insider Advantages

277. Defendants: structured the Token so insiders were exempt from transaction taxes; controlled OTC sales; managed treasury funds; and financed their acquisition via investor-paid fees. Investors were passive participants dependent on Defendants' honesty and competence.

## LOSS CAUSATION

278. Defendants' misrepresentations and omissions artificially inflated the market price of $FJB/$PPY throughout the Class Period. When the truth regarding Defendants' conduct, control, and lack of genuine commitment emerged through partial and full corrective disclosures, the artificial inflation dissipated, causing substantial economic losses to Plaintiff and the Class.

### I. ARTIFICIAL INFLATION INTRODUCED THROUGH DEFENDANTS' PROMOTIONAL CONDUCT

279. From December 2021 forward, Defendants repeatedly represented that:

a. Bannon and Epshteyn were strategic partners personally committed to building the project;

b. they were working on the Token "24/7";

c. the Token would become a viable alternative financial system;

d. it was decentralized and immune from financial censorship or account freezes;

e. embedded marketing and charity fees were being used as represented; and

f. the Token would function as a store of value amid the alleged collapse of the U.S. dollar.

280. These representations created the impression that $FJB/$PPY possessed independent utility, decentralized governance, and sustained insider commitment. In reality, the Token's value depended overwhelmingly on Defendants' continued promotional efforts and discretionary control.

281. The market immediately incorporated Defendants' statements into the Token's price. On December 23, 2021, following Defendants' *War Room* announcement associating the Token with themselves and a "parallel financial system," the price of $FJB increased approximately 267% in a single day, accompanied by an approximately 739% surge in trading volume. The timing and magnitude of this reaction demonstrate that the Token's price was directly responsive to Defendants' public representations and perceived involvement.

282. Similar patterns followed subsequent promotional statements and assurances in early 2022 and thereafter. When Defendants promoted the Token and reaffirmed their commitment, trading volume increased and price declines slowed or temporarily reversed. The Token's price thus reflected artificial inflation attributable to Defendants' statements and omissions.

## II. PARTIAL CORRECTIVE DISCLOSURES REVEALED THE TOKEN'S TRUE RISK PROFILE

283. Over time, information entered the market that contradicted or undermined Defendants' representations. These included:

a. prolonged periods of silence despite prior assurances of promotion;

b. failure to deliver promised listings, expansion, or ecosystem development;

c. disclosures that marketing and charity funds were unaccounted for;

d. confirmation that insiders exercised centralized control over wallets; and

e. wallet freezes, contradicting claims of decentralization.

284. Each of these developments weakened market confidence in Defendants' prior representations. As investor confidence eroded, the Token's price declined, and portions of the artificial inflation dissipated.

## III. FEBRUARY 13–14, 2023: CLASSIC CORRECTIVE DISCLOSURE AND PRICE COLLAPSE

285. On February 13, 2023, Defendant Abdul announced that Bannon and Epshteyn were walking away from the project. This announcement directly conflicted with prior statements that Defendants remained fully committed and were working on the Token "24/7."

286. The market reaction was immediate. On February 14, 2023, the Token's price fell approximately 67% in a single day, accompanied by a roughly 1,575% increase in trading volume. The magnitude and timing of this decline demonstrate that the Token's market price had been supported by Defendants' perceived ongoing involvement and that this support rapidly dissipated when their continued commitment was called into question.

287. Although Defendants later issued reassurances, the whipsawing statements further destabilized the Token and contributed to continued volatility and loss of investor confidence.

## IV. WALLET FREEZES AND REBRAND UNDERMINED CLAIMS OF "DECENTRALIZATION"

288. In December 2023, Defendants froze investor wallets while exempting insider-controlled wallets, and subsequently rebranded the project as Patriot Pay and migrated to a new blockchain architecture that preserved insider control.

289. The market reaction to these events was severe. On November 30, 2023, shortly before the freeze, the Token traded at approximately $0.000264. By January 31, 2024—during the period in which wallets were frozen and investors were unable to transact—the Token's price

had collapsed to approximately $0.000002, representing a decline of more than 99%. The price fell further to approximately $0.000001 on February 2, 2024.

290. These dramatic declines were temporally proximate to the wallet freeze and rebrand and reflected a sharp deterioration in market confidence after Defendants' actions contradicted prior representations that the Token was free from centralized control. As a result, additional artificial inflation dissipated.

## V. FEBRUARY 12, 2025: TRADING DISABLED AND COLLAPSE OF REMAINING PRICE SUPPORT

291. On February 12, 2025, Defendants disabled trading of $PPY and announced the project's closure, while promising that the liquidity pool would be distributed within seven days. No such distribution occurred.

292. The sudden trading halt and operational shutdown eliminated any remaining market confidence that the Token would function as a viable financial ecosystem. Trading activity ceased, liquidity evaporated, and the Token's price collapsed to effectively nominal levels.

293. This event did not immediately disclose all concealed aspects of Defendants' misconduct. However, it removed the final pillar of artificial price support that had been sustained by Defendants' ongoing reassurances and promises of revival. With trading disabled and promised liquidity undistributed, the market could no longer rely on Defendants' representations regarding continued development, decentralization, or financial autonomy.

294. As a result, any remaining artificial inflation dissipated, and investors suffered substantial economic loss.

## VI. CAUSAL CONNECTION BETWEEN MISCONDUCT AND LOSS

295. Plaintiff and the Class purchased $FJB/$PPY at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

296. When corrective information entered the market—through announcements of abandonment, exposure of centralized control, wallet freezes, missing funds, and ultimate shutdown—the artificial inflation dissipated, causing substantial economic loss.

297. The losses suffered by Plaintiff and the Class were not caused by general cryptocurrency volatility. Rather, they were the direct and proximate result of issuer-specific disclosures and events uniquely attributable to Defendants' misconduct.

298. Had the truth been known at the time of purchase, $FJB/$PPY would have traded at substantially lower prices, or not at all.

299. Accordingly, Defendants' misrepresentations, omissions, and deceptive scheme were a direct and proximate cause of Plaintiff's and the Class's damages.

300. Although certain events during the Class Period caused significant price declines, those events did not disclose the full scope of Defendants' concealed conduct. Defendants continued to issue reassurances, contradictory statements, and partial explanations that obscured the underlying structure of insider control, fee diversion, and preferential sales practices. The February 2025 shutdown prompted further investigation into the project's internal operations and ultimately led to the discovery of facts that had been concealed throughout the Class Period.

## OVERVIEW OF FRAUD AND NON-FRAUD CLAIMS

301. Plaintiff asserts both strict liability and negligence-based claims, as well as fraud-based claims pleaded in the alternative. Certain claims arise under the Securities Act and under District of Columbia statutory and common law that impose liability without requiring proof of scienter, intent to deceive, or reckless misconduct. Those claims are based on unregistered offers and sales, negligent misrepresentations, statutory violations, breaches of fiduciary duty, and unjust enrichment. Plaintiff expressly disclaims any allegation of deliberate fraud or intentional

misconduct for purposes of those non-fraud claims, which are separate and distinct from the fraud-based claims asserted in the alternative.

302. In the alternative, Plaintiff asserts fraud-based claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, Section 20(a) of the Exchange Act, and under District of Columbia common law. Those claims are based on allegations that certain Defendants knowingly or recklessly made material misrepresentations and omissions and engaged in a deceptive scheme in connection with the offer and sale of $FJB/$PPY Tokens.

## I. NON-FRAUD-BASED SECURITIES AND STATE LAW CLAIMS

303. The following claims do not require proof of scienter, fraudulent intent, or recklessness:

- Count I (Section 12(a)(1) of the Securities Act – Unregistered Offer and Sale);
- Count III (Section 15 of the Securities Act – Control Person Liability), to the extent predicated on the Section 12(a)(1) violation;
- Count V (Unregistered Offer and Sale under the D.C. Securities Act);
- Count VII (Control Person Liability under the D.C. Securities Act), to the extent predicated on registration violations or negligent misrepresentation;
- Count VIII (D.C. Consumer Protection Procedures Act);
- Count X (Negligent Misrepresentation);
- Count XI (Breach of Fiduciary Duty); and
- Count XII (Unjust Enrichment).

304. These claims are premised on statutory strict liability, negligence standards, fiduciary obligations, or equitable principles. For purposes of these causes of action, Plaintiff does not rely on allegations of fraud, scienter, or intentional deception except to the extent such

allegations are expressly incorporated as alternative theories. To the extent any factual allegations elsewhere in this Complaint could be construed as sounding in fraud, those allegations are not incorporated into these non-fraud-based counts except as consistent with strict liability or negligence standards.

## II. FRAUD-BASED SECURITIES AND STATE LAW CLAIMS (PLED IN THE ALTERNATIVE)

305. The following claims are based on fraud, scienter, and intentional or reckless misconduct:

- Count II (Section 10(b) of the Exchange Act and Rule 10b-5);
- Count IV (Section 20(a) of the Exchange Act);
- Count VI (Misrepresentation Under the D.C. Securities Act), to the extent based on untrue statements or omissions made knowingly or recklessly;
- Count VII (Control Person Liability under the D.C. Securities Act), to the extent predicated on fraudulent misrepresentation;
- Count IX (Common Law Fraud); and
- Count XIII (Aiding and Abetting).

306. These claims are pleaded in the alternative to the non-fraud-based claims set forth above. Plaintiff does not incorporate allegations of scienter, recklessness, or intentional deception into the non-fraud counts unless expressly stated.

307. To state a claim under these counts, Plaintiff must allege facts giving rise to a strong inference that Defendants acted with scienter—*i.e.*, with intent to deceive, manipulate, or defraud, or with recklessness. The facts alleged herein establish scienter under either standard.

**A. <u>Defendants Knew They Controlled the Token While Representing Themselves as Mere "Partners"</u>**

308. Defendants repeatedly described themselves publicly as "partners," "advocates," or "supporters" of the Token, creating the impression that they were independent promoters lending credibility to an external project, when in reality they had acquired ownership and control.

309. At all relevant times, Defendants possessed exclusive knowledge that they had: acquired ownership of Let's Go Brandon Coin LLC; assumed full control of the smart contract private keys; controlled treasury, marketing, and charity wallets; exercised authority over liquidity decisions; retained the power to freeze investor wallets; and structured the acquisition so that investor-paid transaction fees financed their takeover.

310. These facts were uniquely within Defendants' knowledge. The failure to disclose ownership and control while publicly promoting the asset as a third-party partner constitutes knowing concealment of a material conflict of interest, not mere negligence.

**B. <u>Defendants Structured the Acquisition to Be Funded by Investor Fees</u>**

311. Defendants entered into a private agreement to acquire control of the Token without paying cash consideration and structured that transaction so that it would be financed through ongoing transaction fees paid by retail investors.

312. Defendants knew that: the 3% "marketing" tax functioned as purchase consideration for the Founders; retail investors were effectively funding Defendants' acquisition; marketing fees were not contingent upon actual marketing performance; insiders were exempted from transaction taxes; and the fee structure directly benefited Defendants while burdening retail purchasers.

313. The transaction structure itself evidences conscious design. Because Defendants controlled the wallets and contractual terms through which fees flowed, the inference that they knowingly concealed this structure is strong and compelling.

### C. Defendants Knew the Token Was Not Decentralized

314. Defendants repeatedly represented that the Token was "decentralized," immune from financial censorship, and a vehicle for "independence," while retaining unilateral authority over core operational mechanisms.

315. At all relevant times, Defendants knew that they: controlled the smart contract administration; retained authority to freeze investor wallets; exercised freeze authority in practice; maintained centralized control over treasury and liquidity; disabled trading entirely in February 2025; and exempted insider wallets from restrictions applicable to ordinary investors.

316. Representing an asset as decentralized while retaining and exercising centralized freeze authority constitutes, at minimum, severe recklessness and more plausibly intentional deception.

### D. Defendants Repeatedly Reassured Investors While Concealing Material Facts

317. When investors raised concerns about missing funds, liquidity instability, limited marketing activity, charity wallet accounting, and declining development, Defendants responded with reassurances while failing to disclose material structural realities.

318. Defendants knew but concealed: the true nature of the acquisition agreement; the insider transaction-fee exemptions; the existence and structure of over-the-counter sales; the limited or self-interested use of marketing funds; and the absence of meaningful operational development consistent with public statements.

319. Repeated reassurances made in the face of known contradictory facts constitutes conscious misbehavior or, at minimum, severe recklessness.

**E. Defendants Had Clear Motive and Opportunity**

320. Defendants possessed both motive and opportunity to engage in the misconduct alleged.

321. Defendants stood to benefit financially because they: acquired 2 billion Tokens; benefited directly from trading volume; controlled treasury funds; controlled marketing and charity wallets; structured insider advantages; avoided transaction taxes applicable to retail investors; and permitted or conducted over-the-counter sales outside public markets.

322. Defendants possessed opportunity because they: controlled the LLC entities; controlled smart contract keys; controlled treasury wallets; controlled messaging platforms, including *War Room*; directed promotional activity; managed liquidity decisions; and exercised operational authority over trading and shutdown.

323. The alignment of financial incentive and operational control strongly supports a compelling inference of scienter.

**F. The Abrupt Shutdown Supports Conscious Misconduct**

324. In February 2025, Defendants disabled trading, announced the project's closure, and promised liquidity distributions that did not occur.

325. The sudden shutdown following years of promotional assurances reinforces the inference that Defendants were aware of the project's structural deficiencies and material misrepresentations.

326. Conduct inconsistent with prior public assurances supports a strong inference of conscious misconduct.

### G. <u>At Minimum, Defendants Acted With Severe Recklessness</u>

327. Even if Defendants did not act with intent, the allegations establish an extreme departure from the standards of ordinary care and a conscious disregard of a serious risk of misleading investors.

328. Defendants represented decentralization while retaining freeze authority; represented marketing and charitable use of funds without transparent accounting; promoted utility without operational infrastructure; failed to disclose insider exemptions; failed to disclose the investor-funded acquisition structure; and reassured investors while withholding material information uniquely within their control.

329. Such conduct presents a danger of misleading investors that was either known to Defendants or so obvious that they must have been aware of it.

## <u>CAUSES OF ACTION</u>

### COUNT I

Unregistered Offer and Sale of Securities in Violation of
Sections 5 and 12(a)(1) of the Securities Act of 1933
(*Against All Defendants*)

330. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to allegations that Defendants acted "knowingly," "intentionally," "recklessly," or with "conscious design," if such allegations are construed as sounding in fraud.

331. 15 U.S.C. § 77l(a)(1) (Section 12(a)(1) of the Securities Act) provides that "any person who . . . offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him."

332. 15 U.S.C. § 77e(a) (Section 5(a) of the Securities Act) states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

333. 15 U.S.C. § 77e(c) (Section 5(c) of the Securities Act) states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."

334. $FJB/$PPY Tokens are investment contracts within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and are therefore securities under that Act.

335. Defendants, directly and indirectly, offered, solicited, promoted, and sold $FJB/$PPY Tokens to Plaintiff and other members of the Class through means of interstate commerce, including websites, podcasts, livestreams, social media, messaging platforms, digital wallets, and over-the-counter transactions.

336. Defendants were statutory sellers within the meaning of Section 12(a)(1). They:

a. passed title to Tokens;

b. actively solicited purchases motivated by their own financial interests; and

c. orchestrated and controlled the distribution of Tokens, including through insider-managed wallets and OTC sales.

337. No registration statement for $FJB/$PPY Tokens has ever been filed with the SEC, and no registration statement has ever been in effect with respect to the offering of $FJB/$PPY Tokens. No exemption from registration applied.

338. As a direct and proximate result of Defendants' offer and sale of unregistered securities, Plaintiff and other members of the Class have suffered damages.

339. As a result of their conduct, Defendants are liable to Plaintiff and other Class members for damages or rescission, as well as costs, attorneys' fees, and interest.

**COUNT II**
Fraud in Connection with the Purchase or Sale of Securities in Violation of
Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 thereunder
(*Against All Defendants*)

340. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 303–304 and any other paragraph to the extent such allegations are expressly limited to strict liability, negligence, fiduciary duty, or other non-scienter-based theories and are construed as alleging negligence exclusive of scienter.

341. Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of a security, "for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to employ any device, scheme, or artifice to defraud" or to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

342. Defendants used the means and instrumentalities of interstate commerce to perpetrate a fraud on Plaintiff and other Class members in connection with the sale of $FJB/$PPY Tokens.

343. In addition, Defendants used the means and instrumentalities of interstate commerce to misrepresent material facts about $FJB/$PPY Tokens.

344. Defendants' misconduct was not limited to discrete misstatements, but constituted a unified scheme to defraud investors.

345. Defendants made materially false and misleading statements, including but not limited to misrepresentations that:

a. the Tokens were decentralized and uncancellable;

b. the Tokens were safe alternatives to fiat currency;

c. transaction fees were used for marketing and charity as represented;

d. Defendants were mere strategic partners rather than owners and controllers;

e. the Tokens had real, developed utility and infrastructure; and

f. Defendants were devoting sustained efforts to promotion and development.

346. Defendants omitted material facts necessary to make their statements not misleading, including that:

a. investors effectively financed Defendants' acquisition of the project through transaction fees;

b. Defendants retained centralized control over wallets and smart-contract functions;

c. Defendants froze investor wallets while exempting insiders;

d. insiders conducted undisclosed OTC sales at preferential prices;

e. charity and marketing wallets were used to manage price and insider liquidity; and

f. insiders were exempt from fees imposed on retail investors.

347. In addition to misstatements and omissions, Defendants engaged in scheme liability conduct in violation of Rule 10b-5(a) and (c), including by:

a. manipulating Token supply through insider-controlled wallets;

b. freezing and unlocking wallets to control market dynamics;

c. coordinating preferential OTC transactions;

d. stringing investors along with false assurances to prolong participation; and

e. rebranding and relaunching the Token to reset investor expectations without disclosing prior failures.

348. Defendants engaged in these fraudulent activities knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class.

349. Plaintiff and other Class members were ignorant of Defendants' fraudulent scheme and of the false and misleading nature of their material misrepresentations and omissions. But for the fraud perpetrated by Defendants, they would not have purchased $FJB/$PPY Tokens.

350. As a direct and proximate result of Defendants' misconduct, Plaintiff and other members of the Class suffered damages, and Defendants are liable for damages or rescission, as well as costs, attorneys' fees, and interest.

**COUNT III**
Control Person Liability under Section 15 of the Securities Act of 1933
(*Against the Executive Defendants*)

351. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter,

intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to allegations that Defendants acted "knowingly," "intentionally," "recklessly," or with "conscious design," if such allegations are construed as sounding in fraud.

352. Throughout the relevant period, the Executive Defendants acted as controlling persons of the Entity Defendants within the meaning of Section 15 of the Securities Act. Because of their executive positions and control over the day-to-day operations of $FJB/$PPY, the Executive Defendants had the ability and power to control—and did in fact control—the Entity Defendants and their agents, including with respect the offer and sale of $FJB/$PPY Tokens.

353. The Executive Defendants exercised actual control over the primary violations by directing Token issuance, wallet permissions, promotional messaging, investor communications, and the timing and manner of Token sales.

354. Accordingly, the Executive Defendants are liable to Plaintiff and the other Class members pursuant to Section 15 of the Securities Act.

**COUNT IV**
Control Person Liability Under Section 20(a) of the Exchange Act of 1934
(*Against the Executive Defendants*)

355. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 303–304 and any other paragraph to the extent such allegations are expressly limited to strict liability, negligence, fiduciary duty, or other non-scienter-based theories and are construed as alleging negligence exclusive of scienter.

356. Throughout the relevant period, the Executive Defendants acted as controlling persons of the Entity Defendants within the meaning of Section 20(a) of the Exchange Act. By reason of their executive positions and control over the day-to-day operations of $FJB/$PPY, the Executive Defendants had the ability and power to control—and did in fact control—the Entity

Defendants and their agents, including with respect to the content and dissemination of the materially misleading statements, information, and omissions alleged herein.

357. The Executive Defendants exercised actual control over the primary violations by directing Token issuance, wallet permissions, promotional messaging, investor communications, and the timing and manner of Token sales.

358. Accordingly, the Executive Defendants are liable to Plaintiff and the other Class members pursuant to Section 20(a) of the Exchange Act.

**COUNT V**
Unregistered Offer and Sale of Securities in Violation of the
D.C. Securities Act, D.C. Code § 31-5606.05(a)(1)(A)
(*Against All Defendants*)

359. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to allegations that Defendants acted "knowingly," "intentionally," "recklessly," or with "conscious design," if such allegations are construed as sounding in fraud.

360. The D.C. Securities Act, D.C. Code § 31-5606.05(a)(1)(A), makes liable a person who "[o]ffers or sells a security in violation of . . . § 31-5603.01."

361. The D.C. Securities Act, D.C. Code § 31-5603.01, provides: "No person shall offer or sell a security in the District unless the security is registered under this chapter . . . ."

362. $FJB/$PPY Tokens are investment contracts within the meaning of D.C. Code § 31–5601.01(31), and are therefore securities under that Act.

363. Defendants offered, promoted, and sold $FJB/$PPY Tokens. Defendants' unlawful offers and sales, including OTC transactions and wallet-based distributions, were conceived, authorized, and directed from Washington, D.C., including through websites, podcasts,

livestreams, social-media communications, and electronic solicitations received by investors in the District of Columbia.

364. No registration statement for $FJB/$PPY Tokens has ever been filed with the D.C. Securities Bureau, and no registration statement has ever been in effect with respect to the offering of $FJB/$PPY Tokens, nor did Defendants qualify for any exemption from registration.

365. Registration would have required Defendants to disclose material information they instead concealed, including insider ownership and control, conflicts of interest, use of transaction-based marketing and charity fees, wallet authority, trading restrictions, and the risks associated with centralized governance.

366. As a direct and proximate result of Defendants' offer and sale of unregistered securities, Plaintiff and other members of the Class have suffered damages.

367. As a result of their conduct, Defendants are liable to Plaintiff and other Class members for damages or rescission, as well as costs, attorneys' fees, and interest.

**COUNT VI**

Misrepresentation in Connection with the Purchase or Sale of Securities in Violation of the D.C. Securities Act, D.C. Code § 31-5606.05(a)(1)(B)
(*Against All Defendants*)

368. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to allegations that Defendants acted "knowingly," "intentionally," "recklessly," or with "conscious design," if such allegations are construed as sounding in fraud. Such allegations are excluded only insofar as this Count proceeds on a theory of negligent misrepresentation. To the extent this Count proceeds in the alternative on a theory of fraudulent misrepresentation, Plaintiff

realleges and incorporates ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–329, as well as all other allegations sounding in fraud, solely as applicable to that alternative theory.

369. The D.C. Securities Act, D.C. Code § 31-5606.05(a)(1)(B), makes liable a person who "offers or sells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which made, not misleading, the buyer does not know of the untruth or omission and the offeror or seller does not sustain the burden of proof that the offeror or seller did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."

370. Defendants perpetrated a fraud on Plaintiff and other Class members in connection with the sale of $FJB/$PPY Tokens, including through a course of conduct that concealed material information required to be disclosed to permit informed investment decisions.

371. In addition, Defendants misrepresented material facts about $FJB/$PPY Tokens, and omitted material facts necessary to make their statements not misleading, including facts concerning centralized control, insider compensation, use of transaction-based fees, OTC sales, wallet authority, and trading restrictions.

372. Defendants' unlawful offers and sales, including OTC transactions and wallet-based distributions, were conceived, authorized, and directed from Washington, D.C., and disseminated to Plaintiff and other investors in the District of Columbia.

373. Defendants engaged in these fraudulent activities knowingly, or in the exercise of reasonable care should have known, of the untrue statements and material omissions described herein.

374. Plaintiff and other Class members were ignorant of Defendants' fraudulent scheme and of the false and misleading nature of their material misrepresentations and omissions. But for the fraud perpetrated by Defendants, they would not have purchased $FJB/$PPY Tokens.

375. As a direct and proximate result of Defendants' misconduct, Plaintiff and other members of the Class suffered damages, and Defendants are liable for damages or rescission, as well as costs, attorneys' fees, and interest.

**COUNT VII**

Control Person Liability Under the D.C. Securities Act, D.C. Code § 31-5606.05(c)
(*Against the Executive Defendants*)

376. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to allegations that Defendants acted "knowingly," "intentionally," "recklessly," or with "conscious design," if such allegations are construed as sounding in fraud. Such allegations are excluded only insofar as this Count proceeds on theories of failure to register in violation of D.C. Code § 31-5606.05(a)(1)(A), and negligent misrepresentation in violation of D.C. Code § 31-5606.05(a)(1)(B). To the extent this Count proceeds on a theory of fraudulent misrepresentation in violation of D.C. Code § 31-5606.05(a)(1)(B), in the alternative to negligent misrepresentation, Plaintiff realleges and incorporates ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–329, as well as all other allegations sounding in fraud, solely as applicable to that alternative theory.

377. Throughout the relevant period, the Executive Defendants acted as controlling persons of the Entity Defendants within the meaning of the D.C. Securities Act, D.C. Code §§ 31–5601.01(7) and 31-5606.05(c). By reason of their executive positions and control over the day-to-day operations of $FJB/$PPY, the Executive Defendants had the ability and power to control—and did in fact control—the Entity Defendants and their agents, including with respect to the content

and dissemination of the materially misleading statements, information, and omissions alleged herein.

378. The Executive Defendants exercised actual control over the primary violations by directing Token issuance, wallet permissions, promotional messaging, investor communications, and the timing and manner of Token sales, and had the power to prevent or correct the violations alleged herein.

379. Accordingly, the Executive Defendants are liable to Plaintiff and the other Class members pursuant to the D.C. Securities Act, D.C. Code § 31-5606.05(c).

**COUNT VIII**

Violation of D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq.*
(*Against All Defendants*)

380. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to allegations that Defendants acted "knowingly," "intentionally," "recklessly," or with "conscious design," if such allegations are construed as sounding in fraud.

381. The D.C. Consumer Protection Procedures Act ("CPPA") is a remedial statute that is to be broadly construed. It establishes an enforceable right to truthful information.

382. The CPPA prohibits unfair and deceptive trade practices in connection with the offer, sale, and supply of consumer goods and services, and establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia.

383. Defendants are "merchants" that provide "goods and services" within the meaning of the CPPA. *See* D.C. Code § 28-3901(a)(3), (7). Crypto apps, wallets, and tokens marketed to lay users are "goods and services" within the meaning of the Act. In addition, Defendants offered

and sold non-fungible tokens ("NFTs") and branded merchandise to consumers, which also constitute "goods and services" within the meaning of the CPPA.

384. Plaintiff and the Class are "consumers" within the meaning of the CPPA. *See* D.C. Code § 28-3901(a)(2).

385. Defendants violated the CPPA by engaging in unfair, misleading, and deceptive trade practices.

386. Defendants' acts and practices tended to mislead reasonable consumers in the District of Columbia, including by creating the false impression that $FJB/$PPY was decentralized, secure, and suitable for ordinary consumer use, and that transaction fees labeled as "marketing" and "charity" would be used for those stated purposes. In reality, Defendants retained centralized control over the Token's smart contract, wallets, and trading, and used fee-funded wallets at their discretion, including for insider and preferential sales.

387. As a result, Plaintiff is entitled to all forms of relief provided under D.C. Code § 28-3905(k)(2).

**COUNT IX**
Fraud
(*Against All Defendants*)

388. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 303–304 and any other paragraph to the extent such allegations are expressly limited to strict liability, negligence, fiduciary duty, or other non-scienter-based theories and are construed as alleging negligence exclusive of scienter.

389. As set forth herein, Defendants made material false representations of fact about the $FJB/$PPY Tokens to Plaintiff, other members of the proposed Class, and to the investing public generally.

390. Defendants knew that those material representations were false when made.

391. Defendants intended for Plaintiff and other investors to rely on their false representations, and they intended to defraud them thereby.

392. Plaintiff and other members of the Class reasonably relied on Defendants' false representations to purchase the $FJB/$PPY Tokens at artificially inflated prices.

393. As a direct result, Plaintiff and other members of the Class suffered damages.

394. Defendants' misconduct involved high moral turpitude and was aimed at the public generally.

395. Plaintiff and other Class members are entitled to damages and punitive damages in amounts to be determined at trial, along with interest, attorneys' fees, and litigation costs, and such other relief as may be available.

**COUNT X**
Negligent Misrepresentation
(*In the Alternative to Count IX, Against All Defendants*)

396. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to allegations that Defendants acted "knowingly," "intentionally," "recklessly," or with "conscious design," if such allegations are construed as sounding in fraud.

397. Defendants publicly and intentionally represented that they possessed expertise in and specialized knowledge about digital assets, token launches, crypto investing, and the $FJB/$PPY Token. By so doing, Defendants incurred a corresponding common law duty to impart accurate information about the $FJB/$PPY Token to Plaintiff, other Class members, and all other non-insider potential investors in $FJB/$PPY.

398. Defendants violated that duty by providing false information about material aspects of $FJB/$PPY, upon which Plaintiff and other members of the proposed Class reasonably relied

to purchase the Token at artificially inflated prices. As a direct result, Plaintiff and other members of the Class suffered damages.

399. Defendants failed to exercise reasonable care in the course of providing and communicating false information about material aspects of $FJB/$PPY to Plaintiff and the proposed Class.

400. Plaintiff and other members of the Class are entitled to damages in an amount to be determined at trial, along with interest, attorneys' fees, and litigation costs and such other relief as may be available.

**COUNT XI**
Breach of Fiduciary Duty
(*Against the Executive Defendants*)

401. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to allegations that Defendants acted "knowingly," "intentionally," "recklessly," or with "conscious design," if such allegations are construed as sounding in fraud.

402. At all relevant times, Defendants Steve Bannon, Boris Epshteyn, Sarah Abdul, and Grant Tragni owed fiduciary duties, or at minimum fiduciary-like duties arising from a relationship of trust and confidence, to Plaintiff and the Class.

403. Defendants assumed such duties by exercising exclusive and discretionary control over critical aspects of the $FJB/$PPY ecosystem, including but not limited to: the Token's smart contract; transaction-fee routing; "marketing" and "charity" wallets funded by investor transactions; token supply available for sale; liquidity; and the ability to restrict or disable trading.

404. Defendants also held themselves out publicly as stewards and protectors of the Token and its community, representing that they were acting in the best interests of Token holders;

that they were safeguarding holders against financial exclusion and political persecution; and that transaction fees would be used for marketing, charitable causes, and ecosystem growth rather than insider benefit.

405. Plaintiff and the Class reasonably placed trust and confidence in Defendants based on Defendants' representations of expertise, leadership, alignment of interests, and exclusive control over investor-funded wallets and Token operations, while investors themselves lacked access to the Token's code, internal wallet controls, or the ability to independently monitor or govern Defendants' use of funds.

406. By virtue of this relationship, Defendants owed duties of loyalty, care, and full and fair disclosure, including a duty to act in the best interests of Token holders; a duty to refrain from self-dealing and conflicted transactions; and a duty to disclose material facts concerning their control, compensation, and use of investor funds.

407. Defendants breached these duties by, among other things:

a. Engaging in self-interested and conflicted conduct, including conducting undisclosed over-the-counter token sales from insider-controlled tax and charity wallets, coordinating the timing and source of such sales to manage price impact and confer preferential pricing on favored purchasers;

b. Misusing investor-funded wallets, including selling tokens from wallets represented as charitable or marketing-related, and exercising discretion over those wallets in a manner inconsistent with Defendants' public representations;

c. Concealing material conflicts of interest, including the investor-funded nature of Defendants' acquisition and compensation, insiders' exemption from transaction fees, and Defendants' ability to control liquidity and trading;

d. Exercising centralized control over the Token while simultaneously representing it as decentralized, censorship-resistant, and immune from insider interference;

e. Failing to act with due care by neglecting promised promotional efforts, ecosystem development, and transparency, despite Defendants' repeated assurances that they were actively and continuously working to build and support the Token; and

f. Disabling trading and access to liquidity without adequate disclosure or procedural safeguards, while retaining control over investor-funded assets.

408. Defendants also breached their fiduciary duties by failing to disclose material facts that Defendants had a duty to disclose by virtue of their position of trust and exclusive control, including facts concerning wallet control, fee usage, insider sales, and Defendants' unilateral authority over trading and liquidity.

409. As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiff and the Class suffered substantial damages, including loss of investment value, loss of liquidity, and deprivation of the benefit of their bargain.

410. Defendants were unjustly enriched by their breaches of fiduciary duty through the receipt and retention of transaction fees, token proceeds, and other benefits derived from investor-funded wallets and insider-controlled transactions.

411. Plaintiff and the Class are entitled to damages, disgorgement, restitution, imposition of a constructive trust over improperly obtained assets, and such other equitable and legal relief as the Court deems just and proper.

**COUNT XII**
Unjust Enrichment
(*Against All Defendants*)

412. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to allegations that Defendants acted "knowingly," "intentionally," "recklessly," or with "conscious design," if such allegations are construed as sounding in fraud.

413. As a result of Defendants' misconduct alleged herein, Defendants were wrongfully enriched at the expense of Plaintiff and other Class members, whom they exposed to multiple violations of law and significant financial losses.

414. Defendants directly profited from the misconduct alleged herein, causing significant losses to Plaintiff and other members of the Class.

415. Defendants' profits from these deceptive practices were achieved at the direct expense of Plaintiff and the proposed Class, who provided valuable cryptocurrency assets based on false price information and materially misleading representations regarding token stability, liquidity, profitability, and market valuation.

416. It would violate principles of equity and good conscience for Defendants to keep the profits they gained from their misconduct. Accordingly, Defendants must disgorge those profits to Plaintiff and other Class members.

417. Plaintiff and other Class members are entitled to restitution of the full amount wrongfully obtained by Defendants, along with interest, attorneys' fees, litigation costs, and such other equitable relief as the Court may deem just and proper.

**COUNT XIII**
Aiding and Abetting
(*Against Abdul and Tragni*)

418. Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 303–304 and any other paragraph to the extent such allegations are expressly limited to strict liability, negligence, fiduciary duty, or other non-scienter-based theories and are construed as alleging negligence exclusive of scienter.

419. Under D.C. law, a cause of action for aiding and abetting requires that "(1) the party or parties Defendants aided committed [a tort], (2) Defendants were generally aware of their role in the tortious activity, and (3) Defendants knowingly and substantially assisted in the [tort]." *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 50 (D.D.C. 2019).

420. As alleged above, Defendants Steve Bannon, Boris Epshteyn, and the Entity Defendants committed common law fraud by knowingly making materially false and misleading statements and omissions in connection with the promotion and sale of the Token.

421. Defendants Sarah Abdul and Grant Tragni had actual knowledge of the primary fraud or acted with conscious disregard of it.

422. Tragni, as the original lead developer of the Token and its smart contract, knew that the Token was falsely marketed as decentralized, charitable, and utility-driven, while insiders retained centralized control over wallets, transaction fees, and trading.

423. Abdul, acting as a senior administrator and spokesperson under the alias "sundevil28," was aware of undisclosed OTC sales, insider wallet activity, and the misuse of marketing and charity wallets, and communicated directly with investors in a manner designed to conceal those facts.

424. Abdul and Tragni knowingly provided substantial assistance to the fraud by, among other things:

a. administering and controlling wallets used to collect and sell Tokens;

b. facilitating undisclosed OTC sales and preferential transactions;

c. advising on how to sell Tokens to avoid price impact;

d. providing reassurances to investors designed to lull them into holding or purchasing Tokens;

e. concealing the true use of marketing and charity fees; and

f. reinforcing false narratives of decentralization, stability, and insider commitment.

425. Abdul's and Tragni's conduct were a substantial factor in causing Plaintiff's and the Class's injuries. As a direct and proximate result, Plaintiff and the Class suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully request that this Court enter judgment in their favor, and against Defendants, awarding the following relief:

A. Determine that this action is a proper class action and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's undersigned counsel as Class counsel;

B. Declare that Defendants violated the federal securities laws, the D.C. Securities Act, and the D.C. Consumer Protection Procedures Act;

C. Enjoin Defendants from further violations of the securities laws and from offering or selling digital assets without proper registration or disclosure;

D. Order Defendants to disgorge all ill-gotten gains, including proceeds from Token sales, transaction fees, and insider benefits;

E. Rescind Defendants' unlawful sales of $FJB/$PPY Tokens and order restitution of all consideration paid by Plaintiff and the Class, or award rescissory damages;

F. Award Plaintiff and the Class compensatory damages in an amount to be proven at trial, together with pre- and post-judgment interest;

G. Award Plaintiff and the Class exemplary or punitive damages;

H. Award Plaintiff and the Class reasonable costs and attorneys' fees; and

I. Award such equitable, injunctive, or other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands that this case be tried to a jury.

Dated: February 12, 2026

Respectfully submitted,

*/s/ Eric S. Rosen*
Eric S. Rosen (SBN NY0671)
Constantine P. Economides (*pro hac vice* forthcoming)
Yusef Al-Jarani (*pro hac vice* forthcoming)
**DYNAMIS LLP**
175 Federal Street, Suite 1200
Boston, Massachusetts 02110
(305) 985-2959
ceconomides@dynamisllp.com
erosen@dynamisllp.com
yaljarani@dynamisllp.com

*Counsel to Plaintiff and the Proposed Class*