**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

ANDREW BARR, on behalf of himself and all others similarly situated,
502 S Linn Ave
Belle, MO 65013

*Plaintiff,*

v.

STEPHEN K. BANNON,
210 A Street NE
Washington, D.C. 20002

BORIS EPSHTEYN,
3131 Connecticut Ave NW Apt 2503
Washington, D.C. 20008

SARAH ABDUL a/k/a Sarah Abdul Razzaq a/k/a Sarah Abdulrazzi a/k/a Sarah Abdul Williams a/k/a Sarah Abdul Elliott,
3443 S Joshua Tree Ln
Gilbert, AZ 85297

FREEDOM JOBS BUSINESS APP LLC f/k/a LET'S GO BRANDON COIN LLC,
c/o A Registered Agent, Inc.
8 The Green, Ste A
Dover, DE 19901

PATRIOT PAY LLC,
c/o A Registered Agent, Inc.
8 The Green, Ste A
Dover, DE 19901

WARROOM LLC,
c/o United Corporate Services, Inc.
1912 Capitol Ave Ste 500
Cheyenne, WY 82001

354 NOD HILL LLC, and
210 A Street NE
Washington, D.C. 20002

Case No. 1:26-cv-00452-ACR

Hon. Ana C. Reyes

**Style Definition:** Normal: Widow/Orphan control

**Deleted:**

**Deleted:** ¶

**Formatted:** Font: Italic

**Formatted:** Indent: Before: 0"

**Formatted:** Indent: Before: 0"

**Deleted:** GRANT TRAGNI,¶
3009 Loso Ter¶
Charlotte, NC 28217¶
¶

**Deleted:**

TWINDS LLC,
3131 Connecticut Ave NW Apt 2503
Washington, D.C. 20008

*Defendants.*

Formatted: Font: Italic

Formatted: Indent: Before: 0"

**FIRST AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION .......... 1

PARTIES .......... 4

I. NAMED PLAINTIFF .......... 4

II. DEFENDANTS .......... 5

JURISDICTION AND VENUE .......... 8

I. SUBJECT-MATTER JURISDICTION .......... 8

II. PERSONAL JURISDICTION .......... 8

III. VENUE .......... 9

GENERAL ALLEGATIONS .......... 10

I. CRYPTO ASSETS AND HOW THEY ARE BOUGHT AND SOLD .......... 10

II. FJB'S ORIGINS AS A "MEME" COIN AND BANNON'S AND EPSHTEYN'S ACQUISITION OF CONTROL OVER IT .......... 13

A. Creation of Let's Go Brandon Coin and Initial Structure .......... 13

B. The Founders Transferred Control of $FJB to Bannon and Epshteyn Under an Undisclosed Payment Agreement Funded by Investor Fees .......... 16

III. BANNON AND EPSHTEYN RE-LAUNCH FJB AS A UTILITY TOKEN PERSONALLY BACKED BY THEM .......... 20

A. Bannon Publicly Promotes $FJB While Concealing That He Had Already Acquired Control of It .......... 20

B. Bannon and Epshteyn Announce Their "Strategic Ownership Positions" and Promote FJB as a Means of Avoiding Political and Financial Persecution .......... 22

C. Epshteyn Uses His Personal Accounts to Promote FJB as a "Strategic Partnership" and a Way "Not [to] Be Cancelled" .......... 26

D. Bannon and Epshteyn Stress Their Personal Commitment to FJB's Success and Promote It as an Inflation-Resistant, Alternative Store of Value .......... 31

E. $FJB Is Rebranded and Promoted as a "Safe," "Decentralized" "Alternative" to the Dollar and a "Utility Token" with "Real-World Applications" .......... 36

**Deleted:** 
INTRODUCTION→1¶
PARTIES→4¶
I.→NAMED PLAINTIFF→4¶
II.→DEFENDANTS→4¶
JURISDICTION AND VENUE→6¶
I.→SUBJECT-MATTER JURISDICTION→6¶
II.→PERSONAL JURISDICTION→6¶
III.→VENUE→7¶
GENERAL ALLEGATIONS→8¶
I.→FJB'S ORIGINS AS A "MEME" COIN AND DEFENDANTS' UNDISCLOSED ACQUISITION OF IT→8¶
A.→Creation of Let's Go Brandon Coin and Initial Structure→8¶
B.→The Founders Secretly Transferred Control of $FJB to Bannon and Epshteyn Through an Undisclosed Sale Agreement Funded by Investor Fees→10¶
II.→DEFENDANTS RE-LAUNCH FJB AS A UTILITY TOKEN PERSONALLY BACKED BY BANNON AND EPSHTEYN→13¶
A.→Bannon Publicly Promotes $FJB While Concealing His Ownership and the Investor-Funded Nature of His Involvement→13¶
B.→Bannon and Epshteyn Announce a "Partnership" with FJB and Promote It as a Means of Avoiding Political and Financial Persecution→15¶
C.→Defendants Continued to Present Themselves as "Partners" to FJB, When Really They Owned and Controlled It→17¶
D.→Bannon and Epshteyn Stress Their Personal Commitment to FJB's Success and Promote It as an Inflation-Resistant, Alternative Store of Value→20¶
E.→$FJB Is Rebranded and Promoted as a "Safe," "Decentralized" "Alternative" to the Dollar and a "Utility Token" with "Real-World Applications"→22¶
F.→Despite Being Billed as "Decentralized" and a Pathway to "Independence," Defendants Built in a Backdoor to Let Them Freeze Investors' Wallets→24¶
III.→DEFENDANTS BARELY MARKET $FJB BUT ASSURE INVESTORS THEY REMAIN COMMITTED TO ITS SUCCESS→25¶
A.→Erik Finman Makes His First and Last Appearance for $FJB in April 2022→25¶
B.→Defendants Put Out a Press Release Announcing $FJB's "First Phase" in August 2022→27¶
IV.→FUNDS IN THE "MARKETING" AND "CHARITY" WALLETS GO "MISSING" OR ARE WASTED IN UNDISCLOSED RELATED-PARTY TRANSACTIONS→28¶
A.→Defendants Reassure Investors They Are Working on $FJB "24/7"→28¶
B.→Defendants Barely Donated to Charity and Spent the "Marketing" Fee on Self-Interested Transactions that Did Not Actually Go to Promoting the Token→29¶
C.→Defendants Could Not Account for Even the Minimal Amounts Purportedly Spent on Charity→33¶
D.→Funds in the "Marketing" and "Charity" Wallets Went "Missing" and Were Never Accounted for by Defendants→35¶
V.→BANNON AND EPSHTEYN SEEMINGLY ABANDON $FJB WITHOUT NOTICE, ONLY TO RETURN TO THE PROJECT AFTER INVESTOR BACKLASH→38¶
... [1]

F. Despite Being Billed as "Decentralized" and a Pathway to "Independence," the Token Retained a Backdoor That Let Insiders Freeze Investors' Wallets............ 38

IV. BANNON AND EPSHTEYN BARELY MARKET $FJB BUT ASSURE INVESTORS THEY REMAIN COMMITTED TO ITS SUCCESS .................................................... 39

A. Erik Finman Makes His First and Last War Room Appearance for $FJB in April 2022........................................................................................................... 39

B. The Project Puts Out a Press Release Announcing $FJB's "First Phase" in August 2022........................................................................................................... 42

C. Epshteyn Tours Conservative Media as FJB's "Co-Founder" ............................ 44

V. BANNON AND EPSHTEYN CONTROLLED THE PROJECT'S KEYS, WALLETS, AND DECISIONS, AND SPOKE TO INVESTORS THROUGH ABDUL .................. 45

A. Bannon and Epshteyn Held the Keys, the Bank Account, and the Final Say....... 45

B. Abdul Spoke for Bannon and Epshteyn With Their Actual and Apparent Authority .............................................................................................................. 48

VI. FUNDS IN THE "MARKETING" AND "CHARITY" WALLETS GO "MISSING" OR ARE WASTED IN UNDISCLOSED RELATED-PARTY TRANSACTIONS............. 51

A. Bannon and Epshteyn Reassure Investors They Are Working on $FJB "24/7"... 51

B. The Project Barely Donated to Charity and Spent the "Marketing" Fee on Self-Interested Transactions that Did Not Actually Go to Promoting the Token......... 52

C. No One Could Account for Even the Minimal Amounts Purportedly Spent on Charity.................................................................................................................. 56

D. Funds in the "Marketing" and "Charity" Wallets Went "Missing" and Were Never Accounted For..................................................................................................... 59

VII. BANNON AND EPSHTEYN TRY TO EXIT $FJB, THEN DEMAND A RETRACTION AND TELL INVESTORS THEY "HAVEN'T SOLD, AND ARE NOT SELLING" .... 63

VIII. THE PROJECT PULLS THE TOKEN'S LIQUIDITY AND RE-BRANDS (AGAIN) TO PATRIOT PAY ................................................................................................... 66

A. The Project Pulls the Token's Liquidity and Re-Brands to Patriot Pay ............... 66

B. The "New" Website Repeated the Same False and Misleading Statements as the Old Website ......................................................................................................... 72

C. Patriot Pay (Again) Barely Promoted $PPY and, When It Did, Repeated the Same Misleading and False Statements as the $FJB Promotions.................................. 74

IX. ABDUL STRINGS INVESTORS ALONG ON BANNON'S AND EPSHTEYN'S BEHALF UNTIL THE VERY END, WHEN THE RUG IS PULLED ........................... 80

A. Abdul Again Paints a Rosy Picture of $PPY's Future ......................................... 80

B. Abdul Abruptly and Permanently Disables Trading and Abandons $PPY with False Promises of Refunds ........................................................................................... 82

X. ABDUL ORGANIZES TAX-FREE, OVER-THE-COUNTER SALES OF $FJB/$PPY FOR SELECT INVESTORS ........................................................................................... 84

XI. BANNON AND EPSHTEYN AIMED THEIR PITCH AT AN AUDIENCE PRIMED TO BELIEVE IT ....................................................................................................... 89

XII. MR. BARR'S PURCHASES AND RELIANCE ........................................................... 92

XIII. THE TOKEN'S PRICE AND TRADING VOLUME ROSE AND FELL IN DIRECT RESPONSE TO BANNON'S AND EPSHTEYN'S STATEMENTS ............................ 94

A. Immediate Price and Volume Reaction to Bannon's and Epshteyn's Initial Promotions ........................................................................................................ 96

B. The Token's Price Tracked Bannon's and Epshteyn's Promotion and Development of the Project ....................................................................................................... 96

C. The Undisclosed Facts Materialized as Promotion and Development Stalled ..... 97

D. Whipsawing Statements and False Reassurances Exacerbated Losses ................ 97

E. Rebrand to Patriot Pay Repeated the Same Cycle of Inflation and Collapse ....... 98

XIV. CONCEALMENT AND TOLLING ............................................................................... 99

CLASS ALLEGATIONS ......................................................................................................... 101

I. NUMEROSITY ............................................................................................................... 102

II. TYPICALITY .................................................................................................................. 102

III. ADEQUACY .................................................................................................................. 103

IV. COMMONALITY AND PREDOMINANCE ................................................................ 103

V. SUPERIORITY ............................................................................................................... 104

VI. CLASS ACTION IS APPROPRIATE .......................................................................... 104

D.C. LAW APPLIES TO THE ENTIRE CLASS ..................................................................... 104

$FJB/$PPY TOKENS ARE SECURITIES SUBJECT TO THE SECURITIES LAWS ........... 106

I. INVESTMENT OF MONEY ........ 106

II. COMMON ENTERPRISE ........ 106

A. Horizontal Commonality ........ 107

B. Vertical Commonality........ 107

III. REASONABLE EXPECTATION OF PROFITS ........ 107

A. Dollar Collapse Messaging........ 107

B. Promotion as Inflation-Resistant Store of Value ........ 108

C. Marketing and Development Promises........ 108

D. Price Reactions to Promotion........ 108

IV. PROFITS DERIVED FROM THE EFFORTS OF OTHERS ........ 108

A. Centralized Control........ 109

B. Marketing and Influence ........ 109

C. Operational Development ........ 109

D. Insider Advantages........ 109

LOSS CAUSATION........ 109

I. ARTIFICIAL INFLATION INTRODUCED THROUGH BANNON'S AND EPSHTEYN'S PROMOTIONAL CONDUCT ........ 110

II. PARTIAL CORRECTIVE DISCLOSURES REVEALED THE TOKEN'S TRUE RISK PROFILE ........ 111

III. FEBRUARY 13–14, 2023: CLASSIC CORRECTIVE DISCLOSURE AND PRICE COLLAPSE ........ 112

IV. LIQUIDITY WITHDRAWAL AND REBRAND UNDERMINED CLAIMS OF "DECENTRALIZATION" ........ 112

V. FEBRUARY 12, 2025: TRADING DISABLED AND COLLAPSE OF REMAINING PRICE SUPPORT........ 113

VI. CAUSAL CONNECTION BETWEEN MISCONDUCT AND LOSS........ 114

OVERVIEW OF FRAUD AND NON-FRAUD CLAIMS ........................................................ 115

I. NON-FRAUD-BASED SECURITIES AND STATE LAW CLAIMS.......................... 115

II. FRAUD-BASED SECURITIES AND STATE LAW CLAIMS (PLED IN THE ALTERNATIVE) ........................................................................................................ 116

A. Bannon and Epshteyn Knew They Controlled the Token While Representing Themselves as "Partners" ................................................................................ 117

B. Bannon and Epshteyn Structured the Acquisition to Be Funded by Investor Fees ........................................................................................................................ 118

C. Bannon and Epshteyn Knew the Token Was Not Decentralized ...................... 118

D. Bannon and Epshteyn Repeatedly Reassured Investors While Concealing Material Facts ................................................................................................................ 119

E. Bannon and Epshteyn Knew Their Audience Would Rely on Them ................. 120

F. The February 2023 Cover-Up Confirms Bannon's and Epshteyn's Scienter..... 120

G. Abdul Acted With Scienter ................................................................................ 121

H. Bannon and Epshteyn Had Clear Motive and Opportunity ............................... 121

I. At Minimum, Bannon, Epshteyn, and Abdul Acted With Severe Recklessness 122

CAUSES OF ACTION .......................................................................................................... 123

PRAYER FOR RELIEF ........................................................................................................ 143

DEMAND FOR JURY TRIAL ............................................................................................. 144

Plaintiff Andrew Barr (“Plaintiff” or “Mr. Barr”), individually and on behalf of all others similarly situated brings this First Amended Class Action Complaint against Defendants Stephen K. Bannon (“Bannon”), Boris Epshteyn (“Epshteyn”), Sarah Abdul (“Abdul”), Freedom Jobs Business App LLC f/k/a Let’s Go Brandon Coin LLC (“FJB App LLC”), Patriot Pay LLC, Warroom LLC, 354 Nod Hill LLC (“354 Nod Hill”), and TWinds LLC (“TWinds”). Plaintiff’s allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff’s undersigned counsel. That investigation included, without limitation, review and analysis of broadcasts and recordings of *War Room* episodes and other media appearances; social-media posts; the official websites, whitepapers, Telegram channels, and Discord servers for the token at issue; recordings and transcripts of more than one hundred investor “status calls” hosted by the project; screenshots of internal communications among project insiders; blockchain records; state corporate filings; news articles; and other publicly available information

## INTRODUCTION

1. This case is about two of the most recognizable figures in the MAGA movement—Stephen K. Bannon and Boris Epshteyn—who took control of a cryptocurrency, attached their names and faces to it, and sold it to their own audience as a “safe,” “secure,” “uncancellable” refuge from a collapsing dollar and a hostile banking system. It was none of those things. Bannon and Epshteyn controlled it, their lieutenants could freeze it, the fees it charged to fund “marketing” and “charity” were diverted and went “missing,” and, when the people who trusted them wanted out, the switch that Bannon and Epshteyn had always had the power to flip was flipped: trading was “disabled,” and the investors’ money was gone.

**Deleted:** (the “Class”),

**Deleted:** class action lawsuit

**Deleted:** ,

**Deleted:** ,

**Deleted:** , Grant Tragni (collectively, the “Executive Defendants”),

**Deleted:** ,

**Deleted:** ,

**Deleted:** ,

**Deleted:** ,

**Deleted:** (the “Entity Defendants,” and together with the Executive Defendants, “Defendants

**Deleted:** , which

**Deleted:** :

**Deleted:** press releases, news articles,

**Deleted:** ,

**Deleted:** concerning Defendants and the cryptocurrency known as Let’s Go Brandon Coin, and later Patriot Pay

**Deleted:** <#>This action arises from the unregistered offer and sale of a cryptocurrency to retail investors by Defendants Steve Bannon and Boris Epshteyn, who leveraged their prominence, credibility, and loyal following to market a digital token as a stable, secure, and functional alternative to traditional currency—while concealing material facts about the token’s true risks, governance, and economics.¶

2. From December 2021 through February 2025, Bannon and Epshteyn promoted a digital token initially branded as Let's Go Brandon Coin ("FJB" or "$FJB") and later rebranded as Patriot Pay ("PPY" or "$PPY") (together, the "Token") as a serious financial project with real-world utility, charitable purpose, and resilience against inflation, "debanking," and financial censorship. They insisted that the Token was not "some quick day trade," but a "real currency" and an "alternative store [of] value" that would give ordinary Americans "total and complete independence" from the financial system.

3. Bannon and Epshteyn did not speak to the public at large. They spoke to the *War Room* "Posse"—an audience that they themselves had spent years telling that the dollar was being "destroyed," that the banks were coming for conservatives' accounts, and that Bannon and Epshteyn were the leaders who would protect them. Bannon and Epshteyn knew those fears intimately, because they had cultivated them. They then sold the Token as the answer to them.

4. From the first day, Bannon and Epshteyn described their role as a "strategic partnership." Privately, Bannon and Epshteyn had signed a written agreement, in the names of their holding companies—354 Nod Hill (Bannon's) and TWinds (Epshteyn's)—under which they would "assume full control of the Coin," including "marketing and promotion decisions" and "potential updates to the Coin smart contract code," and would receive two billion Tokens without paying a dollar. The Token's own retail buyers unwittingly financed that takeover through a 3% "marketing fee" skimmed from every trade and routed to the Token's creators.

5. Bannon and Epshteyn then ran the project. Epshteyn held the project's bank account and its Coinbase account "the entire time." Bannon and Epshteyn held the keys to the "marketing" and "charity" wallets that collected investors' fees. Their spokesperson, Defendant Sarah Abdul, told investors again and again that she was "purely the messenger," that "Steve,

**Deleted:** late

**Deleted:** early

**Deleted:** Defendants

**Deleted:** ,

**Deleted:** Defendants repeatedly emphasized

**Deleted:** a meme coin or speculative novelty,

**Deleted:** decentralized payment ecosystem

**Deleted:** protect users

**Deleted:** economic instability and institutional control

**Deleted:** <#>Defendants deliberately targeted a politically aligned and deeply loyal audience—individuals who trusted Defendants' judgment, motives, and commitment to shared values—and encouraged them to invest in the Token as a means of participating in a broader movement. Defendants' conduct was particularly insidious because it exploited that trust to induce purchases of an unregistered, highly speculative asset under the guise of financial independence and community membership.¶
Central to Defendants' pitch was the representation—explicit and implicit—that Bannon and Epshteyn had entered into a strategic partnership with the project's founders and would lend their support and influence to help the Token succeed. Defendants repeatedly framed their role as that of partners or advocates, rather than as controlling insiders.¶
In reality, Defendants owned and controlled the project. Through a private, undisclosed transaction, Defendants acquired governance and administrative control of the Token without paying any purchase price, while investors—through embedded transaction fees—effectively financed Defendants' acquisition. Defendants did not disclose that purchasers of the Token were, in substance, funding the very transaction that placed Defendants in control.¶
Defendants further failed to disclose that the Token was centrally controlled; that insiders retained authority over the Token's smart contract and wallets; that Defendants could and did freeze investor wallets; that select purchasers were offered over-the-counter ("OTC") sales outside public markets; and that transaction-based "marketing" and "charity" fees were not used exclusively—or transparently—for the purposes investors were led to believe.¶
Defendants also misrepresented the Token as decentralized, "uncancellable," and immune from the types of account freezes and restrictions imposed by traditional financial institutions. In reality, Defendants retained—and exercised—centralized authority to restrict trading, manage supply, and control liquidity, while exempting insider wallets from those same constraints.¶
Throughout the Class Period, Defendants promoted the Token as a safer alternative to fiat currency, invoking economic collapse, inflation, and financial crisis to create urgency and induce purchases. Defendants warned that the existing financial system was "hurtling towards" catastrophe and represented that participation in the Token was necessary to preserve value, transact freely, and maintain economic sovereignty.¶
At the same time, Defendants failed to build any functioning payment ecosystem, failed to deliver the promised utili ... [2]

along with Boris, makes the final, final decisions on everything," and that "Boris calls those shots"—and then relayed Bannon's and Epshteyn's messages to investors on dozens of recorded calls that, she said, Bannon, Epshteyn, and their teams "listen to."

6. What investors were *not* told was damning. The Token's smart contract let its operators lock any holder's wallet and, later, disable trading altogether. Insider wallets, including the wallets holding Bannon's and Epshteyn's billion-Token stakes, were exempt from the fees imposed on everyone else. The project paid $120,000 in investor fees to a vendor that Abdul called "Boris's friends that did fucking nothing." Abdul told investors that roughly $2.7 million in fees had gone "missing." Abdul quietly sold Tokens from the "marketing" and "charity" wallets over the counter, "tax free," to artificially keep the price from falling.

7. When the truth began to leak, Bannon and Epshteyn covered it up. On February 13, 2023, Abdul posted that "Messrs. Epshteyn and Bannon have accordingly decided to transfer and assign the rights and obligations of $FJB," and the Token's price fell 67% the next day. Abdul was immediately told to "take down your statement" because "[w]e still haven't finalized the deal and it could be extremely consequential to prematurely say anything." That night, Epshteyn personally posted in the Token's Discord server, "Making sure everyone sees this!"—above a post assuring investors that "Steve and Boris both 1000% back the project, haven't sold, and are not selling!" Two days later, Bannon told his *War Room* audience that his and Epshteyn's wallets were "public" and that he had "only bought coins." The price rebounded 71% in a single day.

8. For two more years, Bannon and Epshteyn kept their names on the project. The Token was relaunched in 2024 as Patriot Pay, marketed on Instagram as "A New Patriot Economy & Digital Currency by Steve Bannon & Boris Epshteyn," and advertised on a national broadcast as "Steve Bannon's coin." In November 2024, Abdul told investors that she "did get the final say

from Boris"; in January 2025, she announced that weekly *War Room* promotion had been scheduled with Bannon. Investors, including Mr. Barr, kept buying.

9. Then, on February 12, 2025, thousands of investors who had been told for years that their Tokens could never be frozen or taken away learned that they could no longer sell them at all: Abdul announced that trading had been "disabled" and the project was closed, promising to distribute the Token's liquidity pool to holders "within the next 7 days." No distribution ever came. Asked for answers, Abdul told investors to "[r]each out to Steve and Boris for answers, since that's who we've been waiting on for years with plenty of broken promises."

10. The public statements about the Token made by Bannon and Epshteyn, and by the project in their names, were not puffery. "Safe," "secure," "decentralized," "uncancellable," "won't be deplatformed," "not going to be taken away from you," donations from fees "that are all public," "expanding to Europe," and "haven't sold, and are not selling" are verifiable statements of present fact. Each was false or materially misleading when made, and each was made to an audience that Bannon and Epshteyn knew would take them at their word.

11. Plaintiff brings claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5; the District of Columbia Securities Act (the "D.C. Securities Act"); the District of Columbia Consumer Protection Procedures Act; and District of Columbia common law, on behalf of himself and all others who purchased the Token during the Class Period.

## PARTIES

### I. NAMED PLAINTIFF

12. Plaintiff Andrew Barr is an individual residing in Belle, Missouri. Between December 27, 2021, and February 1, 2025, Mr. Barr purchased $FJB and, after the rebrand, $PPY on more than 100 occasions, including purchases of $PPY in January and February 2025. When trading was disabled on February 12, 2025, he held more than 100 million Tokens that he could

**Deleted:**

**Deleted:** invested in

**Deleted:** /$

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Deleted:** during the Class Period (

no longer sell at any price. Mr. Barr's transactions in the Token are set forth in his certification, attached as Exhibit A, and he suffered a net loss of more than $53,000.

## II. DEFENDANTS

13. Defendant Stephen K. ("Steve") Bannon is an individual residing in Washington, D.C. Bannon was the chief executive of President Donald J. Trump's 2016 presidential campaign and, in 2017, served as White House Chief Strategist and Senior Counselor to the President. Bannon is the host of the *War Room* podcast and broadcast, which is produced by Defendant Warroom LLC. Bannon owns and controls Defendant 354 Nod Hill. Bannon personally made, approved, and disseminated statements promoting the Token on *War Room*, on his account on GETTR, a social-media platform (@SteveBannon), and on investor calls with the Token's holders. In February 2025, Bannon pleaded guilty in the Supreme Court of the State of New York, New York County, to a felony charge of scheming to defraud donors to a nonprofit organization.

14. Defendant Boris Epshteyn is an individual residing in Washington, D.C. Epshteyn is an attorney and a longtime political adviser and spokesperson for President Trump. Epshteyn owns and controls Defendant TWinds. Epshteyn personally made, approved, and disseminated statements promoting the Token on *War Room*, on his personal Twitter/X (@BorisEP), GETTR (@BorisEP), and Instagram (@boris_epshteyn) accounts, on third-party radio and podcast programs, on his personal website, in the Token's Discord server under the username "BorisEp," and on investor calls with the Token's holders. In November 2024, a review conducted by counsel for President-elect Trump's transition examined allegations that Epshteyn had solicited consulting payments from prospective administration nominees—allegations Epshteyn called "false and defamatory."

15. Defendant Sarah Abdul is an individual who, on information and belief, resides in Gilbert, Arizona, and who has used the names Sarah Abdul Razzaq, Sarah Abdulrazzi, Sarah

Deleted: defined herein)

Deleted: approximately $58,730.98 on those investments, as set forth in detail in his accompanying certification

Deleted: (

Deleted: ) K.

Deleted: ("Bannon")

Deleted: he

Deleted: non-profit—a felony

Deleted: <#>Defendant Boris Epshteyn ("Epshteyn") is an individual residing in Washington, D.C. In April 2024, he was indicted in Arizona on nine counts related to election interference, including fraud and forgery—felonies. The case is pending trial.¶

Deleted: ("Abdul")

Deleted: . Abdul

Deleted: operated under a number of aliases, including

Abdul Williams, and Sarah Abdul Elliott. From no later than January 2022 through February 2025, Abdul was the Token's senior administrator and principal spokesperson. She posted in the Token's Discord and Telegram channels as "sundevil28," "Sarah (Will never DM you first)," and "@SarahPatriotPay"; hosted the project's weekly investor status calls; administered its wallets; and, as alleged below, acted at all relevant times as the agent of Bannon and Epshteyn, with actual and apparent authority to speak to investors on their behalf. In April 2022, she described herself to holders as "an employee of FJB." Abdul has represented that she is the owner of record of Patriot Pay LLC.

16. Defendant Freedom Jobs Business App LLC f/k/a Let's Go Brandon Coin LLC is a Delaware limited liability company (Delaware File No. 6345903) formed on October 29, 2021. On April 26, 2022—after Bannon and Epshteyn acquired control of the Token—the entity amended its certificate of formation to change its name from "Let's Go Brandon Coin LLC" to "Freedom Jobs Business App LLC." FJB App LLC was the issuer of $FJB, the owner of the $FJB smart contract, and the entity under which the "Freedom. Jobs. Business." app was published. Project insiders described it as "Boris' company." Its Delaware registration was cancelled on June 1, 2025, for failure to pay taxes.

17. Defendant Patriot Pay LLC is a Delaware limited liability company. Patriot Pay LLC was the issuer of $PPY and the operator of the Patriot Pay app and PatriotPay.org website, and it offered and sold $PPY to the public beginning in 2024. Abdul has represented that she is its owner of record; the project's marketing, however, described Patriot Pay as a "Digital Currency by Steve Bannon & Boris Epshteyn," and Abdul told investors throughout 2024 and early 2025 that Bannon and Epshteyn held its most important decision-making authority.

Deleted: Abdul

Deleted: an

Deleted: the Company

Deleted: the Executive Defendants

Deleted: , manage wallets, coordinate sales, and implement operational decisions. She

Deleted: herself to investors as the "sole proprietor"

Deleted: Grant Tragni ("Tragni") is an individual who, on information and belief, resides in North Carolina. He created the $FJB Token, and continued to be involved with its management and operation after its sale to Bannon's and Epshteyn's LLCs, 354 Nod Hill and TWinds.¶ Defendant…

Deleted: or was

Deleted: organized under the laws of Delaware. It was the issuing and controlling entity for the $FJB Token.

Deleted: owned, controlled, and operated

Deleted: out of their Washington, D.C., homes

Deleted: or was

Deleted: organized under the laws of Delaware. It was the issuing and controlling entity for the $PPY Token. Bannon and Epshteyn owned, controlled, and operated

Deleted: out

Deleted: their Washington, D.C., homes. On information

Deleted: belief,

Deleted: LLC is the successor-in-interest to Let's Go Brandon Coin LLC. Accordingly, they are referred herein collectively as the "Company."

18. Defendant Warroom LLC is a Wyoming limited liability company with its principal place of business in Washington, D.C. Bannon owns and controls Warroom LLC, which produces and distributes the *War Room* podcast and broadcast on which Bannon and Epshteyn promoted the Token, displayed the Token's branding alongside *War Room*'s, and directed viewers to the Token's website. On information and belief, Maureen Bannon, Bannon's daughter and Warroom LLC's chief executive officer, participated with Bannon in the project's decisions and, in January 2025, scheduled *War Room*'s promotion of $PPY. *War Room*'s audience—which Bannon calls the "War Room Posse"—is made up of Bannon's political supporters, whom Epshteyn described on a January 27, 2022 investor call as "the most actionable audience really, I think in the history of media."

**Deleted:** ("War Room")

**Deleted:** media

**Deleted:** organized under the laws of Wyoming,

**Deleted:** ,

**Deleted:** , and operates War Room, and

**Deleted:** broadcasts its

**Deleted:** episodes out

**Deleted:** his Washington, D.C., home.

19. Defendant 354 Nod Hill LLC is a Delaware limited liability company owned and controlled by Bannon. 354 Nod Hill is a named party and "Recipient" under the December 2021 agreement by which control of the Token and two billion Tokens were transferred to 354 Nod Hill and TWinds.

**Deleted:** ("354 Nod Hill") is a limited liability company organized under the laws of Delaware. Bannon owns, controls, and operates 354 Nod Hill out of his Washington, D.C., home. On information and belief, Bannon controlled and operated the Company through 354 Nod Hill.¶
Defendant TWinds LLC ("TWinds") is a

**Deleted:** organized under the laws of Delaware. Epshteyn owns, controls, and operates TWinds out of his Washington, D.C., home. On information and belief, Epshteyn controlled and operated the Company through

20. Defendant TWinds LLC is a Delaware limited liability company owned and controlled by Epshteyn. TWinds is a named party and "Recipient" under the December 2021 agreement by which control of the Token and two billion Tokens were transferred to 354 Nod Hill and TWinds.

21. Relevant non-parties include Grant Tragni ("Tragni"), who used the username "Sammy Paradise" and was one of the Token's original creators (together with Nicholas Smith and Caleb Benedict, the "Founders"); Erik Finman, whom Bannon and Epshteyn announced on *War Room* as the Token's "senior strategic advisor"; Chase Bailey, a developer who used the

username "Speshled"; and VFT Solutions, a vendor paid from the Token's fees. Plaintiff voluntarily dismissed Tragni without prejudice.

## JURISDICTION AND VENUE

### I. SUBJECT-MATTER JURISDICTION

22. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court also has jurisdiction over the Exchange Act claims under Section 27 of that Act, 15 U.S.C. § 78aa(a).

23. This Court also has subject-matter jurisdiction over this dispute in the alternative pursuant to 28 U.S.C. § 1332(d)(2) because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (3) there is minimal diversity because at least one member of the Class and at least one defendant are citizens of different states.

24. This Court has supplemental subject-matter jurisdiction over the state-law claims asserted in this action under 28 U.S.C. § 1367(a).

### II. PERSONAL JURISDICTION

25. FJB App LLC, Patriot Pay LLC, Warroom LLC, 354 Nod Hill, and TWinds are subject to this Court's personal jurisdiction because, on information and belief, each maintained its principal place of business in Washington, D.C., during the relevant period, and because each conducted, authorized, or participated from within this District in the conduct giving rise to Plaintiff's claims, including the promotion, offer, and sale of the Token.

**Deleted:**

**Deleted:** 5, 12(a)(1), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77l(a)(1), 77o, and under Sections

**Deleted:** ,

**Deleted:**

**Deleted:** . In addition, this Court has subject-matter jurisdiction over the Securities Act claims under Section 22 of that Act, 15 U.S.C. § 77v.

**Deleted:** subject-matter

**Deleted:**

**Deleted:** ), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act.

**Deleted:** or

**Deleted:** plaintiff and

**Deleted:**

**Deleted:** Defendants Let's Go Brandon Coin

**Deleted:** general

**Deleted:** at all relevant times, they

**Deleted:** their

**Deleted:** they conceived

**Deleted:** and directed

**Deleted:** $FJB/$PPY Tokens

26. Bannon and Epshteyn are subject to this Court's personal jurisdiction because they reside in Washington, D.C., and because they made many of the statements at issue from Washington, D.C., including on *War Room*, which is produced in Washington, D.C.

27. Abdul is subject to this Court's specific personal jurisdiction because, as the agent of Bannon and Epshteyn and the administrator of FJB App LLC and Patriot Pay LLC, she directed, coordinated, and participated in the promotion, offer, and sale of the Token from and in concert with persons and entities located in Washington, D.C., and relayed to investors the messages and decisions that Bannon and Epshteyn communicated to her from Washington, D.C.

28. In addition, this Court has specific personal jurisdiction over each Defendant because each purposefully availed himself, herself, or itself of the privilege of conducting activities in Washington, D.C., in connection with the promotion, offer, and sale of the Token, including by using podcasts, websites, social media, and digital wallets operated from Washington, D.C., to offer and sell the Token nationwide.

29. This Court also has specific personal jurisdiction over each Defendant pursuant to D.C. Code §§ 13-423(a)(1) and (a)(3) because each transacted business in the District of Columbia and caused tortious injury in the District by acts committed in the District, and Plaintiff's claims arise from that conduct.

## III. VENUE

30. Venue lies in this District under 15 U.S.C. § 78aa(a) because one or more Defendants are found, are inhabitants, or transact business in this District, and because acts and transactions constituting the violations alleged herein occurred in this District.

31. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the production and broadcast of the *War Room* segments promoting the Token; Bannon's

**Deleted:** Defendants
**Deleted:** general
**Deleted:** .
**Deleted:** Defendants
**Deleted:** and Tragni are
**Deleted:** managing agents for Let's Go Brandon Coin LLC
**Deleted:** /or
**Deleted:** they
**Deleted:** controlled
**Deleted:** substantially
**Deleted:** LLCs' operations centered
**Deleted:** including
**Deleted:** regarding Token issuance, promotion, and distribution…
**Deleted:** all Defendants
**Deleted:** they
**Deleted:** themselves
**Deleted:** offer and sale of unregistered securities alleged herein, and with the related fraud and other misconduct also alleged herein. Defendants further purposefully availed themselves of this District
**Deleted:** securities
**Deleted:** Defendants
**Deleted:**
**Deleted:** Defendants
**Deleted:** offering and selling unregistered securities to
**Deleted:** residents
**Deleted:** directly
**Deleted:** 77v
**Deleted:** is
**Deleted:** transacts
**Deleted:** offers
**Deleted:** sales at issue in this action took place
**Deleted:**
**Deleted:** conception, authorization,
**Deleted:** dissemination
**Deleted:** promotional messaging through
**Deleted:** platform;

and Epshteyn's direction of the Token's promotion and investor communications; and the management of the project's bank account, wallets, and fee revenue.

Deleted: and coordination

Deleted: Token

Deleted: transaction-

Deleted: routing, and over-the-counter sales. Defendants' conduct was purposefully directed to consumers and investors in the District of Columbia, and Defendants knew or reasonably should have known that their acts would cause harm in this District

## GENERAL ALLEGATIONS

### I. CRYPTO ASSETS AND HOW THEY ARE BOUGHT AND SOLD

32. A blockchain is a shared digital ledger that records transactions. Copies of the ledger are maintained by a network of computers, and each new batch of transactions is added to the existing record in a way that makes past entries difficult to alter. Put simply, a blockchain works like an accounting ledger that thousands of independent bookkeepers keep identical copies of, so that no one bookkeeper can quietly change the books. The Tokens at issue were recorded first on the BNB Smart Chain and later, after the rebrand, on the Polygon network.

33. A crypto asset, or "token," is a unit of value recorded on a blockchain. Many tokens, including $FJB and $PPY, are not blockchains of their own. They are created by a "smart contract"—a computer program that runs on an existing blockchain and sets the token's rules, such as how many tokens exist, what fees are charged when they change hands, and who may transfer them. A smart contract functions much like a set of bylaws for the token, except that its rules are enforced automatically by software rather than by people.

34. A smart contract can reserve special powers to a designated "contract owner," who exercises them using a secret code called a private key. Depending on how the contract is written, the owner may be able to change the fees charged on each transaction, exempt particular wallets from those fees (known as "whitelisting"), freeze particular wallets, or turn trading on and off. Whoever holds the contract owner's private keys controls those powers; the wallet that holds them is often called the "dev wallet." Some projects require several independent keyholders to approve any use of those powers—a safeguard known as "multi-signature" control—so that no single person can act alone. Unlike corporate bylaws, which ordinarily can be amended only through a

defined process such as a vote of the board or shareholders, the contract owner can rewrite the token's rules on its own—without notice to, or the consent of, the investors who have already bought in.

35. Investors hold tokens in digital "wallets," each identified by a public address and controlled by its own private key. A wallet is roughly analogous to a bank account: the address is like an account number, and the private key is like the password needed to move the money. A wallet's holdings and transactions are visible on the blockchain, but the identity of the person who controls it generally is not.

36. Investors buy and sell tokens in two principal ways. Centralized exchanges, such as XT.com and LBank, are companies that match buyers and sellers and let customers trade using ordinary currency. Decentralized exchanges, such as PancakeSwap (on the BNB Smart Chain) and QuickSwap (on Polygon), have no company in the middle. Buyers and sellers instead trade against a "liquidity pool"—a reserve holding a supply of the token and a supply of another crypto asset. The other asset in the pool is typically the native asset of the underlying blockchain—BNB on the BNB Smart Chain, and MATIC on Polygon—which, unlike a thinly traded token, can readily be exchanged for dollars on major exchanges. Think of a liquidity pool as a currency-exchange booth at an airport that keeps a stack of dollars and a stack of euros: a buyer hands over one currency and takes the other.

37. In a liquidity pool, the token's price is set automatically by the ratio of the two assets in the pool. Each purchase removes tokens from the pool and pushes the price up; each sale adds tokens and pushes the price down. Whoever supplies a pool's assets receives "liquidity-pool tokens," which work like a claim ticket: the holder of those tokens can withdraw the pool's assets. To assure investors that the liquidity cannot be pulled, projects often "lock" their liquidity-pool

tokens with an independent service for a set period. A holder can convert tokens back into money only if there is a pool, or an exchange, willing to take them. If trading is disabled or the pool is removed, the holder cannot sell at any price. The result is like holding a gift card for a store that has closed its doors: the card may show a balance, but it cannot be spent.

38. A project can also replace its token with a new one. In a "fork," the project issues a new token under a new smart contract, takes a "snapshot" of each holder's balance of the old token, and then "airdrops"—sends—an equivalent amount of the new token to each holder's wallet. Crypto projects typically communicate with investors through online chat platforms such as Telegram and Discord, where the project's administrators post announcements and host live audio calls with holders.

39. The cryptocurrency market commonly distinguishes between "meme coins" and "utility tokens." A meme coin is a token built around an internet joke, slogan, or cultural moment, whose price is driven by attention and speculation rather than any use. A utility token is marketed as having a real function—for example, as a means of payment within an app or a network—so that its value is expected to grow as the promised product is built and adopted. The difference is roughly that between a novelty item and an early stake in a business that the promoters promise to build. As alleged below, $FJB began as a meme coin, and Bannon and Epshteyn restructured the project around a utility token as soon as they took control: "It's going to be a currency."

40. Like any asset traded in a market, a token's price reflects supply and demand: it is the price at which buyers and sellers agree to trade. Unlike a share of stock, however, a token like $FJB or $PPY does not pay dividends and is not a claim on a company's assets or earnings. Demand for such a token depends instead on what buyers expect it will be worth in the future. For a utility token, those expectations rest on the promised product—whether the payment system,

app, or network the promoters say they are building will actually be built, and whether people will use it. Put simply, buying a utility token is a bet on the promoters' ability to deliver what they have promised. That is why the promoters' credibility and announcements move the price: when a prominent promoter announces a new exchange listing, a new advisor, or an expansion, buyers arrive and the price rises; when development stalls or confidence in the promoters is shaken, buyers disappear and the price falls.

41. In the cryptocurrency industry, the abandonment of a token by its promoters—who attract investors' money and then drain or remove the token's liquidity or disable trading, leaving investors holding tokens they cannot sell—is commonly called a "rug pull," a reference to pulling a rug out from under someone.

## II. FJB'S ORIGINS AS A "MEME" COIN AND BANNON'S AND EPSHTEYN'S ACQUISITION OF CONTROL OVER IT

Deleted: DEFENDANTS' UNDISCLOSED

### A. Creation of Let's Go Brandon Coin and Initial Structure

42. Let's Go Brandon Coin (FJB) was created in or about October 2021 by the Founders, who organized, operated, and promoted the project through Let's Go Brandon Coin LLC, now known as FJB App LLC.

Deleted: Grant Tragni, Nicholas Smith, and Caleb Benedict (collectively, …

Deleted: "

Deleted: "),

43. At inception, FJB was branded and marketed using overtly political messaging, including the name "Let's Go Brandon," a phrase widely understood to be a euphemism for the profane political slogan, "Fuck Joe Biden." The Token's ticker symbol—"FJB"—was initially promoted in connection with that slogan.

44. As the project developed, promoters began referring to FJB as standing for "Freedom. Jobs. Business."—a backronym intended to present the Token in a more professional and legitimate light to try to appeal to a broader array of investors, despite its origins as a "meme" coin.

45. From the outset, the Founders structured FJB to include transaction-based fees embedded in the Token's smart contract. Specifically, each transaction in FJB charged an eight percent (8%) transaction fee (sometimes referred to as a "tax"), consisting of a three percent (3%) "marketing fee" and a five percent (5%) "charitable donation." This transaction fee was significantly higher than what other cryptocurrencies charged, and it was emphasized as a defining feature of the Token's economics and community. The fees were collected in Tokens and deposited into designated marketing and charity wallets, which the project called its "team wallets" and which Abdul and others also called the "tax wallets." Over the life of the Token on the BNB Smart Chain, the team wallets sold FJB in 798 transactions for approximately 2,569 BNB, worth roughly $1.1 million at the time of each sale.

**Deleted:** <#>From the outset, the Founders structured FJB to include transaction fees embedded in the Token's smart contract, including fees designated for marketing and charity. As represented to investors, each Token transaction triggered an automatic fee, a portion of which was routed to wallets designated for those purposes.¶

**Deleted:** <#>comprised

46. The 3% marketing fee was routed to a dedicated "marketing wallet," where it was purportedly to be reinvested to promote the Token, grow adoption, and increase the Token's value. The 5% donation fee was routed to a dedicated "charity wallet," from which donations were purportedly to be made to charities supporting veterans and first responders.

47. The Founders controlled and administered the Token's smart contract on the BNB Smart Chain (BEP-20) blockchain, as well as the associated treasury, marketing, and charity wallets. The Founders also controlled the Token's branding and messaging and directed the Token's promotion and sale to the public through the project's website (FJBCoin.org), social media, and online communities.

**Deleted:** Binance

48. Tragni was the original lead developer of the Token and its smart contract, and he retained technical authority over the Token's code, including features governing transaction fees, wallet permissions, and other operational parameters.

**Deleted:** Defendant Grant

49. Although Bannon and Epshteyn later characterized FJB as decentralized and community-driven, control during this early period remained centralized in the hands of the Founders. With that control, the Founders exercised unilateral authority over key aspects of the Token's operation, including smart-contract administration, fee allocation, wallet control, and governance decisions.

**Deleted:** Defendants

**Deleted:** power

50. During this period, FJB was offered and sold to retail purchasers nationwide without any registration statement filed with the Securities and Exchange Commission; without audited financial statements; and without meaningful disclosures concerning governance, conflicts of interest, insider compensation, or the risks associated with the Token.

51. These early structural features—including centralized control of the smart contract and wallets, the unusually high embedded transaction tax, reliance on promoter-driven marketing, and the absence of regulatory disclosures—established FJB as a project whose value depended on the managerial and entrepreneurial efforts of insiders.

52. As described below, these same features were later omitted, reframed, or affirmatively misrepresented when Bannon and Epshteyn acquired control of the project and began promoting the Token to a significantly larger and more trusting retail audience.

**Deleted:** concealed

**Deleted:** Defendants Steve

**Deleted:** Boris

53. Bannon's and Epshteyn's later statements describing the Token as decentralized, self-governing, and insulated from insider control were misleading in light of FJB's original structure, which vested control over the smart contract, fee routing, team wallets, and branding in a small group of insiders—control that then passed to Bannon and Epshteyn.

**Deleted:** Defendants'

**Deleted:** treasury

**Deleted:** who never meaningfully relinquished that

54. Bannon's and Epshteyn's statements touting the marketing and charity taxes as investor-benefiting features were misleading because they failed to disclose who controlled the

**Deleted:** Defendants'

**Deleted:** to the extent Defendants

marketing and charity wallets, how those wallets were actually used, and whether fees collected under those labels were in fact used for marketing and charitable donations as represented.

**B. The Founders Transferred Control of $FJB to Bannon and Epshteyn Under an Undisclosed Payment Agreement Funded by Investor Fees**

55. By a written "Cryptocurrency Payment Agreement" (the "Payment Agreement"), the Founders agreed to transfer "control, administration, and governance of the Coin" to TWinds and 354 Nod Hill (collectively, in the agreement's words, the "Recipients"). Under the Payment Agreement, the Recipients "acquire[d]" "two billion, (2.0B), of the Coin from Founders," and the "Recipients will assume full control of the Coin," including "general marketing and promotion decisions" and "potential updates to the Coin smart contract code." The Payment Agreement recited that the Recipients "wish to assume control of the Coin operations in exchange for ownership of the Coin," and that the parties wished "to gain full legal and accompanying ownership … of the Delaware Limited Liability Company Let's Go Brandon Coin LLC (the 'LLC') that owns appropriate rights to the Coin." It provided that "[c]ontrol of the LLC or smart contract private keys is not transferrable to any party or entity other than an entity or entities controlled by the Recipients until after expiration of 12 months from Closing Date"; that the parties "shall not sell any of their holdings of Coins for 60 calendar days from the Closing Date"; and that the Founders "relinquish all ownership and accompanying responsibility … of the Coin." Bannon, on behalf of 354 Nod Hill, and Epshteyn, on behalf of TWinds, signed the Payment Agreement on December 2, 2021; the steps to reach a closing were to be "completed by December 6, 2021."

56. Bannon and Epshteyn treated the acquisition as their own, not as a transaction between shell companies. On *War Room* on December 23, 2021, Bannon announced that "[w]e've actually partnered with and have taken a significant control of" FJB, and Epshteyn told Bannon on air that "you and I have taken strategic ownership positions in FJBCOIN." Four days later, on the

Deleted: Secretly

Deleted: Through

Deleted: Sale

Deleted: <#>In or about December 2021, the Founders entered into a written agreement transferring Let's Go Brandon Coin LLC and two billion (2.0 billion) $FJB Tokens to 354 Nod Hill LLC and TWinds LLC, which are owned and controlled by Steve Bannon and Boris Epshteyn respectively. Bannon and Epshteyn assumed "full legal" "ownership of the Coin," "control, administration, and governance of the Coin," and "[c]ontrol of the LLC [and] smart contract private keys." On information and belief, Bannon and Epshteyn evenly split the Tokens between them, with each taking 1 billion Tokens.

December 27, 2021 episode, Bannon thanked Epshteyn personally for the deal: "Boris, I want to thank you for doing this and for getting the FJB Coin guys involved in this. I really want to thank you for putting this together."

57. As Tragni privately acknowledged, Epshteyn controlled the project's bank account and its Coinbase account:

Deleted: Defendants, through

Deleted: , acquired and retained control of

Deleted: associated with FJB's




Deleted: 


58. When a project insider asked Tragni how the project's bills would be paid, Tragni responded: "Boris has the bank acct[.] He has this whole time." Asked for the project's Coinbase login, Tragni wrote that it was the login "which boris had the entire time," and that "there is no funds for the coin." A project moderator later told investors the same thing: Tragni "was the only other person on the FJB bank account with Boris."

59. Coinbase is the largest cryptocurrency exchange in the United States. Unlike a decentralized exchange such as PancakeSwap, Coinbase is a regulated company that allows account holders to sell crypto assets for dollars and transfer those dollars to a linked bank account. For a project whose fees were collected on the blockchain, a Coinbase account and a linked bank account were a means of converting those fees into dollars and spending them. Whoever controlled those accounts controlled where investors' fee money went once it left the blockchain. Blockchain records trace fee proceeds from the team wallets into a Coinbase deposit account, including a transfer of 2,484 BUSD, a stablecoin pegged to the dollar.

60. Critically, Bannon and Epshteyn did not pay cash or other consideration to acquire $FJB. Instead, the Payment Agreement structured the transaction so that the acquisition would be financed through ongoing transaction fees paid by retail investors, rather than through capital contributions by Bannon, Epshteyn, or their LLCs.

61. Specifically, the Payment Agreement provided that the Token's embedded 3% "marketing fee"—collected from every transaction—would be paid to the Founders for twelve months following the transfer of control.

62. The Payment Agreement did not require the Founders to spend the "marketing fee" on marketing, or to perform any marketing at all. The fee was simply to be "received by Founders for 12 months from Closing Date," and was to be "maintained regardless of any fork, iteration, and/or changes made to the code and coin."

63. As a result, the so-called "marketing fee" was not, in fact, tied to marketing activity, performance, or expenditures. Instead, it functioned as a mechanism to compensate the Founders for transferring control of the Token to Bannon and Epshteyn—using funds generated from retail investor transactions.

**Deleted:** agreement
**Deleted:** Defendants'
**Deleted:** Defendants themselves
**Deleted:** agreement
**Deleted:** a defined period
**Deleted:** agreement further stated that
**Deleted:** would receive these
**Deleted:** -
**Deleted:** payments without any obligation to perform
**Deleted:** services, regardless of whether Defendants modified, terminated
**Deleted:** failed
**Deleted:** carry out
**Deleted:** efforts.

64. The Payment Agreement also provided that the two billion Tokens transferred to the Recipients would be whitelisted or otherwise exempted from transaction fees, allowing Bannon and Epshteyn to transact without paying the same fees imposed on retail investors. The exemption remained in place. On November 14, 2022, in a private chat group of early holders, a project administrator listed "Project owners" among the categories of "tax free wallets" and wrote that "Boris and Bannon are #2"—the project owners. Holders tracking the blockchain identified those wallets as the addresses ending in 25e4 (Bannon) and 5EB8 (Epshteyn), each of which held approximately one billion $FJB.

65. Bannon and Epshteyn never disclosed these terms to investors.

66. At no time did Bannon or Epshteyn disclose that retail investors were, in effect, financing the acquisition and control of the project through transaction fees that were purportedly earmarked for marketing and growth.

67. Instead, Bannon and Epshteyn publicly characterized their involvement as a "strategic partnership" or collaborative effort, creating the misleading impression that they were contributing value, capital, and effort to the project on the same terms as other participants. Although Epshteyn told *War Room* viewers that he and Bannon had "taken strategic ownership positions," neither disclosed that they had paid nothing for those positions, that investors' own fees were paying for them, or that their positions were exempt from the fees every other holder paid.

68. In reality, the Payment Agreement ensured that Bannon and Epshteyn assumed total control of FJB with minimal financial risk, while retail investors bore the economic burden of funding the acquisition through transaction fees extracted from their trades.

Deleted: agreement
Deleted: 2
Deleted: Defendants or their affiliates
Deleted: Defendants
Deleted: ¶
None…
Deleted: were disclosed
Deleted: Defendants
Deleted: Defendants'
Deleted: Defendants
Deleted: Bannon and Epshteyn
Deleted: agreement
Deleted: Defendants

69. The existence and terms of this agreement were material to investors because they revealed that:

a. Bannon's and Epshteyn's incentives were misaligned with those of retail investors;

b. marketing fees were not being used for marketing as represented;

c. Bannon and Epshteyn were not required to provide ongoing promotional or operational support; and

d. the Token's economics were structured to benefit insiders regardless of project success.

**Deleted:** Defendants'

**Deleted:** Defendants

70. Bannon's and Epshteyn's failure to disclose the terms of the Payment Agreement rendered their statements about marketing, partnership, alignment of interests, and long-term commitment materially false and misleading when made.

**Deleted:** Defendants'

**Deleted:** agreement

71. This undisclosed transfer of control marked a fundamental shift in the Token's governance and risk profile and set the stage for the subsequent misrepresentations, omissions, and investor harm described below.

## III. BANNON AND EPSHTEYN RE-LAUNCH FJB AS A UTILITY TOKEN PERSONALLY BACKED BY THEM

**Deleted:** DEFENDANTS

**Deleted:** BANNON AND EPSHTEYN

### A. Bannon Publicly Promotes $FJB While Concealing That He Had Already Acquired Control of It

**Deleted:** His Ownership and the Investor-Funded Nature…

**Deleted:** His Involvement

72. After Bannon and Epshteyn acquired control of the Token, Tragni continued to be heavily involved with the management and operation of the Token. But, as he told holders on December 19, 2021, "I haven't been running the show since December 2nd," and "I don't own the project."

**Deleted:** the transfer of ownership and control to

73. Around that same time in late 2021, and no later than January 2022, Abdul joined the FJB project as an administrator. Bannon and Epshteyn, in Abdul's words, "inherited" her, and

**Deleted:** the other Defendants brought on Sarah

**Deleted:** as a

she became their senior administrator, spokesperson, and operational representative for the project, communicating directly with investors and participating in decisions regarding marketing, vendors, remediation efforts, and project governance.

74. In December 2021, days after the Payment Agreement was signed, Bannon began publicly promoting the Token while failing to disclose his ownership interest or control.

75. On December 7, 2021—five days after the Payment Agreement's signature page was dated—Bannon appeared on *The Culture War* podcast hosted by Tim Pool to discuss the Token. In response to the podcast host's skepticism that FJB was yet another "scam crypto," Bannon emphasized how he "think[s]" a portion of FJB's transaction fee "goes to veterans," presenting himself as a neutral observer. Bannon then added that he "think[s] things like FJB … have to be looked at" and "you owe it to yourself to look at your own digital sovereignty, your own data sovereignty, your own ability to participate in not just cryptocurrencies but other stores of value," because the government "destroyed the U.S. Dollar" with its "printing machine up in Capitol Hill" and spending "$7 trillion."

76. At no point during that appearance did Bannon disclose that he had already acquired ownership and control of $FJB, that he stood to profit directly from increased trading volume, or that retail investors were funding his acquisition through transaction-based "marketing" fees embedded in the Token's smart contract.

77. Instead, Bannon spoke as if he were an outside commentator or advocate, rather than a controlling insider. This omission was material because reasonable investors would have viewed his statements differently had they known he was promoting a Token he owned, controlled, and economically benefited from.

**Deleted:** FJB

**Deleted:** shortly after Defendants Bannon and Epshteyn acquired control of FJB pursuant to a private, undisclosed agreement…

**Deleted:** ,

**B. Bannon and Epshteyn Announce Their "Strategic Ownership Positions" and Promote FJB as a Means of Avoiding Political and Financial Persecution**

Deleted: a "Partnership" with FJB

Deleted: It

78. Approximately two weeks later, on December 23, 2021, Epshteyn made a guest appearance on *War Room*, which is produced by Warroom LLC, during which the pair jointly announced their involvement with FJB. Bannon told his audience: "We've gone into the FJB coin, okay? It's going to be a currency. We're building a community." Epshteyn followed: "you and I have taken strategic ownership positions in FJBCOIN. The website is fjbcoin.org." Bannon also told his audience: "we're building institutions, credit cards, banks, insurance, all of it across the board, which we'll announce later. But now we're coming out with a currency." Epshteyn told viewers that "as we build this community, this will then become the currency for the MAGA movement built on the blockchain," and that "[i]t's uncancellable. It's immutable. … It cannot be robbed from you. It cannot be taken away from you."

Deleted: Bannon's

Deleted: podcast

79. Bannon pitched FJB Coin as a means of avoiding political and financial persecution by President Biden and a Democrat-led federal government. Through FJB, Bannon stated, investors would "very quickly have non-reliance on their financial system," such that "[t]hey're not going to be able to disappear you like the Chinese Communist Party, like the Bolsheviks, like the Nazis" who "try to … get rid of the good people." Instead, investors would "have platforms and institutions that are going to have your back" and "total and complete independence."

Deleted: ." Through $FJB, he said, investors would "very quickly have non-reliance on their financial system

80. Bannon also emphasized that "over $50,000, $60,000 now" had been donated to veterans and first responders, and that he and Epshteyn were going "to add to the charities that some of the fees go to," including supporting "the political prisoners of January 6th." Epshteyn told viewers that "[p]art of the reason that we've joined with this project is they've already donated over $50,000 to key charities," naming "Tunnel to Towers, Wounded Warriors, [and the] Semper Fi Project." Welcoming a representative of the Patriot Freedom Project, Epshteyn promised: "it'll

be our honor as partners in the FJB[] movement to contribute to your charity. … We'll make that contribution over the holidays[,] … we'll make it public," and assured viewers that FJB was "going to be donating portions of the transaction fees that are all public." On *War Room* on December 27, 2021, Bannon told viewers that "part of the proceeds of the fees that come off of the exchange of the FJB coin, we give it to veterans groups, we give it to police groups," and on December 31, 2021, he told them that part of the transaction fees were "going to the Wounded Warriors, Tunnels to Towers, the First Responders groups."

81. Epshteyn added that purchasing FJB Coin was joining a "movement" led by true patriots who "love America," that he and Bannon were going to "build" a "community specifically for holders of these tokens" through "media, parts of shows, videos, et cetera," and that "exciting information" was coming down the pipe such that investors would want to "make sure you're a member of that community."

**Deleted:** will

82. The Token was advertised on *War Room* alongside *War Room* branding, with the two logos appearing side by side:

**Deleted:** the podcast

**Formatted:** Font: Italic




**Deleted:**




In that same or another appearance on

83. On *War Room* in December 2021, Epshteyn named the Wounded Warrior Project, Tunnel to Towers, Semper Fi, and Patriot Freedom Project as donation targets to be paid from the

**Deleted:** on or around

**Deleted:** 23,

**Deleted:** Tunnels To

FJB charity wallet. As alleged below, the Wounded Warrior Project received no donation from $FJB after Bannon and Epshteyn took control.

84. The project's advertising touted the same partnership and the same charitable giving. One FJB advertisement, featuring Bannon's and Epshteyn's photographs, proclaimed a "STRATEGIC PARTNERSHIP WITH STEPHEN K. BANNON AND BORIS EPSHTEYN" and that FJB had "DONATED OVER $60,000 TO CHARITY":

Deleted: Defendants'




85. Bannon's and Epshteyn's December 23, 2021 statements created the impression that purchasing and holding $FJB would allow investors to achieve meaningful financial independence from banks and traditional institutions; that $FJB was a decentralized, censorship-resistant means of avoiding political retaliation such as "de-banking," "disappearing," or being cut off from the financial system; that the Token's fees were being publicly donated to named charities; and that Bannon and Epshteyn were building a parallel financial infrastructure that could not be controlled by centralized actors.

Deleted: and that Defendants

86. This was false and misleading because $FJB was not decentralized in any meaningful sense: control over the Token's smart contract, fee routing, and key wallets remained centralized in the hands of insiders—and, under the Payment Agreement, in the "full control" of Bannon's and Epshteyn's LLCs—and those insiders retained the practical ability to control liquidity, dictate the Token's operational parameters, and, ultimately, disable trading. Investors therefore did not obtain protection from political persecution or financial exclusion; instead, their ability to access liquidity and realize value depended on the discretionary control and continued cooperation of Bannon, Epshteyn, and the persons they allowed to hold the Token's keys.

87. Bannon's and Epshteyn's comparison of $FJB to the banking system also ran the wrong way. A bank that closes a customer's account must return the customer's money, and bank deposits are insured by the Federal Deposit Insurance Corporation up to $250,000. Even when a bank closes an account or fails, the dollars it held keep their value, because dollars are issued by the United States and held and accepted throughout the economy; no single bank's decision can make them worthless. $FJB offered none of these protections. No one insured holders' Tokens, and no regulator oversaw the project. The Token existed only on a single smart contract, and the handful of insiders who held that contract's keys could freeze any holder's wallet, or disable trading altogether, everywhere at once, without legal process, and nothing in the Token's design gave holders a way to get their money back. And because the project was the Token's only issuer and the only source of its value, a decision by those insiders to abandon the project could leave every holder's Tokens worthless. That is what happened: in December 2023, insiders withdrew the Token's liquidity, leaving holders unable to sell, and in February 2025, trading was disabled and the promised distribution of the liquidity pool never came.

**Deleted:** , and Defendants and their agents

**Deleted:** —

**Deleted:** —

**Deleted:** Defendants'

**Deleted:** <#>Further, because FJB utilized a mobile app on the Apple and Google App Stores, it relied on Apple and Google for approvals in order to function, which is contrary to Defendants' purported development of a resilient parallel economy.¶
**Defendants Continued to Present Themselves as "Partners" to FJB, When Really They Owned and Controlled It**¶

88. Further, the FJB app was distributed through Apple's App Store and Google's Play Store, and it could reach investors' phones only if Apple and Google approved it. As of June 2022, the iOS version was still in Apple's "TestFlight" testing program, "waiting for Apple to push us live." The dependence continued after the rebrand. In December 2023, Abdul told investors that the marketing of Patriot Pay was waiting "on … the Apple and Google Play Store to change our logo and the app name," and read from the project's plan: "App to be completed for [Bannon] to talk about Patriot Pay on War Room."

**C. Epshteyn Uses His Personal Accounts to Promote FJB as a "Strategic Partnership" and a Way "Not [to] Be Cancelled"**

89. On December 23, 2021, Epshteyn promoted the Token on his personal Twitter and GETTR accounts (@BorisEP): "With Biden crashing the dollar, crypto is the way to protect yourself and not be cancelled. There is no better project to send a message to Joe than #FJB Coin. Support #FJB Coin today!" The post attached a graphic announcing a "$FJBCOIN STRATEGIC PARTNERSHIP." It did not disclose that Bannon's and Epshteyn's LLCs had acquired "full control of the Coin" under the Payment Agreement, that the acquisition was being paid for with investors' transaction fees, or that their Tokens were exempt from those fees.

**Deleted:** through

**Deleted:** account as "

**Deleted:** ," "[w]ith Biden crashing the dollar." The tweet painted Bannon's and Epshteyn's involvement

**Deleted:** FJB as a "strategic partnership," when in fact Bannon and Epshteyn wholly owned and controlled the Token's smart contract and tax wallets




Deleted: 

90. The Token was repeatedly promoted as affiliated with and backed by *War Room*. For example, on December 24, 2021, Epshteyn posted the following on his personal Twitter account:

**Formatted:** Font: Italic




Deleted:




91. Epshteyn repeated the misleading depiction of his and Bannon's role in a tweet he posted on December 25, 2021:




Deleted:



92. That tweet linked to an article on conservative news site *Gateway Pundit*, dated December 25, 2021, which republished the announcement and reported that Bannon and Epshteyn had taken "strategic ownership positions" in the Token. The press kit distributed with the announcement included the following promotional image, announcing a "Strategic Partnership" between Bannon, Epshteyn, and *War Room* on the one hand, and FJB on the other. It also highlighted Bannon's and Epshteyn's ties to President Trump, experience, and credentials, including that Bannon is a Harvard Business School graduate who worked as an investment banker at Goldman Sachs and Epshteyn is a graduate of Georgetown Law School.

**Deleted:** was one of many press releases Defendants put out. The press kit Defendants sent out

**Formatted:** Font: Italic




93. Bannon and Epshteyn repeatedly tied their personal brands to FJB's. For example, on December 30, 2021, Epshteyn posted the following on his Instagram account—an image of Bannon and Epshteyn flanking a cartoon bald eagle with the text "$FJB" prominently displayed in the center:



Deleted:




94. On January 5, 2022, Epshteyn returned to *War Room* to announce that "FJBCOIN is live today on two new exchanges," including LBank, where "you could buy it with American dollars. You could join the community, join the FJBCOIN movement with American dollars." Bannon told the audience, "That's what we got involved to build this community around."

**D. Bannon and Epshteyn Stress Their Personal Commitment to FJB's Success and Promote It as an Inflation-Resistant, Alternative Store of Value**

95. On January 6, 2022, Bannon and Epshteyn joined a live call with FJB holders, a recording of which was posted to FJB's official YouTube channel. On the call, Bannon publicly endorsed FJB as a serious, functional digital currency and alternative financial system, expressly tying the Token to his own experience and credibility as an investor and business executive. Bannon stated that he had been "very involved in digital currencies," that he had "spent many years investing in companies" in the digital currency space, and that he believed it was "the right time to get involved in a digital currency" because Americans were being "forc[ed] … into alternative currencies" for transactions and as "alternative stores of value." He told holders: "We're not looking at this some quick day trade, right? In fact, we're doing the exact opposite.

**Deleted:** 


**Deleted:** in

**Deleted:** promotional video

What we're looking at is this is going to be a real currency that can be used for real transactions and [an] alternative store [of] value that gets you away from the devaluations that the American people are going [through] every day."

96. On the call, Bannon further represented that he and Epshteyn were actively building FJB as a usable currency, stating that "Boris and I, 24 hours a day, are talking to people about using this currency as a means of transaction," that they were in discussions with "major people" and "all types of verticals," and that FJB would be "used for transactions," offer "discounts," and be supported by "market makers, exchanges," and a "robust, liquid, deep capital market." Bannon also represented that he and Epshteyn were "commit[ted]" to "putting our shoulder to the wheel," bringing in "smart, tough people," and committing their ongoing efforts to ensure that FJB would be "a currency we can count on" with real "value" and "use[]." He promised investors that he was "bringing every ounce" to the project—"[a]ll the skills I've learned throughout my life—as a Naval officer, at Harvard Business School, at Goldman Sachs, all my years as an entrepreneur and investor, and now in … media or politics." And he vouched for Epshteyn: "Boris is laboring 24 hours a day and this guy's a horse."

97. Epshteyn made his own promises on the same call. "As far as this project is concerned," he said, "we are all in, as Steve said, 24 hours a day and we are … driving to make FJB a top 50 cryptocurrency project in the world." He told holders that "major retailers" would "take the FJB coin as currency … as the dollar continues to be devalued," and that "our key goal we have for 2022 is to build a payment gateway." Asked to name the milestone FJB would reach by the end of 2022, Epshteyn answered that FJB would be "the currency of the MAGA movement[,] … accepted by major retailers … [and] by mom and pop shops … all across the country. … That's the milestone that I'm seeing that I'm confident we'll achieve in 2022."

Deleted: In

Deleted: video

Deleted: Defendants

Deleted: Defendants are

Deleted: of "[

Deleted: In the video

98. On the call, Bannon repeatedly invoked imminent economic collapse to induce purchases of FJB, warning that the United States was "hurtling towards an economic financial crisis" due to what he described as an "out-of-control regime" and a corrupt network spanning Wall Street, central banks, and global financial institutions. Bannon asserted that since the 2008 financial crisis, elites had "forced fiat currency into the system" through zero and negative interest rates and quantitative easing, creating artificial asset bubbles while shifting the economic burden onto ordinary Americans. That is why, Bannon said, FJB was "absolutely essential … [f]or the survival of sovereignty and the patriot movement."

99. These statements conveyed that traditional financial systems were on the brink of failure and that immediate participation in alternative currencies like FJB was necessary to protect wealth, transact outside the system, and preserve economic sovereignty. Bannon and Epshteyn did not disclose that insiders could freeze holders' wallets, that the Token's liquidity depended on insiders who controlled the liquidity pool, or that nothing in the Token's structure protected holders from the insiders who controlled it.

**Deleted:** Defendants

**Deleted:** FJB lacked any functioning payment infrastructure, liquidity support, or safeguards that would allow it to serve as a viable alternative during a financial crisis, nor

**Deleted:** value

**Deleted:** overwhelmingly

**Deleted:** continued promotion and insider effort rather than on any intrinsic economic resilience

100. On January 10, 2022, Epshteyn posted a video of himself and Bannon on Rumble in which they described FJB Coin as a "new economy—an economy that cannot be deflated, an economy that cannot be copied, an economy that is unique." They promised that there is "a lot of new information coming" and "a lot of developments coming" that are "very exciting." They directed the audience to FJBCoin.org to learn more.

101. On January 18, 2022, Epshteyn appeared on *War Room* and announced a new hire: "Steve, you and I became strategic partners with FJB Coin just a few weeks ago. And today I'm so proud to announce that we are bringing on a senior strategic advisor, [Erik] Finman," who would be "leading the charge to build out the FJB coin." On January 25, 2022, Epshteyn returned to

**Deleted:** Defendants'

promote the forthcoming FJB app, telling viewers that "it is going to be as easily accessible as any other app you have," and that "[w]e're making ease of transaction a reality."

102. On a January 27, 2022 call with holders, Epshteyn told investors that "from the moment that Steve and I joined this partnership, we became part of this movement, … [a]ll our focus has been on growing it, on making it bigger." Bannon told the same call that "what Boris and Fin[man] are doing every day" was working to "build the depth of the capital market" and to "make ease of transactions and transparency paramount." Epshteyn described *War Room*'s audience as "the most actionable audience really, I think in the history of media." On the same call, Epshteyn told holders that "the app, the direct opportunity to join the movement, to buy the coin through the website is going to be revolutionary," and contrasted $FJB with LGBCoin, a separate "Let's Go Brandon" token: "You've seen this, the dichotomy couldn't be clearer in the last 24 hours in what's happening with our movement, the FJB movement, and what's happening with the joke LGB coin that they had. They try to pump it, dump it, whatever they're doing with it. They're not viewing that as a serious endeavor, as we are seeing this as a serious movement, as a vital movement, and as a movement that takes our MAGA community into the future."

103. On the same call, Epshteyn also told holders that what had happened to "the other coin in the last 24 hours" was "[n]ot so good, but that's what happens when all you want to do is play on memes and be funny. Well, what we're doing is we are expressing a very serious statement." Bannon described $FJB as "a long-term play" meant "to make sure that we can do transactions with this and eventually become an alternative store of value," and said the project was building what "makes this an alternative, not just coin, but alternative currency for both transactions and ultimately store value." He urged holders: "Get some people into the community. Get some people to buy some coins."

104. Bannon's and Epshteyn's economic doomsaying created the impression that $FJB would function as a safer alternative to fiat currency during periods of inflation and monetary instability; that it could serve as a stable store of value to protect ordinary Americans' savings from the alleged destruction of the U.S. dollar; and that it possessed the liquidity, infrastructure, and durability necessary to serve as a reliable medium of exchange in the event of financial crisis.

105. This was false and misleading. Bannon and Epshteyn described $FJB as a "real currency" and an "alternative store [of] value that gets you away from the devaluations" of the dollar—devaluations that Bannon attributed to the decisions of central bankers and financial elites. But $FJB's value was subject to far more concentrated control: a small group of insiders controlled the Token's smart contract, fees, key wallets, and liquidity, and could freeze holders' wallets or disable trading. And while telling holders that they were "all in" and that "[w]e're not looking at this some quick day trade," Bannon and Epshteyn did not disclose that they had paid nothing for their "strategic ownership positions," that investors' own fees were paying for them, or that their positions were exempt from the fees every other holder paid.

**Deleted:** <#>This was false and misleading because $FJB lacked independent utility, meaningful adoption, or intrinsic economic safeguards, and its price and liquidity were overwhelmingly dependent on speculative trading and Defendants' continued promotion and management. Defendants also failed to disclose that insiders maintained centralized control over key wallets and liquidity and could restrict or disable trading—risks fundamentally inconsistent with Defendants' portrayal of $FJB as a stable refuge from fiat-currency decline.¶

106. Bannon's and Epshteyn's contrast between $FJB and the dollar was also false when made. They told investors that $FJB would protect them from "the devaluations" of the dollar. But nothing in $FJB's design preserved purchasing power. It had no reserves or backing and gave holders no right to redeem it for anything; insiders controlled its supply, its liquidity, and its wallets; and its value depended on Bannon's and Epshteyn's development, management, and promotion of the project. What that meant for investors soon became clear. Consumer prices rose 6.5% from December 2021 to December 2022. Over the same period, the price of $FJB fell from approximately $0.0044 on December 27, 2021—the day Bannon thanked Epshteyn on *War Room* "for putting this together"—to approximately $0.00011 on December 31, 2022, a loss of more than

97% of its value. A holder who had moved $1,000 of savings out of dollars and into $FJB at the end of December 2021 to escape inflation would have been left with less than $30 a year later; the same $1,000 held in dollars would have retained roughly $940 of its purchasing power.

### E. $FJB Is Rebranded and Promoted as a "Safe," "Decentralized" "Alternative" to the Dollar and a "Utility Token" with "Real-World Applications"

107. In or about early 2022, the FJB project, under Bannon's and Epshteyn's control, disseminated, including through FJBCoin.org, an official "FJB App Whitepaper," which described a new iteration of FJB—denoted as "V2"—as a "safe, decentralised crypto wallet and payment app," where investors "can safely store their digital assets." The whitepaper represented that the project would enable the Token to function as "an alternative or a near-replacement to fiat currencies," "traditional banking," and "centralized institutions," users of which run the risk of being "de-banked." The whitepaper promised that "[t]he FJB wallet will not only promote individual wealth, it will also ensure individual freedom at various levels such as economic, social, political, and otherwise."

Deleted: Defendants

108. The FJB app was the centerpiece of the utility Bannon and Epshteyn promised. According to the whitepaper, the app would be a "simple, secure decentralized multi-crypto wallet application" through which users could "store, send, receive, spend, exchange and swap crypto assets"; buy "real-world goods and services" through an "FJB Marketplace" and a merchant "payment gateway"; and do so without the project ever holding "custody of users' funds." The whitepaper told investors that the app would make $FJB "a utility token, as it will be needed to access some major service areas of FJB Wallet application." Its roadmap promised that the "FJB App (IOS/Android)" would be "built and deployed" in the second quarter of 2022, a "Payment Gateway" in the third quarter, and an "FJB Exchange" by the end of 2022.

109. Bannon and Epshteyn promoted the app as the Token's core function. Epshteyn told *War Room* viewers that the app would be "as easily accessible as any other app you have," called it a "safe, secure, and easy to use financial alternative!," and told radio listeners that "FJB released an app where you could buy and sell cryptocurrency."

110. The whitepaper repeatedly described FJB as a "utility token" that would support "real-world applications" such as peer-to-peer payments, retailer payments, a payment gateway, and a fully developed wallet ecosystem, and included detailed architectural diagrams, mockups, and a multi-quarter roadmap. The whitepaper assured that "[t]he FJB wallet will ensure that all these features are implemented."

111. The whitepaper further represented that FJB "is designed with a deflationary burning mechanism whereby 1% of FJB Wallet surcharges will be used to repurchase FJB from the available supply of the Pancake Swap liquidity pool to be permanently burnt … until only 5% of the total FJB available supply is left" and "the available supply reaches its desired levels."

112. These representations conveyed to reasonable investors that Bannon, Epshteyn, and those working at their direction were actively developing, funding, and executing a functional payment ecosystem, that the Token's value would be driven by their ongoing managerial and technical efforts, and that the Token would be a safer alternative to fiat currencies like the U.S. dollar.

113. In reality, when the whitepaper was issued, the 3% "marketing" fee charged on each on-chain transaction was already committed, under the undisclosed Payment Agreement, to paying the Founders for Bannon's and Epshteyn's acquisition; the Payment Agreement imposed no obligation on Bannon and Epshteyn to market or develop the project; much of the functionality

**Deleted:** Defendants

**Deleted:** Defendants'

**Deleted:** Dollar

**Deleted:** Defendants failed

**Deleted:** build

**Deleted:** deploy the promised ecosystem, failed to devote meaningful resources to development, failed to implement the …

the whitepaper described had not been built; and the risks associated with investing in a new, unproven cryptocurrency were never disclosed.

114. The whitepaper also identified Bannon and Epshteyn as key team members and advisors, highlighting the same ties to President Trump, experience, and credentials.

115. The whitepaper also listed Finman as a key team member and advisor, touting him as "the youngest Bitcoin millionaire in the world."

116. Investors reasonably understood these representations to signal that Bannon and Epshteyn were actively overseeing the project and would use their influence, resources, and platforms to promote and develop the Token.

117. In truth, Bannon and Epshteyn had not committed the resources those representations implied: investors' fees were financing Bannon's and Epshteyn's own acquisition, and nothing obligated them to promote or develop the project.

118. These omissions rendered the whitepaper's statements materially false and misleading.

**F. Despite Being Billed as "Decentralized" and a Pathway to "Independence," the Token Retained a Backdoor That Let Insiders Freeze Investors' Wallets**

119. When $FJB was promoted as decentralized, neither Bannon nor Epshteyn disclosed that its smart contract allowed its operators to manually lock an investor's Token balance—something that has been described by experts as an "unusual practice" for a cryptocurrency.

120. If the manual lock were activated, the holder of the contract-owner keys could restrict or freeze Token transfers by one or more wallet addresses, including by imposing a global or wallet-specific freeze that prevented affected investors from selling their Tokens. At the same time, the smart contract permitted privileged-status wallets—including the fee-exempt "Project

**Deleted:** in the whitepaper, and failed to adequately disclose

**Deleted:** Defendants Steve

**Deleted:** Boris

**Deleted:** their

**Deleted:** , including that Bannon is a Harvard Business School graduate who worked as an investment banker at Goldman Sachs and Epshteyn is a graduate of Georgetown Law School…

**Deleted:** Erik Finman was

**Deleted:** and touted

**Deleted:** ." Finman was seen as a crypto whiz kid who could lend further credibility to the project.

**Deleted:** Defendants intended for, and investors

**Deleted:** ,

**Deleted:** Defendants failed

**Deleted:** meaningfully

**Deleted:** , while continuing to reassure investors that the project would be revived or expanded

**Deleted:** Defendants Built in

**Deleted:** to

**Deleted:** Them

**Deleted:** promoting

**Deleted:** "

**Deleted:** ," Defendants failed to disclose

**Deleted:** Defendants

**Deleted:** Defendants and other

**Deleted:** to retain

**Deleted:** ability to transfer Tokens and

owners" wallets—to transact without fees, creating a system in which insiders enjoyed advantages that ordinary investors did not.

121. For example, if $FJB's price were to begin to drop, the contract owner could freeze investors' wallets to prevent further decline while insiders liquidated their holdings. By the time locked investors regained access, their Tokens would be worth significantly less.

122. While locks are sometimes written into cryptocurrency code as an "anti-whale" feature to mitigate against the influence of big investors, the locks typically come in the form of triggers that automatically apply to holders trying to carry out large transactions. With $FJB, whoever held the contract-owner keys had the power to manually pick and choose whose wallets to lock and when, for any reason or for no reason at all.

123. This was no mere hypothetical possibility. In December 2023, insiders withdrew the Token's liquidity, and holders could not sell their Tokens for two months, as alleged below. The project then relaunched the Token as $PPY and told investors that it was free from "freezing of your account," without disclosing that the new contract's administrators could still change its transfer restrictions. In July and August 2024, Abdul told holders that "digital does not mean the government can shut it off," while acknowledging that the project "block listed" holders' wallets: "nobody gets block listed unless it's been proven to be a naughty, naughty wallet."

## IV. BANNON AND EPSHTEYN BARELY MARKET $FJB BUT ASSURE INVESTORS THEY REMAIN COMMITTED TO ITS SUCCESS

### A. Erik Finman Makes His First and Last *War Room* Appearance for $FJB in April 2022

124. Despite their promise of "exciting" developments to be revealed soon and their commitment to work on the project "24 hours a day," Bannon and Epshteyn largely fell silent after their flurry of appearances in December 2021 and January 2022.

**Deleted:** could continue to sell or move Tokens while

**Deleted:** faced transfer restrictions

**Deleted:** Defendants

**Deleted:** at the same time liquidating

**Deleted:** codes

**Deleted:** Defendants

**Deleted:** <#>This was no mere hypothetical possibility, but something Defendants frequently did throughout the Class Period, arbitrarily and without notice to investors.¶ DEFENDANTS…

**Deleted:** Defendants

**Deleted:** for approximately eight months

**Deleted:** FJB's re-launch

125. A rare exception was a single appearance Finman made on *War Room* on April 18, 2022, to promote the new FJB Coin App alongside Bannon. On the podcast, Finman and Bannon both described Finman as a "Senior Strategic Advisor" to FJB who helped build the app. That day, Finman told holders that a service provider to the app had "completely shut us down" and sent a questionnaire asking "are you working with Steve Bannon or not? Is he the person that runs this project or not?"—questions to which, Finman said, "you either say no, and that's a lie, which we don't lie, or you say yes."

**Deleted:** Erik

**Deleted:** describe

126. Finman stated that "the goal of FJB Coin is to get crypto and this un-cancelable financial system" in the hands of "as many conservatives and patriots as possible." He noted that he designed it so even his "parents and grandparents" could use it.

**Deleted:** notes

127. Bannon jumped in to note that whereas gold functions simply as a store of value but not a means of transactions, crypto functions as "an alternative store of value and transactions." Finman similarly noted that FJB has "an actual utility to it," as you can "send it to friends" and "merchants and small businesses can accept it."

128. Finman, with Bannon expressing agreement, explained that FJB was a response to "the fall of the dollar empire" caused by President Biden's "using the techniques that they used on Iran on the American people," namely "sanctions" targeting conservatives like MyPillow CEO Mike Lindell and Lieutenant General Michael Flynn so they "can't have a bank account." FJB, Finman said, is a means "to get free from it."

129. Directing a message to "the American people," Bannon warned "you're having a rolling devaluation on your net worth if you hold dollars" because of the government's deficit spending, which is "just going to crush the dollar even more." That is why listeners "need to find out about crypto" and "you owe it to yourself" to learn about FJB.

**Deleted:** warns

130. Despite being initially trumpeted as a "key" team member and advisor for $FJB, this would be Finman's first and only *War Room* appearance on behalf of the Token.

131. That same day, Epshteyn put out the following tweet describing FJB as a "safe, secure, and easy to use financial alternative" to the "[b]anks and payment processors" that "don't care about you or your values":




132. Epshteyn's post and Bannon's statements that day were false and misleading. $FJB was not a "safe" or "secure" alternative to the "[b]anks and payment processors" that could cut holders off: a small group of insiders controlled the Token's smart contract, fees, key wallets, and liquidity, and could freeze any holder's wallet or disable trading. Nor was $FJB "safe" or "secure" for a more basic reason: its value depended on the efforts to develop, manage, and promote the project that Bannon and Epshteyn had promised. Yet by April 18, 2022, their promotion of the Token had already largely stopped, as alleged above, and nothing required them to continue. They had paid nothing for their positions, investors' own fees were paying for them, and the Payment




**Deleted:** Despite being initially trumpeted as a "key" team member and advisor for $FJB, this would be Finman's first and only public appearance on behalf of the Token.¶
Defendants Put…

Agreement's 60-day restriction on selling had long since expired, leaving them free to walk away from positions that had cost them nothing. For the same reasons, $FJB was not "an alternative store of value" insulated from the kind of "rolling devaluation" Bannon warned of; its value was subject to the decisions of the insiders who controlled it. And in urging viewers that they "owe it to [themselves]" to learn about FJB, neither Bannon nor Epshteyn disclosed that their own positions had been paid for with investors' fees and were exempt from the fees every other holder paid.

**B. The Project Puts Out a Press Release Announcing $FJB's "First Phase" in August 2022**

133. On August 2, 2022, after months of inactivity, the project sent some conservative news sites and social media influencers—including Chuck Callesto, *Infowars*, *The Post Millennial*, and *CharlieKirk.com*—a press release announcing the "first phase" of a "parallel financial system" and "New Financial System for Conservatives" in the form of FJB. The press release linked to FJB's new website, FreedomJobsBusiness.org, which described the project's goal as "to create a decentralized economy with stronger assurances and privacy that is open to everyone to use, creating growth within the parallel economy."

Deleted: Defendants

Deleted: .

**The Freedom Jobs Business Organization launches its own 'Conservative Crypto-Wallet' as part of 'New Financial System' for Conservatives**

UNITED STATES, August 2nd, 2022 - - Freedom Jobs Business Organization, the blockchain-focused project that centers itself on increasing freedom, jobs, and business for Americans, has announced the beginning a "new financial system" for conservatives, with the first phase being the launch of its own easy-to-use app and platform that aims to be the "conservative crypto-wallet." The team sees their new cryptocurrency and wallet app as an essential tool for truckers, conservatives, small business owners, and anyone else who is being banned from payment processors and traditional financial services.

Former White House Chief Strategist under the Trump Administration, **Stephen K. Bannon**, had previously signaled his desire to create a "deplorables coin" to help conservatives build their own financial system. Now he is involved in the Freedom Jobs Business Organization and has been announcing it as not only the realization of this idea of a new financial system, but also an entirely new community for Americans.

"We're building a community that you can be a part of. We will never back down, ever. They're trying to destroy this country [...] We are going to fight it every day. We are going to stand up," said **Bannon**.

The Freedom Jobs Business Organization team's efforts to create a parallel financial system have been lauded by conservative icons and cryptocurrency entrepreneurs alike, who see this as a unique way to bring millions of new people into the crypto economy. For example, **Erik Finman**, who has joined the project as a Senior Strategic Advisor, has acknowledged their intention to lean into the culture wars and make their position well known. **Erik Finman** had previously announced his intention to sway the 2022 midterms in conservatives' favor by injecting millions of dollars across different races. He appears to be using the Freedom Jobs Business Organization to upscale these efforts, saying:

"This is a crucial moment not just for the Freedom Jobs Business Organization, but for anybody who cares about freedom and economic opportunity. We've seen far too many good, honest Americans silenced for fear of losing access to the traditional financial system. Big Tech cannot be allowed to keep a stranglehold on America. This is a real conservative alternative to coinbase. This marks the moment we build a new financial system, and the moment we take the muzzle off everyday Americans. We are tired of hiding, tired of being backed into a corner, and tired of being silent. Money talks, and the Freedom Jobs Business Organization gives Americans a loud voice to say what they've really been feeling - without having to worry about losing access to a financial system. It's time to put your cards on the table and show where you stand, no more pretending."

This full-court press to make a new financial system has been echoed by **Stephen K. Bannon,** saying, **"We're building institutions: credit cards, banks, all of it across the board."**

134. The release pitched the Token as backed by Bannon and Finman, and part of a "full-court press to make a new financial system." The Token was characterized in the release as "a real conservative alternative to coinbase"—a major cryptocurrency exchange with over 100 million users.

135. The press release also painted the Token as "essential" for "conservatives … being banned from payment processors and traditional financial services," and a means of securing freedom of speech for "good, honest Americans," "far too many" of whom have been "silenced for fear of losing access to the traditional financial system."

136. The press release's statements were false and misleading. The release told readers that conservatives were "being banned from payment processors and traditional financial services" and that "far too many" "good, honest Americans" had been "silenced for fear of losing access to the traditional financial system." But the public record reflects no appreciable number of ordinary Americans who lost access to banking or payment services for their political views, and in June 2021, according to the Federal Deposit Insurance Corporation, 95.5% of American households had a checking or savings account at a bank or credit union. And for anyone who did face that risk, $FJB offered no protection from it. $FJB was centrally controlled, its wallets could be frozen by whoever held its keys, its app depended on approval by Apple and Google, and its liquidity depended on the continued cooperation of insiders.

Deleted: Defendants'
Deleted: in the press release
Deleted: because they materially overstated the risk
Deleted: , as a class,
Deleted: or
Deleted: based solely on

137. By presenting $FJB as the answer to an imminent, systemic threat, the release created a false sense of urgency that overrode ordinary investor caution and positioned the Token as a necessary safeguard, when in fact its value depended on Bannon's and Epshteyn's development, management, and promotion of the project.

Deleted: framing isolated incidents
Deleted: proof of
Deleted: Defendants
Deleted: designed to override
Deleted: to position
Deleted: rather than a speculative

**C. Epshteyn Tours Conservative Media as FJB's "Co-Founder"**

138. Days later, Epshteyn took the pitch to other conservative audiences. On August 5, 2022, he appeared on *The Shaun Thompson Show*, whose host introduced him as "the co-founder of FJB Crypto Coin." Epshteyn did not correct the description. He told listeners that he and Bannon had been "approached" and had joined the project, and that FJB was "another option for monetary purchases and … [to] hedge inflation." Asked how FJB was priced, Epshteyn answered: "So we don't price it, right? … [T]he price is determined by how many users of the community there are, how widely accepted [it is], and that's part of what we're growing." He described the FJB wallet as "built in a way that it won't be deplatformed … not going to be taken away from you."

139. On August 8, 2022, Epshteyn appeared on *The Andrea Kaye Show*, which billed him as the "co-founder of 'FJB crypto coin.'" He told listeners that "Steve Bannon and I started getting involved with and joined the community in late, late last year," and that "[j]ust in last week FJB released an app where you could buy and sell cryptocurrency." Two different programs, three days apart, introduced Epshteyn with the same title. On information and belief, that is because Epshteyn or his team supplied it, as guests and their representatives customarily do when booking media appearances.

Deleted: asset

140. These statements were false and misleading. Epshteyn's statement that "we don't price it" omitted that the Token's price and liquidity were subject to insiders' control over the contract, the liquidity pool, the fee wallets, and the ability to freeze wallets. His statement that the wallet "won't be deplatformed" and was "not going to be taken away from you" was false: the contract owner could lock any holder's Tokens at will, and the app itself depended on Apple's and Google's approval. And his description of a released app omitted that, as Abdul later told investors, the app was "not very functional," which is why Bannon and Epshteyn "did not want to tell their War Room viewers to download the app."

## V. BANNON AND EPSHTEYN CONTROLLED THE PROJECT'S KEYS, WALLETS, AND DECISIONS, AND SPOKE TO INVESTORS THROUGH ABDUL

### A. Bannon and Epshteyn Held the Keys, the Bank Account, and the Final Say

141. Throughout the Class Period, Bannon and Epshteyn personally controlled the project—not the Token's holders, and not any decentralized community. They held the project's keys, made its decisions, and directed its promotion, as alleged below. They held their ownership stake through the Recipients, holding companies each of them owned and controlled, and they acted through Abdul and other persons they selected.

142. *Keys and wallets.* On November 11, 2022, Abdul told investors that "[a]t this time it's me and B&B who have the keys to the new marketing and charity wallets." Abdul and the project's administrators routinely referred to Bannon and Epshteyn as "B&B"—shorthand for "Bannon and Boris"—sometimes written "B and B" or "BNB." The project's official channel announced that the contract had been moved to a "new dev wallet wholly owned and operated by B&B and their lieutenants," and that the liquidity pool had not been re-locked because "B&B are very leery of the lock providers." On May 19, 2023, asked who held the contract-owner private keys, Abdul answered: "I do[,] B and B do," along with a "[W]ar [R]oom … high up employee." She confirmed that there was no multi-signature control, that the keys had been transmitted by email, and that she held them "[b]ecause that's what B and B … wanted me to do."

143. *Money.* As alleged above, Epshteyn held the project's bank account and Coinbase login "the entire time." In May 2023, Abdul told investors that the project's finances were "logged and … sent to somebody on the [W]ar [R]oom team," and that the review of the finances was part of "everything legal happening that Boris is taking care of." Abdul herself had "a payment agreement with B&B," and told investors she was leaving "my pay sitting right there in the tax wallets." In December 2022, a project administrator reported that a proposal to sell Tokens to holders "directly from the team wallets" had been tabled because Abdul "was unable to get approval from Boris to do it," explaining that the "gift card stuff" then "coming together very rapidly" would "allow buying directly from the team FJBCoin wallets. That is where the gift card coins will come from." The project's GETTR account then invited holders to "email us at admin@fjbcoin.org to purchase your $FJB gift card."

144. *Decisions.* Abdul repeatedly told investors that Bannon and Epshteyn made the project's decisions:

a. October 20, 2022: "Bannon and Boris like everything a very certain way and they are behind every little thing that does or does not happen."

b. October 24, 2022: "I do not make decisions. I am purely the messenger." Information could not be shared if it was "not approved by Boris and Bannon."

c. November 10, 2022: "B&B are the owners for lack of better terms of the coin," and "at the end of the day, BNB are the bosses."

d. December 16, 2022: the project's important decisions were made by a leader "BNB chose … from their side," and those decisions were "ultimately approved by BNB."

e. December 27, 2022: Bannon and Epshteyn were "legally owners of their project, to my knowledge, … with the TWinds LLC."

f. January 27, 2023: "[W]hen I say Boris, it's Boris and Bannon. Boris is just a lot more involved."

g. April 18, 2023: "Steve, along with Boris, makes the final, final decisions on everything."

h. October 20, 2023: "Everybody knows we are owned by B&B."

i. August 9, 2024: "Boris calls those shots."

j. November 22, 2024: "I did get the final say from Boris. So I am just waiting on Steve now."

145. Others with inside knowledge said the same thing. Finman told investors: "Steve and Boris own it and do marketing." In June 2022, the project explained that the FJB app had been submitted to Apple under "Freedom, Jobs, and Business LLC (Boris' company)." And copy that a project volunteer wrote for FJBCoin.org in early 2022 described the contract owner as

"Freedom Jobs Business LLC (File Number: 6345903) … controlled by Stephen K. Bannon and Boris Epshteyn," and stated that "all changes to the smart contract require approval using the private keys that they control."

146. Bannon and Epshteyn also directed the Token's promotion. On May 9, 2022, Finman read to investors a text Epshteyn had sent him that afternoon: "Steve is ready to push to when you're ready." In a message to Finman in the project's team channel, Epshteyn wrote: "Steve wants to do reads and further discords, etc. Can you get Steve and his team on here a 30 second script?" And in April 2022, Abdul assured a holder that Bannon was involved in day-to-day operations through "[d]aily texts, multiple times a day. Him and his entire team, I lost count of how many different text threads/groups we have," adding that "everything Bannon does is V[ery] calculated." The holder responded that Abdul's message "screams…BUY MORE."

147. Epshteyn followed the project closely. Abdul told investors in December 2022 that Epshteyn had a "two to three hours slot every day, and that's his FJB slot," and a "daily Monday through Friday time slot of FJB." In November 2023, she reported that Epshteyn received updates from her at least weekly—"Boris likes his updates"—and, in February 2023, that investors who had emailed Epshteyn "should have gotten a reply from that email" directing them to her. In March 2023, she told investors that the project's calls and chats were recorded and that Bannon and Epshteyn "know and can see everything," adding: "I know they and their teams listen to and read the chats."

**B. Abdul Spoke for Bannon and Epshteyn With Their Actual and Apparent Authority**

148. Abdul was Bannon's and Epshteyn's agent. They "inherited" her from the Founders, gave her the Token's keys because "that's what B and B … wanted," paid her under "a payment agreement with B&B," and used her to communicate their decisions to investors. Abdul

acted on their behalf and subject to their control, and she described herself to investors as "purely the messenger."

149. Epshteyn authorized Abdul to speak for him. Investors who emailed Epshteyn received replies from his email account directing them to Abdul, so that, as Abdul put it, the project would "have everything in one place and have one communication channel." Epshteyn received at least weekly updates from Abdul—"Boris likes his updates"—and personally thanked her in writing for her work on the project's communications, telling her, "We remain committed to it as Steve and i have said repeatedly." Abdul relayed Epshteyn's instructions and decisions to investors by name: "Boris wanted everybody to know that they have been taking care of it as soon as it came to their attention. Those were his exact words"; "Boris calls those shots"; and "I did get the final say from Boris."

150. Bannon, too, communicated with investors through Abdul. Abdul told investors that she was in "[d]aily texts, multiple times a day" with Bannon and "his entire team"; that she was "waiting on Steve" for decisions; and, on January 31, 2025, that promotion had been "scheduled with War Room, … Maureen and Steve." On information and belief, "Maureen" is Maureen Bannon, Bannon's daughter, a frequent guest on *War Room*, and Warroom LLC's chief executive officer, who was publicly described as the "CEO/President of Steve Bannon's www.WarRoom.org" in January 2022 and as War Room's "CEO" in July 2024. Bannon joined an investor status call on September 17, 2022, alongside the project's administrators, and made the statements alleged below. On information and belief, the statements and decisions Abdul attributed to Bannon were communicated to her by Bannon or by members of his *War Room* staff acting at his direction.

151. On February 24, 2023, Abdul told investors that Bannon and Epshteyn both "wanted, actually within the last hour, to make sure that I let you all know" that they were "very happy with FJB" and were "making commitments and putting those in writing." Abdul added that Bannon and Epshteyn "have all the facts" and "are very aware of everything."

152. Bannon and Epshteyn held Abdul out to investors as their spokesperson and never disavowed her. For more than two years, Abdul hosted weekly status calls at which she attributed statements and decisions to Bannon and Epshteyn by name. Bannon and Epshteyn knew about those calls: Abdul told investors that they listened to them, and both men joined the project's investor calls themselves—together on January 6 and January 27, 2022, Epshteyn on September 14, 2022, and Bannon on September 17, 2022. Neither ever corrected a single statement she attributed to him. Epshteyn's own email account directed investors to Abdul as the project's "one communication channel." Investors therefore reasonably understood that whenever Abdul addressed them about the project—on the status calls, in the project's channels, or in direct messages—she was speaking for Bannon and Epshteyn, and she did so with their actual or, at minimum, apparent authority. When she attributed a particular statement or decision to Bannon or to Epshteyn by name, that statement or decision was his.

153. Bannon and Epshteyn had ultimate authority over what Abdul told investors. Abdul told investors that she did "not make decisions," that she was "purely the messenger," and that information could not be shared if it was "not approved by Boris and Bannon." Every statement Abdul made to investors about the project—whether or not she attributed it to Bannon or Epshteyn by name, and including her statements about the Token's wallets, fees, and over-the-counter ("OTC") sales, the missing funds, the *War Room* promotions, and the February 2025 closure and liquidity distribution—was made with their actual or, at minimum, apparent authority and subject

to their control, and, as to the statements she attributed to them or made at their direction, Bannon and Epshteyn are their makers. Abdul is independently liable for disseminating those statements to investors and for her own participation in the conduct alleged in this Complaint.

## VI. FUNDS IN THE "MARKETING" AND "CHARITY" WALLETS GO "MISSING" OR ARE WASTED IN UNDISCLOSED RELATED-PARTY TRANSACTIONS

### A. Bannon and Epshteyn Reassure Investors They Are Working on $FJB "24/7"

154. At some point, the project created an official Telegram community for $FJB investors, which was in addition to a Discord group for investors formed around the time $FJB was created. Beginning in the summer of 2022, Abdul and Tragni would host weekly "status calls" in the $FJB Telegram group, which they treated like investor updates. Abdul and Tragni would not use their real names in their Discord and Telegram communications but instead went by anonymized usernames and did not disclose their true identities to investors.

155. During the status calls that summer, $FJB investors began expressing concerns about the Token's declining value and the lack of promotion by Bannon and Epshteyn, as well as the lack of transparency over donations to veterans that were supposed to be made from the Token's charity wallet. For weeks, investors pled with Abdul and Tragni for Bannon to promote the Token on *War Room*, where it could reach a wider audience. In response, investors were told that Bannon and Epshteyn were busy with the 2022 midterms.

156. On September 14, 2022, Epshteyn joined one of the status calls to reassure investors and make additional pledges about the future of the coin. "The project continues to get stronger and stronger and stronger," he said, and "the fact that FJB is now expanding to Europe is a big deal." "I'm so excited to announce the expansion into Europe," he added, explaining that the project was "non-custodial" and was "enabling the community, enabling conservatives, enabling MAGA to … protect what we have, protect our security, protect our privacy." Three days later,

Deleted: Defendants
Deleted: Defendants
Deleted: Defendants
Deleted: to conceal
Deleted: from
Deleted: caused by a
Deleted: Defendants
Formatted: Font: Italic
Deleted: 17
Deleted: Bannon and
Deleted: for the first time
Deleted: Epshteyn boasted that the coin is "
Deleted: " and Bannon reassured buyers

on September 17, 2022, Bannon joined another call. He told holders that "what you've done on the expansion in Europe, shows that this is the coin of the future. That's why Boris and I are so excited about being involved here," and that "it's going to be a MAGA coin." Bannon added: "I'm available 24/7 on this. Boris will tell you I'm working on this all the time."

157. Although Epshteyn conveyed that concrete steps toward European exchange listings or operations were already underway, no such expansion was occurring at the time, and $FJB was never listed on a European crypto exchange.

**B. The Project Barely Donated to Charity and Spent the "Marketing" Fee on Self-Interested Transactions that Did Not Actually Go to Promoting the Token**

158. On October 20, 2022, Tragni (who went by the username "Sammy Paradise") privately shared with the Token's operators a breakdown of how the 8% tax on each $FJB transaction, 3% of which was earmarked for "marketing" and 5% for "charity," was being spent. He revealed that since Bannon and Epshteyn acquired the Token, only an additional $15,000 had been spent on charity—despite millions of dollars' worth of transactions having taken place by that time. In other words, significantly less than 5% of each transaction was being spent on donations. Further, the total transaction-fee spend was significantly less than 8% of $FJB sales up to that point.

Deleted: ,

Deleted: ," and "

Deleted: Despite conveying

Deleted: Defendants

Deleted: Defendants were allegedly spending

Deleted: ."

Deleted: Defendants

Deleted: spent




159. Among the various expenditures Tragni listed, $120,000 was spent paying the vendor VFT Solutions. This was for "supposedly SEO" services, according to Abdul. Neither Bannon nor Epshteyn disclosed to investors that VFT Solutions was run by people Abdul called "Boris's friends," or that Epshteyn himself had put the project's team in contact with VFT: as Abdul later wrote, "Boris had us on signal group with vft and their scam." As Abdul (who went by the username "sundevil28") admitted, VFT Solutions did nothing other than send some Google analytics "one time." In January 2023, Abdul wrote privately: "what happens to the $100k we paid to VFT…Boris's friends that did fucking nothing? … we stopped paying them 10k a month last summer."

**Deleted:**




**Deleted:** ($10,000 per month)

**Deleted:** Defendants did not disclose

**Deleted:** not selected for the quality of its services, but because it was led

**Deleted:** Epshteyn's

**Deleted:** , to whom he may have owed money.




160. As Tragni privately acknowledged, the project's insiders understood that Epshteyn financially benefited from the related-party transactions with VFT Solutions. In addition, Epshteyn was separately collecting $10,000 a month in "consulting fees" for making appearances on behalf of $FJB—something that was never disclosed to investors.






Deleted: 
sundevil28 01/26/2023 8:37 AM
also...
if they want out of the project, what happens to the +$100k we paid to VFT...Boris's friends that did fucking nothing?

Deleted: Defendants

Deleted: 
Sammy Paradise Today a
Wonder if boris is still gettin
Vft solutions

161. Both Abdul and Tragni privately recognized that Bannon and Epshteyn had grossly mismanaged investor funds, leaving "no funds for the coin":




Deleted: 


162. As a result of the mishandling of investor funds, Abdul and Tragni told investors during status calls that the project was in debt and was making back-payments to its developer and to cover other overhead.

**Deleted:** Defendants'

**Deleted:** $FJB representatives

163. Chase Bailey ("Bailey"), who was responsible for updating $FJB's code (and who went by the username "Speshled"), confirmed that Epshteyn had pilfered over $100,000 in tax funds under the guise of paying a vendor:

**Deleted:** ")




**C. No One Could Account for Even the Minimal Amounts Purportedly Spent on Charity**

164. When asked how exactly the alleged $15,000 was spent on charity, Abdul and Tragni could only cite a $500 donation to St. Jude Children's Research Hospital, and an unknown amount to an unnamed organization purportedly supporting 9/11 first responders. When asked for proof of even those donations, Abdul and Tragni did not provide any.

165. Even the public blockchain does not provide clarity, as any donations were not made directly from charity wallets, but were first transferred to intermediary wallets that are difficult to track. For example, some of $FJB's charity-wallet funds went to an intermediary wallet that sends money to *another* wallet that makes high-risk investments in obscure crypto tokens.

166. Although one wallet appeared to be designated for donation to the Wounded Warrior Project, the non-profit confirmed that it never received any donation from $FJB after November 2021 (*i.e.*, since before Bannon and Epshteyn took over). The Wounded Warrior Project confirmed the same to ABC News in February 2023. On information and belief, the charity wallet did not fund other charities either. On September 11, 2023, when a holder asked whether a sale he saw "in the donation wallet" would "be going to the firefighters and first responder[s] of 9/11," Abdul answered: "No, but I'd be happy to provide you a list of charities if you're looking to donate," and "No, we have no plans of donating but you're welcome to."




**Deleted:** Defendants…

**Deleted:** Not

**Deleted:** Children's

**Deleted:** Defendants

**Deleted:** after Bannon and Epshteyn took over).

167. As investors increasingly questioned the use of funds flowing from the Token's "charity" wallet—particularly after substantial transaction-based fees had been collected under Bannon's and Epshteyn's control—the project was pressured to produce proof of charitable donations. In response, project administrators shared what was initially a cropped image of a donation confirmation email, presented as evidence that charitable contributions were being made consistent with the Token's publicly advertised 5% charity tax.

168. When the uncropped version was later obtained, it revealed that the referenced donation was in the amount of just $100.00, and was made to The Folded Flag Foundation on November 4, 2021—*i.e.*, before the transfer of control of the project to Bannon and Epshteyn. Further, the donation was made by Tragni from personal funds rather than from the Token's charity wallet, as Finman (who went by "FIN" in the FJB Discord channel) revealed on September 27, 2022:

**Deleted:** Defendants' ownership—Defendants were

**Deleted:** Defendants

**Deleted:** ownership and

**Deleted:** Defendants.

**Deleted:** Defendant

**Deleted:** Defendants' "advisor" Erik




Deleted:




169. The presentation of a cropped image of a $100 pre-acquisition donation as purported proof of post-acquisition charity-wallet activity—omitting both the nominal amount and the pre-transfer date—underscores the lack of transparency and creates a misleading impression regarding the use of transaction-based "charity" taxes.

**Deleted:** supports a strong inference that Defendants knowingly sought to create

## D. Funds in the "Marketing" and "Charity" Wallets Went "Missing" and Were Never Accounted For

Deleted: for by Defendants

170. In October 2022, Abdul revealed on a status call that an unknown amount of money in the marketing and charity wallets had gone "missing."

Deleted: Also in

171. Under the Payment Agreement, Bannon and Epshteyn had "full control of the Coin," including its fee wallets, and they decided who would hold those wallets' keys. By November 2022, as alleged above, Abdul and Bannon and Epshteyn held the keys to the new marketing and charity wallets.

Deleted: <#>Defendants were in control of the wallets holding the transaction fees.¶

172. When pressed by investors to account for the missing funds, Abdul declined to provide any more information, citing an "internal investigation" and "legal action."

173. On or about November 11, 2022, Abdul privately disclosed to Bailey that an "audit" had found that the VFT Solutions self-dealing by Epshteyn was "drops in the bucket" compared to the total amount of malfeasance that occurred, describing "what we've found" as "unbelievable" and "worse than i ever imagined." The findings of this "audit" were never disclosed to investors but were known only to insiders.

Deleted: Defendants apparently conducted

Deleted: and


Speshled
wouldn't have made that announcement without 100% rock solid info...lots of it
sundevil28 Today at 8:11 AM
Sunday, in case we get in too late Saturday? Topgolf or Valle Luna?
Are you truly in the dark, like I was, or messing with me?
Speshled Today at 8:34 AM
Sarah you're the only reason I haven't mentioned things like social media monitoring in gen lol
sundevil28 Today at 8:34 AM
drop in the bucket spesh
a tiny fucking drop
what we've found is unbelievable
and i know you know defi
but worse than i ever imagined
Speshled Today at 8:35 AM
No I'm saying I genuinely like you too and it's a shame we haven't gone to have drinks yet
Just trust me when I say
That we need to meet up for you
Message @Speshled


Speshled
Speshled Today at 10:19 PM
wen honesty
when mention boris's social media monitoring company
sundevil28 Today at 10:20 PM
Drops in the bucket, that the audit found
Do you honestly not know, or are you covering up for them?
Speshled Today at 10:26 PM
I have no idea the details of it but I can say I have 100% faith that Grant wouldn't do something like that
even if I didn't know Grant I'd have a very very hard time believing that 3 people in the united states would steal money from a high profile lawyer in a fully traceable way (edited)
this looks sooooo neglegent like there's some big ass details missing
NEW MESSAGES
Speshled Today at 11:16 PM
wen drinks
wifey and kids out of town this weekend and I finally have free time to be able to
Message @Speshled


Speshled
wouldn't have made that announcement without 100% rock solid info...lots of it
sundevil28 Today at 8:11 AM
Sunday, in case we get in too late Saturday? Topgolf or Valle Luna?
Are you truly in the dark, like I was, or messing with me?
Speshled Today at 8:34 AM
Sarah you're the only reason I haven't mentioned things like social media monitoring in gen lol
sundevil28 Today at 8:34 AM
drop in the bucket spesh
a tiny fucking drop
what we've found is unbelievable
and i know you know defi
but worse than i ever imagined
Speshled Today at 8:35 AM
No I'm saying I genuinely like you too and it's a shame we haven't gone to have drinks yet
Just trust me when I say
That we need to meet up for you
Message @Speshled

**Deleted:**


Speshled
Speshled Today at 10:19 PM
wen honesty
when mention boris's social media monitoring company
sundevil28 Today at 10:20 PM
Drops in the bucket, that the audit found
Do you honestly not know, or are you covering up for them?
Speshled Today at 10:26 PM
I have no idea the details of it but I can say I have 100% faith that Grant wouldn't do something like that
even if I didn't know Grant I'd have a very very hard time believing that 3 people in the united states would steal money from a high profile lawyer in a fully traceable way (edited)
this looks sooooo neglegent like there's some big ass details missing
NEW MESSAGES
Speshled Today at 11:16 PM
wen drinks
wifey and kids out of town this weekend and I finally have free time to be able to
Message @Speshled

174. "We," here, meant the FJB Advisory Council—a select group of insiders the project selected from the broader community to advise on the project. These insiders were given the opportunity to trade on material, non-public information in advance of disclosure to investors—if there was any disclosure at all.

Deleted: Defendants

Deleted: gleaned from Defendants

175. During a status call on November 29, 2022, in response to investor backlash about the missing funds, Abdul assured investors that "[t]here is an ongoing investigation with an entire team working on this," "[i]t's definitely not getting brushed under the rug," and investors would be notified once "legal proceedings toward regaining missing funds commenced." Three days later, on December 2, 2022, Abdul assured investors that "B&B are in no way, shape, or form walking away from the project." Investors were threatened that if they "accuse anybody" or even "reach out to anybody" in the meantime, it could constitute "defamation."

Deleted: ,"

176. During another status call on December 7, 2022, Abdul was coy with investors about the missing funds but confirmed that they were misappropriated: "We are not claiming the money has been stolen. We're saying the funds are missing. They did not go to the purpose they were intended for, and that's as far as we'll speak on."

177. Abdul told investors that Epshteyn was personally handling the missing funds. The project's moderators reported that "a legal investigation has been launched by Boris to claw back those funds." On January 24, 2023, Abdul told investors that "Boris wanted everybody to know that they have been taking care of it as soon as it came to their attention. Those were his exact words." Asked on the same call whether there were "other owners besides B and B," Abdul answered: "No, that still remains a no."

178. On August 16, 2023, Abdul revealed that "time is running out" to recover the approximately $2.7 million in "missing" transaction fees:




179. Neither Bannon nor Epshteyn ever disclosed the results of Epshteyn's purported work to recover the misappropriated funds. By Abdul's account, approximately $2.7 million in transaction fees remains unaccounted for. On information and belief, those funds were misappropriated by insiders to their own personal benefit.

180. Bannon's and Epshteyn's representations concerning both the "charity" and "marketing" transaction fees were false and misleading because they failed to disclose that funds routed to wallets labeled and promoted as charitable or marketing-related were not used solely for those stated purposes, but were instead used, at least in part, to pay for the acquisition, for related-party vendors, for insider-directed Token sales, and for other project uses unrelated to charity or promotion.

181. These misrepresentations and omissions were material because reasonable investors would have considered it important to know whether amounts represented as charitable contributions would in fact be donated to qualified charitable organizations. By misleading investors into believing that a portion of each transaction constituted a charitable contribution, Bannon and Epshteyn deprived investors of the ability to accurately assess the nature of their



**Deleted:** Defendants never

**Deleted:** An estimated

**Deleted:** Defendants directly or indirectly

**Deleted:** the funds

**Deleted:** Defendants'

**Deleted:** Defendants

**Deleted:** necessarily

**Deleted:** Defendants

transactions and, to the extent investors believed they were making charitable contributions, exposed them to the risk that such payments would not qualify for a charitable tax deduction.

## VII. BANNON AND EPSHTEYN TRY TO EXIT $FJB, THEN DEMAND A RETRACTION AND TELL INVESTORS THEY "HAVEN'T SOLD, AND ARE NOT SELLING"

Deleted: SEEMINGLY ABANDON

Deleted: WITHOUT NOTICE, ONLY TO RETURN TO THE PROJECT AFTER INVESTOR BACKLASH…

182. On February 13, 2023, after months of silence from Bannon and Epshteyn, Abdul announced to the $FJB Discord community that "Messrs. Epshteyn and Bannon have accordingly decided to transfer and assign the rights and obligations of $FJB, Let's Go Brandon Coin," adding: "Although I have faith that this is in the best interest of the organization, I have sold some coins to have some funds readily available."

Deleted: []

Deleted: she had

Deleted: of her own Tokens

Deleted: "

183. Abdul was then told, on behalf of Bannon and Epshteyn, to take the announcement down: "Sarah, We need you to take down your statement to the community right now. We still haven't finalized the deal and it could be extremely consequential to prematurely say anything. We'll need you to send a retraction message as well that I'd like to see to correct this." In contemporaneous private messages, Abdul explained what was happening: "They're leaving the project[.] They want nothing to do with lawsuit[.] They don't wanna give up their coins," and "They're upset I told the community they're transferring coin over."

Deleted: On February 14, 2023

184. That evening, in response to investors' furor over Bannon's and Epshteyn's seeming abandonment of the Token, *War Room*'s CFO Grace Chong posted that "Steve and Boris both 1000% back the project, haven't sold, and are not selling!" The next day, when an investor asked on GETTR whether Bannon and Epshteyn were "really going to let their fellow patriots bleed to death and not say a word," Chong replied: "They did yesterday[.] They haven't sold and they back it 100%":

Deleted: on GETTR that the pair "haven't sold" and continue to "back it 100%."

Formatted: Font: Italic




Deleted: 


185. Epshteyn personally amplified Chong's statement. Posting in the Token's Discord server under his own username, "BorisEp," Epshteyn reposted it on the evening of February 13, 2023, with the message, "Making sure everyone sees this!":




186. About an hour later, he posted it again: "Evening - just making sure everyone saw the earlier post."

187. On February 15, 2023, in an episode of *War Room*, Bannon reassured investors: "not only am I a huge supporter of that project [and] the community, my wallet, I want everybody to know [Boris and my] wallet is public, right? … I've not only never sold a coin, I've only bought coins, and that wallet is public. Everybody check it. We are huge supporters of the FJB project [and] the community." The project's official Twitter account posted the quote—

Deleted: that he and Epshteyn remain "

Deleted: supporters

Deleted: the $FJB

Deleted: "

Deleted: have "

Deleted: ," but "

Deleted: ."

"@BorisEP and my wallet is public. I've not only never sold a coin, I've only bought coins"—and Epshteyn retweeted it on his personal account.

188. On February 17, 2023, Abdul told investors that "Bannon, Boris, and I remain committed to the coin and organization, and look forward to the future." That statement was not Abdul's alone. She drafted it with a person identified to her as "Will," who approved it—"That's perfect. You send that to the community"—and explained its purpose: "That story is gonna be dead after this." Shortly afterward, Epshteyn wrote to Abdul directly: "Thank you for working with Will to make sure everything is done correctly. … No interest in taking one cent of any of the current wallet for us. Let's make sure the project is strong and steady and growing. We remain committed to it as Steve and i have said repeatedly, including this week."

Deleted: , in an about-face,

Deleted: she,

Deleted: Epshteyn "remained

189. On February 23, 2023, ABC News reported that $FJB had lost roughly 95% of its value and that the Wounded Warrior Project had received no donation from $FJB since Bannon and Epshteyn took over in December 2021. A person close to Bannon and Epshteyn told ABC News that "Steve and Boris are fully committed to the $FJB community, and are working with a proficient and dedicated team," and that there was "a full effort under way to determine and remedy any and all issues stemming from actions of the original founders of the coin." The next day, as alleged above, Abdul told investors that Bannon and Epshteyn "are very happy with FJB" and were "making commitments and putting those in writing." She promised "War Room Weekly Shills imminent."

190. These February 2023 statements were false and misleading when made. When Chong, Epshteyn, and Bannon told investors that Bannon and Epshteyn "1000% back the project," "are not selling," and were "huge supporters," Bannon and Epshteyn had just decided to "transfer and assign the rights and obligations" of the project, were negotiating a "deal" that had not yet

been "finalized," and—in Abdul's words—were "leaving the project" because "[t]hey want nothing to do with lawsuit." Bannon's statement that his and Epshteyn's wallet was "public" and that he had "only bought coins" omitted that the Tokens in those wallets had been acquired for no cash, paid for with investors' fees, and exempt from the fees every other holder paid. As Abdul herself later told holders, on February 5, 2024, "the only coins they've been given was … their wallets of 1 billion coins." The purpose of the statements, as the person who approved Abdul's reassurance put it, was to make sure "[t]hat story is gonna be dead."

191. Despite these reassurances, Bannon and Epshteyn largely went silent again in the months that followed, communicating with investors principally through Abdul.

## VIII. THE PROJECT PULLS THE TOKEN'S LIQUIDITY AND RE-BRANDS (AGAIN) TO PATRIOT PAY

### A. The Project Pulls the Token's Liquidity and Re-Brands to Patriot Pay

192. In December 2023, the wallet the project had announced as its "new dev wallet wholly owned and operated by B&B and their lieutenants" withdrew the Token's liquidity from PancakeSwap, leaving holders with no market in which to sell their $FJB. That month, asked whether the project would put back all of the liquidity, Abdul answered that "[t]he team is deciding how to best do that. Again, to pay, to help pay for influencers and vendors." Asked whether the team controlled the wallets for the new $PPY Token, she answered, "Yes." And asked who held the keys to the new contract, she answered: "that hasn't changed."

193. On November 18, 2022, the liquidity-pool tokens representing the claim to FJB's PancakeSwap liquidity had been transferred to that wallet. On December 16, 2023, it executed three withdrawals of liquidity from the pool.

194. Abdul announced that the project had decided to rebrand "Freedom. Jobs. Business." ($FJB) to Patriot Pay ($PPY), and would be making edits to ("forking") the code so

Deleted: Defendants

Deleted: DEFENDANTS FREEZE INVESTORS' WALLETS…

Deleted: BRAND

Deleted: Defendants Freeze Investors' Wallets

Deleted: Brand

Deleted: <#>In December 2023, Defendants activated the code's backdoor locking mechanism to freeze everyone's wallets except their own.
Defendants announced that they…

that it was now on the Polygon (MATIC) blockchain network instead of the BNB Smart Chain. The project took a "snapshot" of holders' $FJB balances and then airdropped $PPY to those holders in the same amounts, so that each holder was "exactly where they were at the time of snapshot." On information and belief, the fork was necessary because Abdul accidentally, permanently froze the FJB contract, locking the project out of its ability to centrally control the Token: on January 30, 2023, the same dev wallet had called the contract's "lock" function, surrendering the contract owner's controls.

Deleted: Matic
Deleted: Binance.
Deleted: Defendants were forced to
Deleted: the code
Deleted: Defendants
Deleted: their

195. In connection with the fork from $FJB to $PPY, the project further entrenched centralized control by deploying the Token through a proxy smart-contract architecture. Under this structure, a static read-only proxy contract merely references a separate, amendable implementation contract that the project's administrators could modify after deployment. This design permitted them to change core Token functionality—including transfer restrictions, fee mechanics, and control permissions—without redeploying the Token or obtaining holder consent. As Abdul later put it, "the proxy addition … gives us the huge benefit … that we can make contract modifications without having to fork again," and "steve boris or i have a lot more to lose than say rug pulling the community."

Deleted: Defendants
Deleted: Defendants
Deleted: Defendants

196. Neither PatriotPay.org nor the promotions bearing Bannon's and Epshteyn's names disclosed this architecture. By using a proxy contract, the project effectively removed the immutability and transparency safeguards that investors reasonably expect from blockchain-based assets, while simultaneously promoting $PPY as decentralized, secure, and resistant to insider control. The proxy structure gave the contract's administrators ongoing unilateral authority to alter the Token's behavior and rules, materially contradicting the Token's marketing regarding

Deleted: Defendants did not disclose
Deleted: to investors.
Deleted: Defendants
Deleted: Defendants
Deleted: Defendants' representations

decentralization and financial autonomy and exposing investors to undisclosed risks of arbitrary modification and control.

197. In February 2024, after two months during which investors could not sell their Tokens, the fork was completed. "Freedom. Jobs. Business." became Patriot Pay; $FJB became $PPY; and FJBCoin.org became PatriotPay.org.

198. The project updated $FJB's social media pages to match the new branding, which now billed the Token as "by Steve Bannon & Boris Epshteyn," using their names and likenesses. The Patriot Pay Instagram account's profile read: "A New Patriot Economy & Digital Currency by Steve Bannon & Boris Epshteyn – Try the app in your browser & buy PPY Coin now, no download needed." Epshteyn's personal Instagram account (@boris_epshteyn) followed the Patriot Pay account:




Deleted: had no access to the Tokens in

Deleted: wallets

Deleted: and the lock lifted

Deleted: Defendants

Deleted: name and likeness




Deleted:






199. Bannon and Epshteyn approved the rebrand and the use of their names, and they never disavowed any of the promotions that traded on them. In October 2023, Abdul told investors that "B&B have been confirming the name and everything," and that "[e]verybody knows we are owned by B&B." In January 2024, Abdul reported that "Boris is very excited for his airdrop." Abdul distributed Patriot Pay T-shirts reading "Download the Patriot Pay App by Steve Bannon!" And the FJB banner on Epshteyn's personal website—a banner Epshteyn's team had asked the project to update in December 2022—linked to PatriotPay.org.

200. The "Freedom. Jobs. Business." (now Patriot Pay) app was also updated to reflect the new branding, although the app itself remained largely unchanged in terms of substance:




Deleted: 

201. $PPY advertisements continued to tie the brand personally to Bannon and Epshteyn, and to *War Room*, such as this one on February 23, 2024:

Deleted: Steve

Deleted: Boris

Formatted: Font: Italic




Deleted: 

202. As of the filing of the original Complaint, and still as of the filing of this First Amended Complaint, Bannon's GETTR profile continued to list $FJB/$PPY's website alongside *War Room*'s:

Deleted: time of

Deleted: continues

Formatted: Font: Italic




203. In connection with the rebranding of $FJB as "Patriot Pay," the project failed to conduct a trademark clearance for the new name. An application to register "Patriot Pay" as a trademark was rejected by the U.S. Patent and Trademark Office due to the existence of a prior, conflicting trademark. No one appealed the Office Action, sought an alternative mark, or otherwise remedied the defect.

204. Investors were never told that the "Patriot Pay" name was subject to an unresolved trademark conflict, that the application had been rejected, or that efforts to secure trademark protection for the brand had been abandoned. This omission was material because the rebrand was simultaneously being promoted as a professional, stable, and long-term financial ecosystem.

**Deleted:**




**Deleted:** Defendants

**Deleted:** Defendants applied

**Deleted:** , but the application

**Deleted:** Defendants did not appeal

**Deleted:** seek

**Deleted:** remedy

**Deleted:** Defendants did not disclose to investors

**Deleted:** their

**Deleted:** they had abandoned

**Deleted:** under which they were actively soliciting investment….

**Deleted:** Defendants were

**Deleted:** promoting the rebrand

**Deleted:** , while concealing that the project's core branding faced unresolved legal risk and that Defendants had failed to exercise basic diligence in executing the rebrand

**B. The "New" Website Repeated the Same False and Misleading Statements as the Old Website**

205. Following the rebrand from "Freedom. Jobs. Business." ($FJB) to Patriot Pay ($PPY), Patriot Pay LLC launched and maintained a new website, PatriotPay.org, which repeated—and in several respects escalated—the same false and misleading representations previously made about $FJB.

206. PatriotPay.org promoted $PPY as a "secure," "decentralized," and "uncancellable" financial alternative to traditional banking, repeatedly assuring users that Patriot Pay placed "control back in YOUR hands—no banks, no middlemen, no freezing of your account."

207. The website expressly claimed that Patriot Pay was "more secure than the bank you trust," and that, unlike traditional financial institutions, Patriot Pay users could not have their accounts frozen or access restricted by any centralized authority.

208. These representations were materially false and misleading. $PPY was not decentralized in any meaningful sense. The project's administrators—Abdul and the persons Bannon and Epshteyn allowed to hold the keys—retained centralized control over the Token's smart contract and wallets, could modify the contract through the proxy at will, and had already withdrawn the Token's liquidity and left every holder unable to sell.

209. PatriotPay.org further represented that $PPY was a functional "utility token" with real-world applications, including the ability to "buy, sell, and donate with confidence," to "use your money freely," and to support "causes you believe in."

210. The website reassured prospective purchasers that "crypto like Patriot Pay is safe," that users' "money is protected and easy to access," and that Patriot Pay provided "security, control, and privacy."

**Deleted:** Defendants

**Deleted:** As Defendants knew,

**Deleted:** Defendants

**Deleted:** exercised their authority to freeze investors' wallets arbitrarily and without notice, while exempting their own wallets from those restrictions

211. These representations conveyed that $PPY functioned as a usable payment system and reliable store of value, suitable even for unsophisticated users. In reality, the app through which $PPY was to be used had been plagued by failures—Abdul acknowledged to investors that "transactions are failing" and that users were "not being able to access [their] smart wallet funds and transfer them"—and $PPY's value depended on Bannon's and Epshteyn's continued development, management, and promotion of the project and on the discretionary control of the insiders who ran it.

212. PatriotPay.org also emphasized charitable giving, representing that transaction fees would be used to support charitable causes and encouraging users to donate through the Patriot Pay ecosystem.

213. PatriotPay.org failed to disclose that wallets labeled or described as "charity" wallets were under insider control, were used for Token sales, and did not consistently fund charitable donations in the amounts represented. It further failed to disclose that charity-wallet funds were routed through intermediary wallets and, in some cases, used for purposes unrelated to charity.

214. PatriotPay.org omitted any disclosure that Abdul conducted over-the-counter sales of $FJB and $PPY from insider-controlled wallets, including tax and charity wallets, at negotiated prices for select purchasers, while the Token was promoted as trading through open, decentralized markets.

215. PatriotPay.org likewise failed to disclose that the Token's embedded "marketing fee" did not solely fund marketing, but instead had historically been diverted pursuant to undisclosed arrangements and insider-controlled spending decisions, including payments to related-party vendors.

**Deleted:** In reality, $PPY lacked any functioning payment infrastructure, merchant adoption, or operational safeguards, and its value depended almost entirely on continued promotion by Defendants

**Deleted:** Defendants

**Deleted:** token

**Deleted:** Defendants

**Deleted:** Defendants

**Deleted:** ("OTC")

**Deleted:** publicly representing that

**Deleted:** occurred

216. By continuing to promote $PPY as decentralized, secure, and immune from freezing or insider manipulation—while omitting the centralized control, OTC sales practices, and misuse of fee wallets alleged above—PatriotPay.org presented a materially misleading picture of the Token's risk profile, governance, and economics.

Deleted: Defendants'

### C. Patriot Pay (Again) Barely Promoted $PPY and, When It Did, Repeated the Same Misleading and False Statements as the $FJB Promotions

Deleted: Defendants

Deleted: Promote

Deleted: They

217. After an initial spate of advertising activity following the rebrand, the advertising again petered out. This again led investors to openly question Bannon's and Epshteyn's commitment to the Token, and again prompted a response from Abdul reiterating that they were still committed to the Token's success. For example, on April 20, 2024, Abdul posted the following on $PPY's Telegram channel:

Deleted: re-brand, it

Deleted: Defendants'

Deleted: Defendants




Deleted:




218. On April 26, 2024, Abdul told holders that a working app was "Steve's number one priority," and that once it was working, "he will push it as much as we want and push anything we want and everything we want. But we need it working and that is his, that is the deal." On the same call, Abdul told holders that purchases in the app's marketplace would carry a 6% fee, which "gives holders an incentive to spend their PPY in marketplace versus selling it."

219. On June 27, 2024, Patriot Pay posted a promotional video on its Instagram page featuring various videos of Bannon stating that he was "working on tokens for the populist movement on a worldwide basis," that there was a need to use "cryptocurrency to fight against being debanked and controlling our own money where they can't print 6 thousand, billion, trillion dollars," and declaring "this is why I support Patriot Pay." During the video, the words "DONATE" and "UNCANCELLABLE" flashed across the screen.

Deleted: Defendants

Deleted: Patriot Pay's

220. The caption of the post declared that "[t]he dollar will continue depreciating," and included the call to action, "It's time you take control!" It described Patriot Pay as "secure" and as a platform that lets users "support … causes you believe in, and take control of your finances!"




Deleted:




221. There was another spate of promotions that took place in September and October 2024, before the promotions again abruptly ended.

222. On September 7, 2024, a broadcaster on the Right Side Broadcasting Network (RSBN) did a sponsored ad-read for Patriot Pay with an overlay image describing it as "Decentralized" and "Steve Bannon's Movement" alongside an image of Bannon. The ad-read, repeated throughout the broadcast, told viewers: "Steve Bannon has something crucial to share

Deleted: an

Deleted: :

with you today … It's called Patriot Pay," that "[i]n minutes you'll be able to buy Patriot Pay, Steve Bannon's coin," and that "[i]t's never been easier to join the movement and support the causes that matter most":




Deleted:




223. The broadcast featuring the ad was uploaded to YouTube, where it has accumulated nearly 500,000 views.

224. On September 13, 2024, Patriot Pay's Instagram page reposted a post by conservative influencer Anthony Raimondi (who goes by "Conservative Ant"), in which he described Patriot Pay as "so easy that my grandma … can do it" and "a great way to do donations." Raimondi has over 1 million followers on Instagram.

Deleted: . . .

225. On September 27, 2024, Patriot Pay's Instagram page made a promotional post addressing individuals who were "[u]nsure about digital currency." The post, which exclusively featured $PPY, claimed that "It's more secure than the bank you trust," and "That's why President Trump and many patriots are turning to crypto." The post explained that "Decentralized currency like Patriot Pay puts control back in YOUR hands—no banks, no middlemen, no freezing of your

account." "With the dollar losing value," the post said, "it's time to reclaim your financial freedom" by buying $PPY.




Deleted:




226. The post also included an ad describing cryptocurrency as "just digital money, instead of paper cash" that you can use to "buy stuff with" or "donate to causes you believe in." The ad reassured viewers: "Don't worry, it's safe." That is because, "with apps like Patriot Pay, your money is protected and easy to access."

227. On October 4, 2024, the same Patriot Pay account made a similar promotional post addressing the question, "Is crypto safe?" The post answered: "Absolutely!" It claimed that "crypto is more secure than traditional banking," because "[u]nlike centralized banks, decentralized currencies protect your assets by spreading out control, meaning no single entity, like a bank or government, can freeze or track your funds." Again, the post exclusively featured $PPY, adding that "[w]ith the Patriot Pay App, you can buy, sell, and donate with confidence, knowing your financial freedom is safe."




Deleted:




228. The post also featured an ad making similar claims in the context of "busting myths" about crypto. The ad rejected the idea that "crypto isn't safe," claiming that "digital currencies like Patriot Pay" are "incredibly secure." The ad also rejected as "myth" the notion that "banks are more secure than digital currency," claiming that "actually, it's the opposite." Banks are "easier to hack," it said, whereas with crypto, "you have full control of your funds." "Don't let this stop you from joining the future of money," the ad claimed, adding that "with Patriot Pay, you get security, control, and privacy." The ad ended with: "It's so easy, even your grandma can do it," revealing that the promotion targeted lay, retail investors who were not sophisticated.

Deleted: ends

Deleted: Defendants were targeting

229. Patriot Pay's social-media posts and advertisements were false and misleading because they portrayed $PPY as simple, safe, decentralized, and more secure than traditional

Deleted: Defendants'

banking, and as a means of maintaining control over one's money free from freezing, tracking, or insider interference, when in reality $PPY lacked those characteristics.

230. Contrary to these claims, $PPY was not decentralized: Abdul and the persons Bannon and Epshteyn allowed to hold the keys retained centralized control over the Token's smart contract, transaction-fee routing, associated wallets, and trading functionality, and possessed the ability to restrict transactions, control liquidity, and disable trading altogether.

**Deleted:** Defendants'

**Deleted:** Defendants

**Deleted:** their agents

231. Nor did the promotions disclose that every on-chain transaction was subject to substantial fees routed to insider-controlled fee wallets, that these wallets were not independently governed, and that the funds were not used solely for marketing or donations as implied.

**Deleted:** Defendants also failed to

**Deleted:** "marketing" and "charity"

**Deleted:** necessarily

232. The promotions also did not disclose that the fees had been redirected away from charity. On December 9, 2023, the $PPY contract's ordinary buy and sell fee was set at 1% to charity, 6% to "operations," and 1% to liquidity; on February 4, 2024, the fee on ordinary wallet-to-wallet transfers was set at 8% to operations and nothing to charity. In practice, the contract paid the operations wallet roughly seven times as much as the charity wallet. Yet $PPY continued to be promoted as a means of giving. In July 2024, an influencer video that Abdul shared with investors told viewers that "[f]or the rest of July, Patriot Pay is donating all transaction fees" to support the family of Corey Comperatore. On information and belief, that statement was false: the contract continued to route most of each fee to the operations wallet.

233. Nor was $PPY "more secure than the bank you trust," "protected," or a stable alternative to a depreciating dollar; its value depended on the continued development, management, and promotion of the project and on the discretionary actions of its controllers. What that meant for holders soon became clear. Consumer prices rose 3.0% from January 2024 to January 2025. Over roughly the same period, $PPY lost about 60% of its value: holders who

**Deleted:** it was a highly volatile speculative asset whose value depended largely on Defendants' continued promotion and discretionary actions.

received $PPY in the February 2024 airdrop received Tokens valued at approximately $0.0003 each, and by January 9, 2025, $PPY traded at approximately $0.00012. A holder who kept $1,000 in dollars over that year would have lost about $30 of purchasing power; a holder who moved $1,000 into $PPY would have lost roughly $600. And on February 12, 2025, less than two weeks after Abdul announced that Bannon would promote $PPY on *War Room*, trading was disabled altogether, and holders could not sell their $PPY at any price. By presenting $PPY as safe, easy, suitable for unsophisticated users, and immune from centralized control—while omitting these risks—Patriot Pay LLC and Abdul, and Bannon and Epshteyn, who approved the use of their names for $PPY and never disavowed the promotions that used them, materially misled reasonable investors, particularly lay retail purchasers, about the nature of the Token, the risks of loss, and the control insiders held over their funds.

Deleted: Defendants

Deleted: Defendants'

234. These misrepresentations and omissions were material because a reasonable investor deciding whether to purchase $PPY as a secure means of transacting, donating, or preserving value would have considered it important to know that the Token was centrally controlled, fee-laden, subject to insider discretion, and incapable of providing the financial security, autonomy, or stability its promoters promised.

Deleted: Defendants

## IX. ABDUL STRINGS INVESTORS ALONG ON BANNON'S AND EPSHTEYN'S BEHALF UNTIL THE VERY END, WHEN THE RUG IS PULLED

Deleted: DEFENDANTS STRING

Deleted: THEY PULLED

Deleted: ON THE PROJECT

### A. Abdul Again Paints a Rosy Picture of $PPY's Future

Deleted: Defendants

Deleted: Paint

235. On December 3, 2024, Abdul updated investors on Telegram that Bannon and Epshteyn were "finalizing everything" necessary to begin regular promotions of $PPY on *War Room* and that "everything's going better than I expected":




236. Abdul's other updates in this period likewise tied every delay to Bannon and Epshteyn. On November 15, 2024, she posted that she was "[s]till waiting to meet with Boris to finalize some things." On November 22, 2024, she told investors: "I did get the final say from Boris. So I am just waiting on Steve now." And in her December 3, 2024 update, she promised news "as soon as B&B (and Mo [laughing emoji]) have made a final decision." On information and belief, "Mo" is Maureen Bannon, Warroom LLC's chief executive officer.

237. During what would be the final investor status call on January 31, 2025, Abdul announced: "we have the marketing scheduled with War Room, … Maureen and Steve." She told investors that the project would begin with "two mentions a week" on the *War Room* Telegram channel and *War Room* social media, and that from "week five and onward" there would also be "one mention a week on the War Room show by Steve." She added that "all the other updates … as far as the app and everything else is waiting on that," and that once the marketing started, "we'll be back in motion for everything else."



**Deleted:**




**Deleted:** that $PPY would

**Deleted:** weekly "

**Deleted:** ." During "weeks 1 to 2 we will do 2

**Formatted:** Font: Not Italic

**Deleted:** in

**Deleted:** , then weeks 3 and 4 we will add 2 mentions a week on the …

**Deleted:** accounts as well, then on

**Deleted:** 5

**Deleted:** we will begin to have Steve Bannon promote $PPY …

**Deleted:** his

**Deleted:** a week from there on out

238. None of that came to fruition. Abdul's assurance that the marketing would commence on a defined timetable implied that arrangements with *War Room* had already been finalized and secured. On information and belief, no such finalized arrangements existed.

239. Abdul's repeated promises that Bannon and Epshteyn would promote $PPY to a wider audience through *War Room* were material. A reasonable investor would have found it important to know whether the main promoters of the Token, whose value depended on their continued development, management, and promotion of the project, would continue to market the Token and the extent to which they would do so.

**Deleted:** Defendants'

**Deleted:** they purposefully tied to

**Deleted:** own personal brands

**Deleted:** promotional efforts

**B. Abdul Abruptly and Permanently Disables Trading and Abandons $PPY with False Promises of Refunds**

**Deleted: Defendant**

**Deleted: Freeze Investors' Wallets**

**Deleted: Abandon**

240. On February 12, 2025, Abdul, out of the blue, announced the "closure" of $PPY and that its trading had been "disabled":

**Deleted:** has




Deleted:


February 12
Sarah (Will never DM you first)
Dear Patriot Pay Community,

241. She alluded to "significant challenges" she faced "in securing the necessary resources and support to continue operations," and said she felt "let down by the lack of support" from Bannon and Epshteyn.

242. Abdul promised investors that "[w]e will be distributing the liquidity pool (LP) equally among all holders (with Matic), ensuring that everyone receives their rightful share." She added that "everything will be completed within the next 7 days."

**Deleted:** on behalf of Defendants

243. Abdul unequivocally represented that the liquidity pool would be distributed within seven days, without qualification or contingency, despite lacking any operational plan to execute such a distribution.

**Deleted:** Defendants

244. When investors demanded answers, Abdul pointed them to the people she had spoken for all along: "Reach out to Steve and Boris for answers, since that's who we've been waiting on for years with plenty of broken promises."

245. On February 14, 2025, after receiving enormous backlash from investors, Abdul reassured them that a "solution" was being worked on:




246. The $PPY liquidity pool was never distributed to investors, and their Tokens remain frozen. Investors have not heard from Abdul, Bannon, or Epshteyn since Abdul's promise of a forthcoming "solution" on February 14, 2025.

**X. ABDUL ORGANIZES TAX-FREE, OVER-THE-COUNTER SALES OF $FJB/$PPY FOR SELECT INVESTORS**

247. On or about December 15, 2022, an administrator in the official $FJB Discord revealed that Abdul was supportive of the idea of offering over-the-counter sales to "OG" ("original gangster") members of the group (*i.e.*, those who had been there since the start of $FJB) directly out of the $FJB tax wallets.

**Deleted:** Defendants were "working on a

**Deleted:** for them

**Deleted:**




**Deleted:** wallets

**Deleted:** permanently locked.

**Deleted:** Defendants

**Deleted:** , leaving them no choice but to seek recourse from this Court…

**Deleted:** /$PPY

**Deleted:** have




Deleted: 

248. Abdul was not only supportive of the idea, but soon thereafter made over-the-counter sales herself. As one member of the Discord confirmed, he bought $FJB from Abdul over the counter on December 31, 2022:




Deleted: 

249. Another administrator of the Discord confirmed that Abdul had been making over-the-counter sales, potentially from "multiple wallets":




250. On March 10, 2023, Abdul told investors on a status call that "FJB marketing wallet sells over the counter. Tax free are still happening." and that those sales "help[] us out because then we don't have to sell and keep the price up."

251. On information and belief, because sales of Tokens from the team wallets required Epshteyn's approval, as alleged above, Abdul's over-the-counter sales from the tax and charity wallets were made with it.

252. On February 28, 2024, Abdul told another member of the Discord to refer his friend to her "if your friend is looking to buy," as she'd "like to empty the tax wallets before they buy," which "gives them a cheaper price and helps us too":

**Deleted:**


Back
PPY OTC Sales
13 messages
March 3
Ed G, 2025-03-01: Ed shares or potentially multiple wallets that Sarah used for OTC Sales.
https://polygonscan.com/address/0xDF7B13Bde6c8C2D67845B4465B53D8453596
edited 6

**Deleted:** she




Shawn, 2024-02-28: Convers between Sarah and Shawn (?) concerning Sarah wanting to s contents of the contract tax w directly to individuals.

253. Abdul's statement reflects coordination of insider-controlled Token supply and the timing of sales to facilitate off-market or preferential transactions. By proposing to "empty the tax wallets" before a contemplated purchase, Abdul indicated that insiders would first sell Tokens under their control to affect market pricing, after which a favored purchaser could acquire Tokens at a reduced price, benefiting both the purchaser and the project's insiders. No one disclosed to investors the existence of such preferential sales practices or the role of insiders in managing Token supply and pricing.



**Deleted:**



Shawn, 2024-02-28: Convers between Sarah and Shawn (?) concerning Sarah wanting to s contents of the contract tax w directly to individuals.

**Deleted:** tokens

**Deleted:** benefitting

**Deleted:** Defendants did not disclose

**Deleted:** token

254. Indeed, as another member of the Discord revealed, Abdul had been selling directly from the charity wallets "for a while," as a sale from the tax wallets "doesn't dump on the price" of the Token.




Deleted:



255. This admission reflects that Abdul actively managed the timing and manner of Token sales from insider-controlled wallets to minimize price impact, rather than allowing market forces to operate transparently. Investors were never told that wallets represented as charitable were being used in this manner or that insiders exercised such control over supply and price dynamics.

**Deleted:** Defendants

**Deleted:** token

**Deleted:** Defendants did not disclose to investors

256. Abdul's conduct and statements were false and misleading because, while $FJB and $PPY were represented as fairly traded, decentralized, and governed by transparent market forces, Abdul was conducting undisclosed over-the-counter sales directly from insider-controlled marketing and charity wallets, coordinating the timing and source of those sales to influence price and liquidity. Neither Abdul nor anyone else disclosed that wallets labeled as "charity" and "marketing" were used as sources of Token supply for insider sales, or that insiders actively managed Token distribution to avoid price impact, confer preferential pricing on favored purchasers, and benefit themselves and the project.

Deleted: Defendants'

Deleted: representing

Deleted: /$

Deleted: Defendants failed to disclose that insiders—including Abdul—were

Deleted: Defendants also failed to disclose

Deleted: token

Deleted: token

257. These omissions were material because a reasonable investor would have considered it important to know that insiders were selling Tokens off-market, selectively draining tax and charity wallets, and manipulating the timing and manner of Token sales to manage price and liquidity. Had investors known that purportedly charitable or marketing-designated wallets were being used to facilitate insider and preferential sales, and that Token pricing did not reflect transparent market forces, they would have viewed the Token as riskier, less fair, and less suitable for investment, and would not have purchased $FJB/$PPY at the prices they did, or at all.

Deleted: tokens

Deleted: token

Deleted: token

## XI. BANNON AND EPSHTEYN AIMED THEIR PITCH AT AN AUDIENCE PRIMED TO BELIEVE IT

258. Bannon and Epshteyn did not pitch $FJB to crypto traders. They pitched it to their own audience: the viewers of *War Room*, the followers of their personal social-media accounts, and the listeners of the conservative programs on which Epshteyn appeared. Epshteyn called that audience "the most actionable audience really, I think in the history of media."

259. That audience trusted Bannon and Epshteyn. Bannon and Epshteyn presented themselves as insiders at the highest levels of American politics—Bannon as President Trump's former chief strategist, and Epshteyn as the President's longtime adviser and attorney—and as

experienced financial hands. Bannon repeatedly invoked his service "as a Naval officer, at Harvard Business School, at Goldman Sachs," and "all my years as an entrepreneur and investor"; the project's whitepaper and press materials touted Bannon's Goldman Sachs and Harvard pedigree and Epshteyn's Georgetown law degree.

260. Their audience was also unsophisticated about cryptocurrency. Finman told investors in May 2022 that "the type of people that watch War Room are figuring out how to get the Bitcoin," and that "you lose … 95% just because the process." The project's own advertising said that $PPY was "so easy, even your grandma can do it."

261. And Bannon and Epshteyn spoke to their audience's fears. They told their audience, again and again, that the dollar was being "destroyed," that the government was "crashing the dollar," and that banks and payment processors would "cancel" or "de-bank" them for their politics. Those fears were widely held among the audience Bannon and Epshteyn targeted. According to a Brookings Institution analysis, "[b]y the end of 2021, the short-run inflation expectations of Republicans were 5.5 percentage points higher than those of Democrats." In an April 2023 Gallup poll, "majorities of Republicans (55%) and independents (51%)" said they were at least moderately worried about the safety of their money in banks, compared with "a 36% minority of Democrats." And in January 2024, Gallup reported that "72% of Republicans and 64% of independents say inflation has been a hardship for them, compared with 51% of Democrats."

262. Bannon and Epshteyn presented de-banking as a threat to their viewers personally—to ordinary Americans who shared their politics. But, as alleged above, the public record reflects no appreciable number of ordinary Americans who lost access to banking for voting Republican or expressing conservative views.

263. Bannon and Epshteyn also appealed to their audience's loyalty to particular causes. Veterans are among the most reliably Republican groups in the country: according to the Pew Research Center, 63% of veteran voters identify with or lean toward the Republican Party. Bannon and Epshteyn made support for veterans and first responders part of the pitch. On *War Room*, Bannon told viewers that "over $50,000, $60,000 now" had been donated to veterans and first responders, and Epshteyn named the Wounded Warrior Project, Tunnel to Towers, and Semper Fi among the charities that investors' fees would support. Buying $FJB was presented not only as an investment but as a way to help the people this audience most wanted to help. As alleged above, the Wounded Warrior Project received nothing from $FJB after Bannon and Epshteyn took control, and years later $PPY was still being promoted as "donating all transaction fees" to the family of Corey Comperatore, a volunteer firefighter killed at a Trump rally, while the contract sent most of each fee to the operations wallet.

264. Epshteyn told the audience that buying $FJB was joining a "movement" led by patriots who "love America." On *War Room* on December 27, 2021, he told viewers: "FJBcoin.org is the website. Everybody should join the movement. This is how we speak. This is how we have our voices be heard."

265. For that reason, the statements by Bannon and Epshteyn, and by the project in their names, that the Token was "safe," "secure," "decentralized," "non-custodial," "uncancellable," a "real currency" and "alternative store [of] value," and a way to "protect yourself" from a "crashing" dollar were concrete statements about how the Token worked and who controlled it, made by the Token's controlling owners to an audience that would act on them. A reasonable investor—including one in the audience to which these statements were directed, who had been told by the Token's owners that it could not be frozen, that its fees went to named charities, and

that its owners were working on it "24 hours a day"—would have considered the truth about the Token's control, fees, and insider arrangements important in deciding whether to buy.

## XII. MR. BARR'S PURCHASES AND RELIANCE

266. Mr. Barr first purchased $FJB on December 27, 2021—four days after Bannon and Epshteyn announced their "strategic ownership positions" on *War Room*, two days after Epshteyn's December 25, 2021 tweet promoting the announcement, and on the day Bannon thanked Epshteyn on *War Room* "for putting this together." Mr. Barr saw the December 23, 2021 *War Room* announcement. He could not buy that night, but four days later he bought, at a substantially higher price, because of the representations made in the announcement, the plan Bannon and Epshteyn described for the Token, and his confidence, given their backgrounds, that they would carry it out. Mr. Barr purchased because of Bannon's and Epshteyn's involvement and their representations about the Token, including that it was a decentralized, uncancellable alternative to a failing dollar, that its fees funded marketing and named veterans' charities, and that Bannon and Epshteyn were personally committed to building it.

267. Mr. Barr followed Bannon's and Epshteyn's promotions of the Token throughout the Class Period. He was an active member of the Token's Discord and Telegram communities; he followed the project's announcements and Abdul's status calls, at which she relayed Bannon's and Epshteyn's decisions and commitments; and he communicated directly with Abdul.

268. Mr. Barr's purchases tracked Bannon's and Epshteyn's statements. He bought $FJB repeatedly in the days after the December 23, 2021 announcement and during Epshteyn's January 2022 *War Room* appearances, including on January 18, 2022, the day Epshteyn announced Finman as the Token's senior strategic advisor. He made eight separate purchases on April 18, 2022, the day of Finman's *War Room* appearance with Bannon. He bought on August 2, 2022, the day of the project's "New Financial System for Conservatives" press release, and repeatedly

in the weeks after Epshteyn's August 5 and August 8, 2022 radio appearances. He bought on October 13, 2022, the day after the project announced that "Bannon and Boris have recorded the Warroom FJB segments." And after the rebrand, he bought $PPY on January 9, 11, and 16, 2025—after Abdul's reports that Bannon and Epshteyn were "finalizing everything" and that she had "the final say from Boris"—and again on January 31, 2025 (recorded on the blockchain as February 1, 2025, UTC), the day Abdul announced that Bannon would promote $PPY on *War Room* on a set schedule.

269. In all, Mr. Barr purchased $FJB and $PPY on more than 100 occasions. His transactions are set forth in his certification.

270. Mr. Barr did not know, and had no reasonable way to know, that Bannon's and Epshteyn's acquisition had been paid for with investors' fees; that their Tokens were exempt from the fees he paid on his purchases; that the marketing fee was being paid to the Founders and to Epshteyn's friends rather than spent on marketing; that the charity wallet was not funding the charities Bannon and Epshteyn named; that Abdul was selling Tokens over the counter from the charity wallet, as well as the marketing wallet, at negotiated prices to select purchasers; that Bannon and Epshteyn had tried to exit the project in February 2023 while telling investors they were "not selling"; or that, until January 30, 2023, the contract owner could freeze his Tokens at will. Had he known the truth, he would not have purchased the Tokens, or would not have purchased them at the prices he paid.

271. Mr. Barr saw and relied on many of the statements alleged above, including the December 23, 2021 *War Room* announcement and the statements made to investors in the project's community channels and status calls, which he followed throughout the Class Period. In addition, and in the alternative, the Tokens traded in an open market that incorporated Bannon's and

Epshteyn's statements into the price, as alleged below; and Plaintiff's claims against Bannon and Epshteyn are primarily ones of omission—of the Payment Agreement's terms, their fee exemption, their control, and the use of investor fees—as to which reliance is presumed.

## XIII. THE TOKEN'S PRICE AND TRADING VOLUME ROSE AND FELL IN DIRECT RESPONSE TO BANNON'S AND EPSHTEYN'S STATEMENTS

Deleted: DEFENDANTS' PROMOTIONAL CONDUCT…

272. From the outset, Bannon's and Epshteyn's own words made clear that the value of $FJB/$PPY was tied not to any existing use or decentralized adoption, but to their personal involvement and efforts to develop, manage, and promote the project, including their promise to build the app and payment system that would give the Token its use.

Deleted: Defendants

Deleted: or independent utility

Deleted: , credibility,

Deleted: promotional

273. Bannon and Epshteyn repeatedly told investors that they were "putting [their] shoulder to the wheel," that they were "available 24/7," that they were "working on this all the time," and that they would personally drive adoption, partnerships, listings, and ecosystem development.

Deleted: Defendants

274. Retail investors purchased $FJB/$PPY precisely because of Bannon's and Epshteyn's representations and promises of sustained involvement—making the Token's market price acutely sensitive to their public statements, appearances, and perceived commitment.

Deleted: As Defendants well knew, retail

Deleted: prominence, influence,

275. To test that relationship, an analyst working on Plaintiff's behalf conducted an event study of the Token's daily closing prices as reported by the Bitget exchange, which closely match the prices reported by the CoinLore data service. Using a constant-mean-return model estimated over the 437 non-event days from December 6, 2021 through February 28, 2023, the analyst calculated the Token's abnormal return, and the corresponding test statistic ($z$), on the *War Room* broadcasts at which Bannon and Epshteyn announced their involvement, announced Finman's role, promoted the FJB app, and responded to reports of their exit, and over the day of and the day after the February 13, 2023 announcement that they would "transfer and assign" the

project. An absolute *z*-statistic greater than 1.96 indicates a price movement that is statistically significant at the 95% confidence level—that is, a movement unlikely to have occurred by chance. The results, stated as abnormal returns, are summarized below. Percentage price changes stated elsewhere in this Complaint are raw daily changes; the *z*-statistics are those of the corresponding abnormal returns:

a. December 23, 2021 (Bannon and Epshteyn announce their "strategic ownership positions" on *War Room*): +270.1% ($z = 13.67$);

b. December 27, 2021 (Bannon thanks Epshteyn on *War Room* "for putting this together"): +23.7% ($z = 2.23$);

c. January 18, 2022 (Epshteyn announces Finman as senior strategic advisor on *War Room*): +30.3% ($z = 2.77$);

d. April 18, 2022 (Finman appears on *War Room* with Bannon to promote the FJB app, which investors report has crashed): −54.2% ($z = -8.15$);

e. February 13–14, 2023 (Abdul announces that Bannon and Epshteyn will "transfer and assign" the project): −72.0% over two days ($z = -9.40$); and

f. February 15, 2023 (Bannon tells *War Room* viewers he has "never sold a coin" and remains a "huge supporter"): +72.4% ($z = 5.69$).

276. The same pattern held after the rebrand. Using the same model estimated over the 354 non-event days from February 15, 2024 through February 12, 2025, $PPY's abnormal return was +21.7% on January 31, 2025, the day Abdul announced that Bannon would promote $PPY on *War Room* on a set schedule and that updates on the app were waiting on that promotion ($z = 2.70$), and +59.6% over that day and the next ($z = 4.54$).

**A. Immediate Price and Volume Reaction to Bannon's and Epshteyn's Initial Promotions**

277. The most dramatic market reaction occurred on December 23, 2021, when Bannon and Epshteyn jointly announced $FJB on *War Room*, explicitly associating the Token with themselves, their movement, and the "total and complete independence" it would offer.

278. On that date, $FJB's closing price increased by approximately 267.3% in a single day, while trading volume increased by approximately 739%, reflecting a surge of retail buying directly following Bannon's and Epshteyn's promotional statements. The move was more than thirteen standard deviations above the Token's mean daily return.

279. The following days saw sustained elevated trading volume and price volatility as Bannon and Epshteyn continued to promote $FJB across *War Room*, social media, and affiliated platforms, reinforcing the market's perception that they were actively backing and building the project.

**B. The Token's Price Tracked Bannon's and Epshteyn's Promotion and Development of the Project**

280. On January 6, 2022, Bannon told holders on a call that he had been "very involved in digital currencies," that he and Epshteyn were working "24 hours a day" on $FJB, and that the Token would become a usable currency with liquidity, market makers, exchanges, discounts, and real-world utility.

281. Bannon further framed $FJB as a safer alternative to fiat currency amid an impending economic and financial crisis, again encouraging investors to view the Token as both a medium of exchange and a store of value.

282. Following that call and similar statements by Epshteyn in early January 2022, $FJB's price held near its post-announcement levels. And when Epshteyn announced on *War Room* on January 18, 2022, that he and Bannon were "bringing on a senior strategic advisor," the

**Deleted:** Defendants'

**Deleted:** a "parallel economy."

**Deleted:** Defendants'

**Deleted:** Defendants

**Formatted:** Font: Italic

**Deleted:** Defendants

**Deleted:** <#>Continued Promotional Statements Drove Short-Term Price Support¶

**Deleted:** released

**Deleted:** YouTube video in which he stated

**Deleted:** appearance

**Deleted:** FJB experienced renewed bursts of

Token's price rose 29.3% in a single day, accompanied by an 86% increase in trading volume—a statistically significant reaction ($z = 2.77$).

**Deleted:** and price stabilization, reflecting investors' reliance on Defendants' assurances of ongoing development and support.…

283. Throughout 2022, the Token's price continued to track Bannon's and Epshteyn's promotion and development of the project. When Finman appeared on *War Room* with Bannon on April 18, 2022, to promote the FJB app, the app failed: holders reported that day that it had crashed and was "down," and one wrote, "Strategic error having the app crash like this." The Token's price fell 54.5% in a single day on a 160% increase in trading volume ($z = -8.15$). And on September 14, 2022, when Epshteyn told holders that "FJB is now expanding to Europe," the Token's price rose 19.8% and its trading volume rose 473%.

**Deleted:** <#>Throughout 2022, similar patterns repeated: when Defendants appeared publicly, promised expansion, or reassured holders, trading volume spiked and price declines slowed or temporarily reversed.
**Prolonged Silence and Broken Promises Caused Sustained Price Decline**
By mid-2022 and into early 2023, Defendants dramatically reduced their promotional efforts despite having repeatedly promised sustained involvement and expansion.

**C. The Undisclosed Facts Materialized as Promotion and Development Stalled**

284. After January 2022, Bannon's and Epshteyn's promotion of the Token became sporadic, and the development they had described did not follow. That was the consequence of the facts they had not disclosed: investors' fees were paying for Bannon's and Epshteyn's acquisition rather than funding the project, and nothing obligated them to promote or develop it.

285. During periods when Bannon and Epshteyn were largely silent, $FJB's trading volume steadily declined, liquidity dried up, and the Token's price fell precipitously.

286. By February 2023, as those undisclosed facts materialized, $FJB had lost approximately 95% of its value from its post-announcement highs.

**Deleted:** By February 2023—after months in which Defendants failed to deliver promised promotions, partnerships, or ecosystem development—$

287. Investors repeatedly pleaded with Bannon and Epshteyn to promote the Token, explicitly stating that price and liquidity depended on their continued involvement—an understanding that neither Bannon nor Epshteyn ever corrected.

**Deleted:** Defendants

**Deleted:** Defendants'

**Deleted:** Defendants never

**D. Whipsawing Statements and False Reassurances Exacerbated Losses**

288. On February 13, 2023, Abdul announced in a community channel that Bannon and Epshteyn had "decided to transfer and assign the rights and obligations" of the project.

**Deleted:** Defendant

**Deleted:** were "walking away" from

289. That announcement triggered a near-immediate market collapse. $FJB's price fell approximately 16.6% on February 13 and a further 66.9% on February 14, 2023—a combined decline of 72.4% over the two days ($z = -9.40$)—accompanied by a roughly 1,575% spike in trading volume as investors rushed to exit.

**Deleted:** , with
**Deleted:** falling
**Deleted:** 67% in a single day,
**Deleted:** massive

290. On the evening of February 13—and again in the days that followed—Epshteyn and Bannon publicly reaffirmed their support for the Token and denied that they had disengaged. After Bannon told *War Room* viewers on February 15, 2023, that he had "never sold a coin" and remained a "huge supporter," the Token's price rose 71.1% in a single day ($z = 5.69$).

**Deleted:** Later that same day
**Deleted:** Defendants reversed course, with
**Deleted:** reaffirming
**Deleted:** denying

291. These contradictory statements caused extreme volatility, whipsawing investors between panic selling and renewed hope, and preventing the market from accurately pricing the Token's true prospects.

292. Rather than correcting earlier misrepresentations, Bannon and Epshteyn continued to reassure investors that they remained committed, prolonging the artificial inflation of the Token's price and delaying full market correction.

**Deleted:** Defendants

**E. <u>Rebrand to Patriot Pay Repeated the Same Cycle of Inflation and Collapse</u>**

293. Beginning in December 2023, the project rebranded $FJB as $PPY and renewed promotional efforts, again featuring Bannon's and Epshteyn's names, Bannon's image, and statements about fighting de-banking, controlling currency, and building a parallel financial system.

**Deleted:** In 2024, Defendants
**Deleted:** Patriot Pay ($
**Deleted:** )
**Deleted:** name,

294. Following renewed promotions—including social media advertisements, influencer posts, and platform endorsements—$PPY again experienced spikes in price and volume, including single-day price increases exceeding 25% accompanied by volume surges of several hundred percent.

**Deleted:** sharp

295. As before, as the undisclosed facts about insider control and the use of investors' fees materialized, $PPY's price resumed its decline.

Deleted: once promotional efforts waned

Deleted: promised initiatives failed to materialize

296. By early 2025, after Abdul disabled trading and announced closure without delivering promised liquidity distributions, $PPY's value collapsed to near-zero levels, rendering most investors' holdings effectively worthless.

Deleted: Defendants

## XIV. CONCEALMENT AND TOLLING

Deleted: DEFENDANTS'

297. The misconduct alleged here was inherently self-concealing. Bannon, Epshteyn, and Abdul exercised exclusive control over the Token's smart contracts, tax wallets, charity wallets, and OTC sales practices, and they did not publicly disclose the internal arrangements governing those accounts.

Deleted: Defendants'

Deleted: Defendants

298. Although certain aspects of the Token's operation were implemented through smart-contract code recorded on the blockchain, that code was not meaningfully accessible or intelligible to ordinary retail investors, who lacked the technical expertise and information necessary to discern insiders' centralized control, wallet permissions, fee exemptions, and transactional practices from raw on-chain data alone.

Deleted: Defendants'

299. Bannon, Epshteyn, and Abdul affirmatively concealed material facts from investors, including that transaction-based "marketing" fees were used as undisclosed consideration for the acquisition of control; that Bannon's and Epshteyn's wallets were exempt from transaction taxes; that insiders conducted preferential OTC sales; that wallets labeled as "charity" wallets were used for insider sales; and that, until January 30, 2023, the contract owner retained unilateral authority to freeze investor wallets.

Deleted: Defendants

Deleted: Defendants'

Deleted: insiders

Deleted: Defendants

300. On information and belief, the project's channel owners also enabled timed "channel wipe" or disappearing-message settings on the project's community channels, so that

Deleted: Defendants

messages posted to investors during the Class Period were automatically deleted and are no longer available to investors.

301. Bannon, Epshteyn, and Abdul further lulled investors into inaction by repeatedly assuring them that issues were being investigated or resolved, including statements that "[i]t's definitely not getting brushed under the rug," that Epshteyn was "taking care of it," that funds were being recovered, that any wrongdoing was attributable to "the original founders of the coin," and that Bannon and Epshteyn remained committed to the project and would double down on promotion and development.

**Deleted:** Defendants

302. Plaintiff and the Class exercised reasonable diligence under the circumstances. Investors repeatedly sought transparency during status calls and through community channels, requested proof of charitable donations, and requested additional promotion and disclosure. They were met with reassurances, delay, and concealment.

**Deleted:** Defendants responded

303. Even so, critical facts concerning Bannon's and Epshteyn's control, the fee-funded acquisition, fee exemptions, fee diversion, the terms and extent of OTC sales, and wallet manipulation were known only to Bannon, Epshteyn, Abdul, and other insiders and were not discoverable by Plaintiff through reasonable diligence, particularly given the use of pseudonymous accounts, intermediary wallets, and non-public over-the-counter transactions.

**Deleted:** Defendants'

**Deleted:** Defendants and

**Deleted:** Defendants'

304. Nor did public reports during the Class Period put investors on notice of the facts alleged here. A February 23, 2023 ABC News report described the December 2021 agreement's grant to Bannon and Epshteyn of "control, administration, and governance of the coin," but it did not report that investors' fees were paying for their acquisition, that their two billion Tokens were exempt from the fees every other holder paid, that the agreement imposed no obligation on them to market or develop the project, or that insiders were selling Tokens over the counter from the tax

and charity wallets. And Bannon and Epshteyn met the February 2023 reports with denials. On February 15, 2023, Bannon told *War Room* viewers that he had "never sold a coin" and remained a "huge supporter," and the Token's price rose 71.1% that day. A person close to them told ABC News that they were "fully committed to the $FJB community" and blamed "the original founders of the coin," and, in December 2022, Abdul had assured investors that "the bosses" were "taking care of the legal fees" while work continued on "recovering our funds." When holders lost the ability to sell in December 2023, the project told investors that the migration would leave each holder "exactly where they were at the time of snapshot," and it then promoted $PPY as free from "freezing of your account."

305. Plaintiff did not discover, and could not reasonably have discovered, the facts constituting the violations alleged herein until after February 12, 2025, when trading was disabled, the project's closure was announced, and the promised liquidity distribution failed to occur by February 19, 2025, the end of the seven days Abdul had promised.

306. Plaintiff commenced this action promptly after discovering Defendants' misconduct.

307. Accordingly, any applicable statutes of limitation were tolled under the doctrines of fraudulent concealment and equitable tolling until Plaintiff's discovery of Defendants' misconduct.

## CLASS ALLEGATIONS

308. Plaintiff brings this action as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities (the "Class") who purchased or otherwise acquired Let's Go Brandon Coin ($FJB) and/or Patriot Pay ($PPY) during the period from December 6, 2021, when Bannon and Epshteyn acquired control of the

Deleted: full scope of Defendants' misconduct

Deleted: Defendants froze wallets, announced

Deleted: failed to deliver

Deleted: )

Formatted: Font: Not Bold

Deleted: Defendants Steve

Deleted: Boris

Token and began promoting it to the public, through February 12, 2025, when trading was disabled and the project's closure was announced (the "Class Period"). Because holders of $FJB received $PPY in the same amounts in the February 2024 airdrop, the Class includes purchasers of both.

Deleted: Defendants
Deleted: trading
Deleted: announced

309. Plaintiff also brings Counts IV and V on behalf of a subclass of all Class members who purchased or otherwise acquired $FJB and/or $PPY on or after February 12, 2023, three years before the original Complaint was filed (the "D.C. Securities Act Subclass"). *See* D.C. Code § 31-5606.05(f)(1). That date reflects the time limits on those claims, not the date on which the Tokens became securities; as alleged below, the Tokens were securities throughout the Class Period.

310. Excluded from the Class and the D.C. Securities Act Subclass are Defendants; members, managers, and officers of the entity Defendants; members of the FJB Advisory Council; the Founders; members of Defendants' immediate families; Defendants' legal representatives, heirs, successors, or assigns; and any entity in which any Defendant has or had a controlling interest.

Deleted: , including
Deleted: Counsel
Deleted: Defendants have

## I. NUMEROSITY

311. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, $FJB/$PPY Tokens were sold to thousands of individual retail investors nationwide through websites, social media, podcasts, livestreams, messaging platforms, and over-the-counter transactions. As of April 2026, more than 9,000 wallet addresses held $FJB.

Deleted: Defendants sold

312. Members of the Class can be readily identified through the project's records, blockchain transaction data, and exchange and wallet records.

Deleted: Defendants'

## II. TYPICALITY

313. Plaintiff's claims are typical of the claims of the Class. Plaintiff purchased $FJB/$PPY Tokens during the Class Period, including on and after February 12, 2023, and was

injured by the same course of conduct that injured other Class members, including the materially false and misleading statements, omissions, and deceptive scheme alleged herein.

314. Plaintiff was exposed to the same uniform misrepresentations and omissions disseminated through common channels—*War Room*, Bannon's and Epshteyn's personal social-media accounts, the project's websites and official channels, and Abdul's status calls—and suffered losses as a result.

## III. ADEQUACY

315. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of the Class and has retained counsel experienced in securities, consumer protection, cryptocurrency, and class action litigation.

## IV. COMMONALITY AND PREDOMINANCE

316. Questions of law and fact common to the Class predominate over any questions affecting only individual members. Common questions include, but are not limited to:

a. whether $FJB/$PPY constituted securities;

b. whether Bannon, Epshteyn, Abdul, Patriot Pay LLC, and FJB App LLC were statutory sellers of the Tokens;

c. whether Bannon, Epshteyn, and Abdul made materially false or misleading statements or omissions;

d. whether the Tokens were falsely represented as decentralized, safe, and immune from freezing;

e. whether Bannon, Epshteyn, and their agents exercised centralized control over wallets and trading;

f. whether insiders conducted undisclosed OTC sales and insider transactions;

**Deleted:** Defendants' unregistered offering,

**Deleted:** by Defendants

**Deleted:** Defendants offered

**Deleted:** sold unregistered securities

**Deleted:** Defendants

**Deleted:** Defendants

**Deleted:** the Tokens

**Deleted:** Defendants

**Deleted:** Defendants

g. whether Bannon, Epshteyn, and the other Defendants engaged in a deceptive scheme in violation of Rule 10b-5(a) and (c);

h. whether Bannon, Epshteyn, and Abdul acted with scienter;

Deleted: Defendants

i. whether Plaintiff and the Class suffered damages; and

j. the proper measure of damages or rescission.

317. These questions are susceptible to class-wide proof and do not depend on individualized issues.

## V. SUPERIORITY

318. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class members are relatively modest in comparison to the expense and burden of individual litigation, making individual actions economically impracticable.

319. Concentrating the litigation in a single forum will avoid inconsistent rulings and promote judicial economy.

## VI. CLASS ACTION IS APPROPRIATE

320. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

321. In the absence of a class action, Defendants will be permitted to retain the proceeds of their unlawful conduct to the detriment of Plaintiff and the Class and contrary to public policy.

## D.C. LAW APPLIES TO THE ENTIRE CLASS

322. Washington, D.C.'s substantive laws apply to every member of the Class, regardless of where in the United States the Class members reside.

323. Washington, D.C.'s substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, U.S. Const. amends. V, XIV, and the Full Faith and Credit Clause, U.S. Const. art. IV, § 1. Washington, D.C. has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating state interests that ensure that the choice of Washington, D.C. law is not arbitrary or unfair.

324. Bannon and Epshteyn reside in Washington, D.C., and *War Room*—on which much of the promotion at issue was broadcast—is produced by Warroom LLC in Washington, D.C. Bannon's and Epshteyn's decision to reside in Washington, D.C., and avail themselves of Washington, D.C.'s laws, and to engage in the challenged conduct from and emanating out of Washington, D.C., renders the application of D.C. law to the claims herein constitutionally permissible.

325. Washington, D.C. is also the place from which the misconduct emanated. On information and belief, the decisions regarding the Token's marketing strategy and the related sale of Tokens were made by Bannon and Epshteyn in, and emanated from, Washington, D.C., and the project's finances were reported to *War Room* personnel there. This conduct similarly injured and affected Plaintiff and all other Class members.

326. The application of D.C. law to the Class is also appropriate under Washington, D.C.'s choice of law rules because Washington, D.C. has significant contacts to the claims of Plaintiff and the proposed Class, and Washington, D.C. has a greater interest in applying its laws here than any other interested state.

Deleted: 14th Amend. § 1
Deleted: Art.
Deleted: §1 of the U.S. Constitution
Deleted: Two of the four Executive Defendants
Deleted: all of the Executive Defendants operated the Company's headquarters and principal place of business located...
Deleted: The
Deleted: of Executive Defendants and the Company
Deleted: .
Deleted: state
Deleted: Executive Defendants'
Deleted: decision-making
Deleted: parameters of the Company
Deleted: occurred
Deleted: . As such,
Deleted: conduct complained of herein emanated from Washington, D.C

**$FJB/$PPY TOKENS ARE SECURITIES SUBJECT TO THE SECURITIES LAWS**

327. The Securities Act of 1933 (the "Securities Act") and the Exchange Act define "security" to include an "investment contract." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). Under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946), an investment contract exists where there is: (1) an investment of money; (2) in a common enterprise; (3) with a reasonable expectation of profits; (4) to be derived from the efforts of others.

Deleted: Securities

Deleted: of 1934 (the "Exchange Act")

Deleted:

328. From December 6, 2021, when Bannon and Epshteyn acquired control of the Token, through the end of the Class Period, the $FJB/$PPY Tokens met each element of the *Howey* test and therefore constituted securities within the meaning of the securities laws.

Deleted: The

Deleted: meet

Deleted: constitute

**I. INVESTMENT OF MONEY**

329. Purchasers of $FJB and later $PPY invested money or other valuable digital assets in exchange for Tokens.

330. Retail investors paid consideration to acquire the Tokens on public markets and through over-the-counter sales. Every purchase required the transfer of value to obtain the Token. In addition, each on-chain transaction was subject to an embedded 8% transaction fee (for $FJB, 3% "marketing" and 5% "charity"), meaning investors paid even more than the nominal purchase price to acquire and hold the asset.

331. This constitutes an "investment of money" under *Howey*.

Deleted: Courts uniformly hold that payment in cryptocurrency or digital assets satisfies this element.

**II. COMMON ENTERPRISE**

332. A common enterprise existed because investors' fortunes were tied to each other and to the success of Bannon, Epshteyn, and those acting at their direction in operating and promoting the Token.

Deleted: Defendants' success

### A. Horizontal Commonality

333. Investor funds were pooled through transaction fees embedded in the smart contract; liquidity pools; and "marketing" and "charity" wallets funded by every trade.

334. All investors' returns rose and fell together based on: Token price; trading volume; liquidity; and the use (or misuse) of pooled marketing and treasury funds.

335. Price charts and trading volume demonstrate that the Token's value moved in direct response to Bannon's and Epshteyn's promotional conduct and periods of silence. Investors' fortunes were therefore interdependent.

Deleted: Defendants'

### B. Vertical Commonality

336. Bannon's and Epshteyn's fortunes were directly linked to investor purchases. They: acquired, through the Recipients, two billion Tokens through a private transfer; personally controlled the smart contract keys and the team wallets; benefited from transaction volume; and structured the project so investor-paid marketing fees financed their acquisition.

Deleted: Defendants'

Deleted: 2

Deleted: treasury

337. Bannon's and Epshteyn's financial gain depended on increasing demand and trading activity. Investors' gains likewise depended on Bannon's and Epshteyn's success in promoting and sustaining the Token ecosystem.

Deleted: Defendants'

Deleted: Defendants'

## III. REASONABLE EXPECTATION OF PROFITS

338. Investors had a reasonable expectation of profits based on Bannon's and Epshteyn's statements and conduct. As early as January 2022, Epshteyn told holders that, unlike a "joke" token that its promoters would "pump" and "dump," $FJB was "a serious movement" that would take "our MAGA community into the future."

Deleted: Defendants' statements and conduct.

### A. Dollar Collapse Messaging

339. Bannon and Epshteyn repeatedly warned that: the U.S. dollar was being "destroyed"; government spending would lead to collapse; investors needed "digital sovereignty";

Deleted: Defendants

Deleted: Dollar

and the Token would serve as an alternative store of value. These statements framed the Token as an investment vehicle designed to preserve and grow wealth in anticipation of economic crisis.

B. **Promotion as Inflation-Resistant Store of Value**

340. Bannon and Epshteyn described the Token as: an "alternative store [of] value"; a "safe" alternative to fiat currency; a path to "total and complete independence"; a way to "hedge inflation"; and a hedge against de-banking and censorship. Epshteyn told holders that he was "driving to make FJB a top 50 cryptocurrency project in the world." Such representations signaled an expectation that the Token would appreciate or at least preserve purchasing power relative to traditional currency.

Deleted: Defendants
Deleted: "inflation-resistant"; a "safe
Deleted: "
Deleted: financial
Deleted: debanking

C. **Marketing and Development Promises**

341. Bannon and Epshteyn repeatedly promised: aggressive marketing efforts; partnerships; exchange listings; ecosystem development; a functioning payment network; and "real-world utility." They and Abdul assured investors, including in weekly investor updates, that they were working "24/7" and personally committed to the project's success.

Deleted: Defendants

D. **Price Reactions to Promotion**

342. The Token's price and trading volume rose sharply following Bannon's and Epshteyn's promotional appearances and statements, and declined during extended silence or broken promises. This pattern confirms that investors were buying in anticipation of price appreciation driven by Bannon's and Epshteyn's efforts. Abdul acknowledged the link: on January 10, 2023, she told holders that the Token's "all-time highs" had "been very, very directly linked to them."

Deleted: Defendants'
Deleted: Defendants' efforts.

## IV. PROFITS DERIVED FROM THE EFFORTS OF OTHERS

343. Investors' potential profits depended almost entirely on the managerial and entrepreneurial efforts of Bannon, Epshteyn, and those acting at their direction.

Deleted: Defendants'

**A. Centralized Control**

344. Despite marketing the Token as "decentralized," Bannon and Epshteyn, directly and through their agents: controlled the LLC; controlled smart contract private keys; controlled the team wallets; controlled liquidity; had the ability to freeze investor wallets; and, through Abdul, exercised authority to disable trading entirely. Investors had no voting rights, governance power, or ability to influence the project's direction.

**Deleted:** Defendants

**Deleted:** treasury, marketing, and charity

**B. Marketing and Influence**

345. The Token's success depended on Bannon's and Epshteyn's efforts to build the promised app and payment system, secure exchange listings and partnerships, manage the Token's wallets and liquidity, and promote the project, including on *War Room*. Investors could not increase Token value through their own efforts. Bannon's and Epshteyn's actions moved the market.

**Deleted:** : Bannon's *War Room* platform;

**Deleted:** political network; their credibility

**Deleted:** public influence;

**Deleted:** continued public promotion.

**Deleted:** Only Defendants'

**C. Operational Development**

346. Bannon and Epshteyn promised: a payment ecosystem; partnerships; utility expansion; and technical upgrades. These were managerial functions exclusively within the control of Bannon, Epshteyn, and those acting at their direction.

**Deleted:** Defendants

**Deleted:** Defendants' control

**D. Insider Advantages**

347. The Token was structured so that Bannon's and Epshteyn's wallets were exempt from transaction taxes; insiders controlled OTC sales; insiders managed the funds in the team wallets; and the acquisition was financed via investor-paid fees. Investors were passive participants dependent on Bannon's and Epshteyn's honesty and competence.

**Deleted:** Defendants:

**Deleted:** the Token

**Deleted:** insiders

**Deleted:** treasury

**Deleted:** financed their

**Deleted:** Defendants'

**LOSS CAUSATION**

348. Bannon's and Epshteyn's misrepresentations and omissions artificially inflated the market price of $FJB/$PPY throughout the Class Period. When the truth regarding their conduct,

**Deleted:** Defendants'

**Deleted:** Defendants'

control, and lack of genuine commitment emerged, and when the risks they had not disclosed materialized, the artificial inflation dissipated, causing substantial economic losses to Plaintiff and the Class.

Deleted: through partial

Deleted: full corrective disclosures

## I. ARTIFICIAL INFLATION INTRODUCED THROUGH BANNON'S AND EPSHTEYN'S PROMOTIONAL CONDUCT

Deleted: DEFENDANTS'

349. From December 2021 forward, Bannon and Epshteyn repeatedly represented that:

Deleted: Defendants

a. Bannon and Epshteyn were strategic partners personally committed to building the project;

b. they were working on the Token "24/7";

c. the Token would become a viable alternative financial system;

d. it was decentralized and immune from financial censorship or account freezes;

e. embedded marketing and charity fees were being used as represented; and

f. the Token would function as a store of value amid the alleged collapse of the U.S. dollar.

350. These representations created the impression that $FJB/$PPY had, or would soon have, a real function as a currency and means of payment, decentralized governance, and sustained insider commitment. In reality, the Token's value depended on Bannon's and Epshteyn's continued efforts to develop, manage, and promote the project and on insiders' discretionary control.

Deleted: possessed independent utility

Deleted: overwhelmingly

Deleted: Defendants'

Deleted: promotional

Deleted: and

351. The market immediately incorporated Bannon's and Epshteyn's statements into the Token's price. On December 23, 2021, following their *War Room* announcement associating the Token with themselves and promising "total and complete independence," the price of $FJB increased approximately 267.3% in a single day, accompanied by an approximately 739% surge

Deleted: Defendants'

Deleted: Defendants'

Deleted: a "parallel financial system

in trading volume. That increase was more than thirteen standard deviations above the Token's mean daily return ($z = 13.67$). The timing and magnitude of this reaction demonstrate that the Token's price was directly responsive to Bannon's and Epshteyn's public representations and perceived involvement.

352. Similar patterns followed subsequent promotional statements. Bannon's December 27, 2021 *War Room* appearance (+22.8%; $z = 2.23$) and Epshteyn's January 18, 2022 announcement of Finman's hiring (+29.3%; $z = 2.77$) each produced statistically significant price increases. And on April 18, 2022, when the FJB app that Finman and Bannon promoted on *War Room* failed, the Token's price fell 54.5% ($z = -8.15$), confirming that the market valued the Token on the development Bannon and Epshteyn had promised. The Token's price thus reflected artificial inflation attributable to Bannon's and Epshteyn's statements and omissions.

## II. PARTIAL CORRECTIVE DISCLOSURES REVEALED THE TOKEN'S TRUE RISK PROFILE

353. Over time, information entered the market that contradicted or undermined Bannon's and Epshteyn's representations. These included:

a. the materialization, as promotion and development stalled, of the concealed fact that investors' fees were financing Bannon's and Epshteyn's acquisition rather than the project;

b. disclosures that marketing and charity funds were unaccounted for;

c. confirmation that insiders exercised centralized control over wallets; and

d. the withdrawal of the Token's liquidity, which left holders unable to sell, contradicting claims of decentralization.

**Deleted:** Defendants'

**Deleted:** assurances in early

**Deleted:** thereafter. When Defendants

**Deleted:** reaffirmed their commitment, trading volume increased and price declines slowed or temporarily reversed.

**Deleted:** Defendants'

**Deleted:** Defendants'

**Deleted:** <#>prolonged periods of silence despite prior assurances of promotion;¶
failure to deliver promised listings, expansion, or ecosystem development;¶

**Deleted:** wallet freezes

354. Each of these developments weakened market confidence in Bannon's and Epshteyn's prior representations. As investor confidence eroded, the Token's price declined, and portions of the artificial inflation dissipated.

**Deleted:** Defendants'

## III. FEBRUARY 13–14, 2023: CLASSIC CORRECTIVE DISCLOSURE AND PRICE COLLAPSE

355. On February 13, 2023, Abdul announced that Bannon and Epshteyn had "decided to transfer and assign the rights and obligations" of the project. This announcement directly conflicted with prior statements that they remained fully committed and were working on the Token "24/7."

**Deleted:** Defendant

**Deleted:** were walking away from

**Deleted:** Defendants

356. The market reaction was immediate. The Token's price fell 16.6% on February 13 and a further 66.9% on February 14, 2023—a combined decline of 72.4% ($z = -9.40$)—accompanied by a roughly 1,575% increase in trading volume. The magnitude and timing of this decline demonstrate that the Token's market price had been supported by Bannon's and Epshteyn's perceived ongoing involvement and that this support rapidly dissipated when their continued commitment was called into question.

**Deleted:** On February 14, 2023, the

**Deleted:** approximately 67% in

**Deleted:** single day,

**Deleted:** Defendants'

357. Bannon's February 15, 2023 statement that he had "never sold a coin" and remained a "huge supporter" then drove the price up 71.1% in a single day ($z = 5.69$), re-inflating the price on the basis of the false and misleading reassurances alleged above. The whipsawing statements further destabilized the Token and contributed to continued volatility and loss of investor confidence.

**Deleted:** Although Defendants later issued reassurances, the

## IV. LIQUIDITY WITHDRAWAL AND REBRAND UNDERMINED CLAIMS OF "DECENTRALIZATION"

**Deleted: WALLET FREEZES**

358. In December 2023, insiders withdrew the Token's liquidity, leaving holders unable to sell, and the project subsequently rebranded as Patriot Pay and migrated to a new blockchain architecture that preserved insider control.

**Deleted:** Defendants froze investor wallets while exempting insider-controlled wallets

**Deleted:** the project

359. The market reaction to these events was severe. On November 30, 2023, shortly before the liquidity withdrawal, $FJB traded at approximately $0.000264. By January 31, 2024—during the period in which investors were unable to sell—the price of $FJB on the BNB Smart Chain had collapsed to approximately $0.000002, representing a decline of more than 99%. The price fell further to approximately $0.000001 on February 2, 2024.

Deleted: freeze, the Token
Deleted: wallets were frozen and
Deleted: transact
Deleted: Token's
Deleted:

360. These dramatic declines were temporally proximate to the liquidity withdrawal and rebrand and reflected a sharp deterioration in market confidence after the project's actions contradicted prior representations that the Token was free from centralized control. The liquidity withdrawal was a materialization of the very risk—insider control over holders' ability to trade—that Bannon and Epshteyn had not disclosed. As a result, additional artificial inflation dissipated.

Deleted: wallet freeze
Deleted: Defendants'

## V. FEBRUARY 12, 2025: TRADING DISABLED AND COLLAPSE OF REMAINING PRICE SUPPORT

361. On February 12, 2025, Abdul disabled trading of $PPY and announced the project's closure, while promising that the liquidity pool would be distributed within seven days. No such distribution occurred.

Deleted: Defendants

362. The sudden trading halt and operational shutdown eliminated any remaining market confidence that the Token would function as a viable financial ecosystem. Trading activity ceased, liquidity evaporated, and the Token's price collapsed to effectively nominal levels.

363. This event did not immediately reveal every aspect of the misconduct alleged herein. However, it removed the final pillar of artificial price support that had been sustained by Bannon's and Epshteyn's ongoing reassurances and promises of revival, and it was the ultimate materialization of the undisclosed risk that the insiders who controlled the Token could, at will, prevent holders from selling it. With trading disabled and promised liquidity undistributed, the

Deleted: disclose all concealed aspects
Deleted: Defendants'
Deleted: .
Deleted: Defendants'
Deleted: .

market could no longer rely on representations regarding continued development, decentralization, or financial autonomy.

Deleted: Defendants'

364. As a result, any remaining artificial inflation dissipated, and investors suffered substantial economic loss. Mr. Barr held more than 100 million Tokens when trading was disabled; immediately before the halt, $PPY traded at approximately $0.000167.

## VI. CAUSAL CONNECTION BETWEEN MISCONDUCT AND LOSS

365. Plaintiff and the Class purchased $FJB/$PPY at prices that were artificially inflated by the materially false and misleading statements and omissions alleged herein.

Deleted: Defendants'

366. When corrective information entered the market—through announcements of abandonment, exposure of centralized control, the withdrawal of the Token's liquidity, missing funds, and ultimate shutdown—the artificial inflation dissipated, causing substantial economic loss.

Deleted: wallet freezes

367. The losses suffered by Plaintiff and the Class were not caused by general cryptocurrency volatility. Rather, they were the direct and proximate result of issuer-specific disclosures and events uniquely attributable to the misconduct alleged herein.

Deleted: Defendants'

368. Had the truth been known at the time of purchase, $FJB/$PPY would have traded at substantially lower prices, or not at all.

369. Accordingly, the misrepresentations, omissions, and deceptive scheme alleged herein were a direct and proximate cause of Plaintiff's and the Class's damages.

Deleted: Defendants'

370. Although certain events during the Class Period caused significant price declines, those events did not disclose the full scope of the undisclosed conduct. Bannon, Epshteyn, and Abdul continued to issue reassurances, contradictory statements, and partial explanations that obscured the underlying structure of insider control, fee diversion, and preferential sales practices.

Deleted: Defendants' concealed

Deleted: Defendants

The February 2025 shutdown prompted further investigation into the project's internal operations and ultimately led to the discovery of facts that had not been disclosed throughout the Class Period.

Deleted: concealed

**OVERVIEW OF FRAUD AND NON-FRAUD CLAIMS**

371. Plaintiff asserts both strict liability and negligence-based claims, as well as fraud-based claims pleaded in the alternative. Certain claims arise under District of Columbia statutory and common law that impose liability without requiring proof of scienter, intent to deceive, or reckless misconduct. Those claims are based on untrue statements and omissions in the offer and sale of securities, control-person liability, negligent misrepresentations, statutory violations, breaches of fiduciary duty, and unjust enrichment. Plaintiff expressly disclaims any allegation of fraud, or of knowing, intentional, or reckless misconduct, for purposes of those non-fraud claims, which are separate and distinct from the fraud-based claims asserted in the alternative.

Deleted: the Securities Act and under

Deleted: unregistered offers

Deleted: sales

Deleted: deliberate

372. In the alternative, Plaintiff asserts fraud-based claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, Section 20(a) of the Exchange Act, the D.C. Securities Act, and District of Columbia common law. Those claims are based on allegations that Bannon, Epshteyn, and Abdul knowingly or recklessly made material misrepresentations and omissions, and that they and the other Defendants engaged in a deceptive scheme, in connection with the purchase and sale of $FJB/$PPY Tokens.

Deleted: under

Deleted: certain Defendants

Deleted: and

Deleted: offer

## I. NON-FRAUD-BASED SECURITIES AND STATE LAW CLAIMS

373. The following claims do not require proof of scienter, fraudulent intent, or recklessness:

- Count IV (Misrepresentation Under the D.C. Securities Act), to the extent predicated on negligent misrepresentation;

Deleted: I (Section 12(a)(1) of

Deleted: – Unregistered Offer and Sale);
Count III (Section 15 of the Securities Act – Control Person Liability

Deleted: the Section 12(a)(1) violation

- Count V (Control Person Liability Under the D.C. Securities Act), to the extent predicated on negligent misrepresentation;
- Count VI (D.C. Consumer Protection Procedures Act);
- Count VIII (Negligent Misrepresentation);
- Count IX (Breach of Fiduciary Duty); and
- Count X (Unjust Enrichment).

374. These claims are premised on statutory strict liability, negligence standards, fiduciary obligations, or equitable principles. For purposes of these causes of action, Plaintiff does not rely on allegations of fraud, scienter, or intentional deception except to the extent such allegations are expressly incorporated as alternative theories. To the extent any factual allegations elsewhere in this Complaint could be construed as sounding in fraud, those allegations are not incorporated into these non-fraud-based counts except as consistent with strict liability or negligence standards.

## II. FRAUD-BASED SECURITIES AND STATE LAW CLAIMS (PLED IN THE ALTERNATIVE)

375. The following claims are based on fraud, scienter, and intentional or reckless misconduct:

- Count I (Section 10(b) of the Exchange Act and Rule 10b-5(b));
- Count II (Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c));
- Count III (Section 20(a) of the Exchange Act);
- Count IV (Misrepresentation Under the D.C. Securities Act), to the extent based on untrue statements or omissions made knowingly or recklessly;
- Count V (Control Person Liability Under the D.C. Securities Act), to the extent based on untrue statements or omissions made knowingly or recklessly;

Deleted: Unregistered Offer and Sale under the D.C. Securities Act);
Count VII (…

Deleted: under

Deleted: registration violations or

Deleted: VIII

Deleted: X

Deleted: XI

Deleted: XII

Deleted: );

Deleted: IV

Deleted: VI

Deleted: VII

Deleted: under

Deleted: predicated

Deleted: fraudulent misrepresentation

- Count VII (Fraud); and
- Count XI (Aiding and Abetting).

376. These claims are pleaded in the alternative to the non-fraud-based claims set forth above. Plaintiff does not incorporate allegations of scienter, recklessness, or intentional deception into the non-fraud counts unless expressly stated.

377. Bannon, Epshteyn, and Abdul acted with scienter—*i.e.*, with intent to deceive, manipulate, or defraud, or with severe recklessness—as the facts alleged herein show.

**A. Bannon and Epshteyn Knew They Controlled the Token While Representing Themselves as "Partners"**

378. Bannon and Epshteyn repeatedly described themselves publicly as "partners," "advocates," or "supporters" of the Token, creating the impression that they were promoters lending credibility to an external project, when in reality their LLCs had acquired "full control of the Coin" under an agreement they never disclosed.

379. Bannon and Epshteyn knew the terms of the Payment Agreement: their own LLCs were the "Recipients." Bannon signed it on behalf of 354 Nod Hill, and Epshteyn signed it on behalf of TWinds. At all relevant times, Bannon and Epshteyn knew that they had: acquired, through the Recipients, ownership of Let's Go Brandon Coin LLC; personally assumed full control of the smart contract private keys; controlled the team wallets; exercised authority over liquidity decisions; retained the power to freeze investor wallets (until January 30, 2023); and structured the acquisition so that investor-paid transaction fees financed their takeover. Epshteyn held the project's bank account and Coinbase login "the entire time."

380. These facts were uniquely within Bannon's and Epshteyn's knowledge. The failure to disclose them while publicly promoting the asset as a third-party "partnership" constitutes knowing concealment of a material conflict of interest, not mere negligence.

**Deleted:** IX (Common Law

**Deleted:** XIII

**Deleted:** To state a claim under these counts, Plaintiff must allege facts giving rise to a strong inference that Defendants

**Deleted:** . The

**Deleted:** establish scienter under either standard

**Deleted:** **Defendants**

**Deleted:** **Mere**

**Deleted:** Defendants

**Deleted:** independent

**Deleted:** they

**Deleted:** ownership and

**Deleted:** Defendants possessed exclusive knowledge

**Deleted:** treasury, marketing, and charity

**Deleted:** ;

**Deleted:** Defendants'

**Deleted:** ownership and control

**Deleted:** partner

**B. Bannon and Epshteyn Structured the Acquisition to Be Funded by Investor Fees**

Deleted: Defendants

381. Bannon and Epshteyn entered into a private agreement, in the names of their LLCs, to acquire control of the Token without paying cash consideration and structured that transaction so that it would be financed through ongoing transaction fees paid by retail investors.

Deleted: Defendants

382. Bannon and Epshteyn knew that: the 3% "marketing" tax functioned as purchase consideration for the Founders; retail investors were effectively funding their acquisition; marketing fees were not contingent upon actual marketing performance; their own wallets were exempted from transaction taxes; and the fee structure directly benefited them while burdening retail purchasers. A project administrator identified "Boris and Bannon" as the "Project owners" whose wallets were "tax free."

Deleted: Defendants

Deleted: Defendants'

Deleted: insiders

Deleted: Defendants

383. Bannon and Epshteyn had no skin in the game: they paid no cash for their two billion Tokens, their wallets were exempt from the fees every other holder paid, and they stood to profit from any rise in the Token's price without risking any money of their own. The transaction structure itself evidences conscious design. Because Bannon and Epshteyn controlled the wallets and contractual terms through which fees flowed, the inference that they knowingly concealed this structure is strong and compelling.

Deleted: Defendants

**C. Bannon and Epshteyn Knew the Token Was Not Decentralized**

Deleted: Defendants

384. Bannon and Epshteyn, and the promotions bearing their names, repeatedly represented that the Token was "decentralized," "non-custodial," immune from financial censorship, and a vehicle for "independence," while they and their agents retained unilateral authority over core operational mechanisms.

Deleted: Defendants

Deleted: retaining

385. At all relevant times, Bannon and Epshteyn knew that they and the persons to whom they gave the keys: controlled the smart contract administration; retained authority to freeze

Deleted: Defendants

investor wallets (until the $FJB contract owner's controls were surrendered on January 30, 2023) and to change $PPY's transfer restrictions; exercised that control in practice, including by withdrawing the Token's liquidity in December 2023; maintained centralized control over the team wallets and liquidity; and could disable trading entirely. Abdul told investors that she held the contract-owner keys because "that's what B and B … wanted me to do."

Deleted: freeze authority

Deleted: treasury

Deleted: disabled

Deleted: in February 2025; and exempted insider wallets from restrictions applicable to ordinary

Deleted: .

386. Representing an asset as decentralized while retaining and exercising centralized freeze authority constitutes, at minimum, severe recklessness and more plausibly intentional deception.

**D. Bannon and Epshteyn Repeatedly Reassured Investors While Concealing Material Facts**

Deleted: **Defendants**

387. When investors raised concerns about missing funds, liquidity instability, limited marketing activity, charity wallet accounting, and declining development, Bannon and Epshteyn—directly and through Abdul—responded with reassurances while failing to disclose material structural realities.

Deleted: Defendants

388. Bannon and Epshteyn knew but concealed: the true nature of the Payment Agreement; their own wallets' exemption from transaction fees; the existence and structure of over-the-counter sales from the tax and charity wallets; the limited or self-interested use of marketing funds, including payments to Epshteyn's friends at VFT Solutions; and the absence of meaningful operational development consistent with public statements. Abdul told investors that Bannon and Epshteyn listened to the project's status calls, and both men joined investor calls themselves.

Deleted: Defendants

Deleted: acquisition agreement; the insider

Deleted: -fee exemptions

389. Repeated reassurances made in the face of known contradictory facts constitute conscious misbehavior or, at minimum, severe recklessness.

Deleted: constitutes

**E. Bannon and Epshteyn Knew Their Audience Would Rely on Them**

Deleted: Defendants

390. Bannon and Epshteyn knew that their audience trusted them, that it was unsophisticated about cryptocurrency, and that it feared a collapsing dollar and a hostile banking system. They knew that retail investors purchased $FJB/$PPY precisely because of their representations and promises of sustained involvement, and they intended their representations to signal that they were actively overseeing the project and would use their influence, resources, and platforms to promote and develop the Token. They made, and approved promotions in their names that made, statements that the Token was "safe," "secure," "decentralized," and "uncancellable" to an audience they knew would act on them, and the August 2, 2022 press release's false sense of urgency was designed to override that audience's ordinary caution. Abdul, who spoke for them, said as much: on December 30, 2022, she told holders that Bannon and Epshteyn would be the ones to promote the Token on *War Room* "because the viewers trust them[;] that's who they go on War Room to watch."

391. The SEC describes affinity fraud as "investment scams that prey upon members of identifiable groups," in which promoters "often enlist respected community … leaders from within the group to spread the word about the scheme by convincing those people that a fraudulent investment is legitimate and worthwhile." Bannon and Epshteyn were those leaders.

**F. The February 2023 Cover-Up Confirms Bannon's and Epshteyn's Scienter**

392. The events of February 13 through 17, 2023, independently establish a strong inference of scienter. Bannon and Epshteyn had decided to "transfer and assign the rights and obligations" of the project and were negotiating a "deal" to do so. When Abdul disclosed that decision, a demand was made on their behalf that she "take down [her] statement to the community right now" and "send a retraction message" because "[w]e still haven't finalized the deal." Within hours, Epshteyn personally reposted, twice, the statement that he and Bannon "1000% back the

project, haven't sold, and are not selling!" Two days later, Bannon told *War Room* viewers that he and Epshteyn remained "huge supporters" and that he had "only bought coins." And Epshteyn thanked Abdul for "working with Will" on a follow-up statement that Will predicted would ensure that "[t]hat story is gonna be dead after this."

393. Bannon and Epshteyn made these statements knowing that they were false or misleading, and for the purpose of reversing the market's reaction to the truth. They succeeded: the Token's price, which had fallen more than 70% over February 13 and 14, rose 71.1% on February 15, 2023.

**G. Abdul Acted With Scienter**

394. Abdul knew the facts that made her statements, and those she relayed on Bannon's and Epshteyn's behalf, false and misleading. She held the keys to the contract and the fee wallets; she conducted the OTC sales from the tax and charity wallets to "keep the price up"; she privately called VFT Solutions "Boris's friends that did fucking nothing"; she privately acknowledged in February 2023 that Bannon and Epshteyn were "leaving the project" and "want[ed] nothing to do with [the] lawsuit"; and she then told investors that "Bannon, Boris, and I remain committed to the coin and organization." She also understood the regulatory significance of the Token's structure, telling investors in May 2024 that "[i]f we have a utility, then it is not a security."

**H. Bannon and Epshteyn Had Clear Motive and Opportunity**

395. Bannon and Epshteyn possessed both motive and opportunity to engage in the misconduct alleged.

396. Bannon and Epshteyn stood to benefit financially because they: acquired, through the Recipients, two billion Tokens for no cash; benefited directly from trading volume; controlled the team wallets; structured insider advantages; avoided transaction taxes applicable to retail investors; and permitted over-the-counter sales outside public markets. Epshteyn also collected

**Deleted:** Defendants

**Deleted:** Defendants

**Deleted:** 2

**Deleted:** treasury funds; controlled marketing and charity

**Deleted:** or conducted

$10,000 a month in undisclosed "consulting fees," and the project paid $10,000 a month to his friends at VFT Solutions.

397. Bannon and Epshteyn possessed opportunity because they: controlled the LLC entities; controlled, and allocated, the smart contract keys; controlled the team wallets; controlled messaging platforms, including *War Room* and their personal accounts; directed promotional activity; managed liquidity decisions; and exercised operational authority over trading.

398. The alignment of financial incentive and operational control strongly supports a compelling inference of scienter.

**I. At Minimum, Bannon, Epshteyn, and Abdul Acted With Severe Recklessness**

399. Even if Bannon, Epshteyn, and Abdul did not act with intent, the allegations establish an extreme departure from the standards of ordinary care and a conscious disregard of a serious risk of misleading investors.

400. Bannon and Epshteyn represented decentralization while retaining freeze authority; represented marketing and charitable use of funds without transparent accounting; promoted utility without operational infrastructure; failed to disclose insider exemptions; failed to disclose the investor-funded acquisition structure; and reassured investors while withholding material information uniquely within their control. Abdul, who held the keys to the contract and the fee wallets, relayed those reassurances while conducting undisclosed OTC sales from the tax and charity wallets.

401. Such conduct presents a danger of misleading investors that was either known to Bannon, Epshteyn, and Abdul or so obvious that they must have been aware of it.

**Deleted:** Defendants

**Deleted:** treasury

**Deleted:** and shutdown

**Deleted:** <#>The Abrupt Shutdown Supports Conscious Misconduct
In February 2025, Defendants disabled trading, announced the project's closure, and promised liquidity distributions that did not occur.
The sudden shutdown following years of promotional assurances reinforces the inference that Defendants were aware of the project's structural deficiencies and material misrepresentations.
Conduct inconsistent with prior public assurances supports a strong inference of conscious misconduct.

**Deleted:** <#>Defendants

**Deleted:** Defendants

**Deleted:** Defendants

**Deleted:** Defendants

## CAUSES OF ACTION

### COUNT I

Untrue Statements and Omissions in Connection with the Purchase or Sale of Securities
in Violation of Section 10(b) of the Exchange Act of 1934
and Rule 10b-5(b) Thereunder
(*Against Bannon, Epshteyn, and Abdul*)

402. Plaintiff realleges and incorporates by reference the allegations in the sections of this Complaint titled "Parties," "Jurisdiction and Venue," "General Allegations," "Class Allegations," "$FJB/$PPY Tokens Are Securities Subject to the Securities Laws," "Loss Causation," and "Fraud-Based Securities and State Law Claims (Pled in the Alternative)."

403. Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), make it unlawful, in connection with the purchase or sale of a security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

404. Bannon, Epshteyn, and Abdul used the means and instrumentalities of interstate commerce—including *War Room*, radio and podcast programs, Twitter/X, GETTR, Instagram, Discord, Telegram, and websites—to make untrue statements of material fact and to omit material facts necessary to make their statements not misleading, in connection with the purchase and sale of $FJB/$PPY Tokens.

405. Bannon and Epshteyn were each the "maker" of the statements attributed to him in this Complaint. Bannon and Epshteyn are also the makers of the statements Abdul attributed to them or made at their direction, over whose content and communication they had ultimate authority, as alleged above, and Epshteyn is the maker of the statements he adopted and

**Moved down [1]:** (*Against All Defendants*)

**Moved down [2]:** COUNT II

**Deleted:** Unregistered Offer

**Deleted:** Sale of Securities in Violation of
Sections 5 and 12(a)(1) of the Securities Act of 1933

**Deleted:** Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to allegations that Defendants acted "knowingly," "intentionally," "recklessly," or with "conscious design," if such allegations are construed as sounding in fraud.
15 U.S.C. § 77l(a)(1) (Section 12(a)(1) of the Securities Act) provides that "any person who . . . offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him."
15 U.S.C. § 77e(a) (Section 5(a) of the Securities Act) states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."
15 U.S.C. § 77e(c) (Section 5(c) of the Securities Act) states: "It shall be unlawful for any person, directly or indirec ... [3]

**Deleted:** Fraud

**Deleted:** in Violation of

**Deleted:**

**Deleted:** thereunder

**Deleted:** *All Defendants*

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Deleted:** ¶¶ 1–329

**Deleted:** , except ¶¶ 303–304 and any other paragraph ... [4]

**Deleted:** are expressly limited to strict liability, neglig ... [5]

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Deleted:** are construed as alleging negligence exclusiv ... [6]

**Formatted:** Not Expanded by / Condensed by

**Deleted:** )

**Deleted:** illegal

**Deleted:** . . . to employ any device, scheme, or artifice ... [7]

**Deleted:** Defendants

**Deleted:** to perpetrate a fraud on Plaintiff and other C ... [8]

**Deleted:** <#>In addition, Defendants used the means a ... [9]

republished, including Grace Chong's February 13, 2023 statement and the February 15, 2023 quotation of Bannon that he retweeted.

406. The false and misleading statements include, without limitation:

a. Epshteyn's statements that the Token was "uncancellable" and "immutable" and could not "be robbed from you," that crypto was the way to "protect yourself and not be cancelled," that the FJB wallet "won't be deplatformed" and was "not going to be taken away from you," and that the project was "non-custodial" (December 23, 2021; August 5, 2022; September 14, 2022), and the statements in the $PPY promotions bearing Bannon's and Epshteyn's names that the Token was "decentralized" and "uncancellable" (2024 through 2025);

b. Bannon's and Epshteyn's statements that the Tokens were a "safe, secure" alternative and "store [of] value" that would protect investors from a "crashing" dollar and "hedge inflation" (December 23, 2021; January 6, 2022; April 18, 2022; August 5, 2022);

c. Bannon's and Epshteyn's statements that the Tokens' fees were being donated to named charities and that the donations were "all public" (December 23, 2021);

d. Bannon's and Epshteyn's statements that they were "strategic partners" holding "strategic ownership positions," which omitted that their acquisition was paid for with investors' fees and that their Tokens were exempt from those fees (December 23, 2021; January 18, 2022);

e. Epshteyn's statements that FJB was "now expanding to Europe," that "FJB released an app where you could buy and sell cryptocurrency," and that he was "confident" FJB would be accepted by major retailers across the country in 2022 (September 14, August 8, and January 6, 2022, respectively);

**Deleted:** , including but not limited to misrepresentations that

**Deleted:** <#>the Tokens were decentralized and uncancellable;¶
the Tokens were safe alternatives to fiat currency;¶
transaction fees were used for marketing and charity as represented;¶
Defendants were mere strategic partners rather than owners and controllers;¶
the Tokens had real, developed utility and infrastructure; and¶
Defendants were devoting sustained efforts to promotion and development.¶
Defendants…

f. Bannon's and Epshteyn's statements that they were working on the Token "24 hours a day" and "24/7" (January 6, 2022; September 17, 2022);

g. the February 2023 statements that Bannon and Epshteyn "1000% back the project, haven't sold, and are not selling," that Bannon had "only bought coins," and that they "remain committed" (February 13, 15, and 17, 2023); and

h. the statements Abdul made and relayed on Bannon's and Epshteyn's behalf, including that *War Room* promotion was "imminent" and that promotion had been "scheduled with War Room, … Maureen and Steve" (2022 through January 31, 2025).

407. Each of these statements omitted material facts necessary to make it not misleading, including that:

Deleted: their statements

a. investors effectively financed Bannon's and Epshteyn's acquisition of the project through transaction fees;

Deleted: Defendants'

b. Bannon, Epshteyn, and their agents retained centralized control over wallets and smart-contract functions, including the ability to freeze any holder's Tokens;

Deleted: Defendants

c. the fee revenue labeled "marketing" was paid to the Founders and to Epshteyn's friends, and the fee revenue labeled "charity" was not funding the charities named;

Deleted: <#>Defendants froze investor wallets while exempting insiders;¶

d. insiders conducted undisclosed OTC sales at preferential prices;

e. charity and marketing wallets were used to manage price and insider liquidity; and

f. Bannon's and Epshteyn's Tokens were exempt from fees imposed on retail investors.

Deleted: insiders

408. Bannon, Epshteyn, and Abdul made these statements knowingly, or with severe recklessness, as alleged in the section titled "Fraud-Based Securities and State Law Claims (Pled in the Alternative)."

409. Plaintiff and other Class members were ignorant of the false and misleading nature of these statements and omissions, and they relied on them, directly and through the market price of the Tokens. To the extent the claims are based on omissions, Plaintiff and the Class are entitled to a presumption of reliance. But for these statements and omissions, Plaintiff and the Class would not have purchased $FJB/$PPY Tokens, or would not have purchased them at the prices they paid.

410. As a direct and proximate result of this misconduct, Plaintiff and other members of the Class suffered damages, and Bannon, Epshteyn, and Abdul are liable for damages, as well as costs, attorneys' fees, and interest.

**COUNT II**

Scheme Liability in Violation of Section 10(b) of the Exchange Act of 1934
and Rule 10b-5(a) and (c) Thereunder
*(Against Bannon, Epshteyn, Abdul, FJB App LLC, Patriot Pay LLC, Warroom LLC, 354 Nod Hill, and TWinds)*

411. Plaintiff realleges and incorporates by reference the allegations in the sections of this Complaint titled "Parties," "Jurisdiction and Venue," "General Allegations," "Class Allegations," "$FJB/$PPY Tokens Are Securities Subject to the Securities Laws," "Loss Causation," and "Fraud-Based Securities and State Law Claims (Pled in the Alternative)."

412. Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a), (c), make it unlawful, in connection with the purchase or sale of any security, "[t]o employ any device, scheme, or artifice to defraud," or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

413. Bannon and Epshteyn devised and carried out a scheme to sell the Token to their audience on the strength of their names while concealing how the project actually worked. Each



Deleted: In addition to misstatements

Deleted: omissions, Defendants engaged in scheme liability conduct in violation of Rule 10b-5(a) and (c), including by:
manipulating Token supply through insider-controlled wallets;
freezing and unlocking wallets to control market dynamics;
coordinating preferential OTC transactions;
stringing investors along with false assurances to prolong participation; and
rebranding and relaunching the Token to reset investor expectations without disclosing prior failures.
Defendants engaged in

Deleted: fraudulent activities

Deleted: and intentionally

Deleted: in such a deliberately reckless manner

Deleted: to constitute willful deceit and fraud upon Plaintiff and other members of

Formatted: Not Expanded by / Condensed by

Formatted: Not Expanded by / Condensed by

Deleted: Class.

Formatted: Not Expanded by / Condensed by

Formatted: Not Expanded by / Condensed by

Formatted: Not Expanded by / Condensed by

Formatted: Not Expanded by / Condensed by

Formatted: Not Expanded by / Condensed by

Deleted: Defendants' fraudulent scheme and of

Formatted: Not Expanded by / Condensed by

Formatted: Not Expanded by / Condensed by

Formatted: Not Expanded by / Condensed by

Deleted: their material misrepresentations and

Deleted: .

Deleted: the fraud perpetrated by Defendants, they

Formatted: Not Expanded by / Condensed by

Formatted: Not Expanded by / Condensed by

Formatted: Not Expanded by / Condensed by

Deleted: Defendants'

Deleted: Defendants

Deleted: or rescission

Moved (insertion) [2]

Defendant named in this Count committed deceptive and manipulative acts in furtherance of that scheme:

a. Bannon and Epshteyn caused 354 Nod Hill and TWinds to acquire "full control of the Coin" and two billion fee-exempt Tokens under the Payment Agreement, paid for with investors' fees, and concealed those terms while promoting the Token as a "strategic partnership";

b. Bannon, Epshteyn, and Warroom LLC disseminated the promotions alleged above on *War Room*, displayed the Token's branding alongside *War Room*'s, and directed viewers to the Token's website; and Warroom LLC's CFO disseminated the February 13, 2023 "not selling" statement;

c. Bannon and Epshteyn directed and allocated control of the contract and the fee wallets, and Abdul used that control to conduct undisclosed, tax-free OTC sales from the marketing and charity wallets to "keep the price up";

d. Epshteyn caused investors' fees to be paid to his friends at VFT Solutions for services that were never performed;

e. Bannon, Epshteyn, and Abdul orchestrated the February 2023 retraction and reassurance campaign to reverse the market's reaction to their attempted exit;

f. FJB App LLC and Patriot Pay LLC, acting through Abdul and at Bannon's and Epshteyn's direction, disseminated the false and misleading statements on FJBCoin.org, PatriotPay.org, and the Tokens' official channels, and relaunched the Token as "A New Patriot Economy & Digital Currency by Steve Bannon & Boris Epshteyn" without disclosing the prior failures, freeze, and insider control;

g. Abdul disseminated to investors, on the project's status calls, in its official channels, and in direct messages, the false and misleading statements alleged above, knowing that they were false or misleading; and

h. Abdul disabled trading on February 12, 2025, while promising a liquidity distribution that never came.

414. Each Defendant named in this Count acted knowingly or with severe recklessness. The scienter of FJB App LLC, Patriot Pay LLC, 354 Nod Hill, and TWinds is established by the scienter of Bannon, Epshteyn, and Abdul, who owned, controlled, and acted for them; Warroom LLC's scienter is established by the scienter of Bannon, its owner.

415. Plaintiff and the Class relied on the integrity of the market for the Tokens and on the deceptive conduct alleged herein, and they were damaged when the scheme was revealed and the risks it concealed materialized.

416. Defendants named in this Count are liable to Plaintiff and the Class for damages, as well as costs, attorneys' fees, and interest.

**COUNT III**
Control Person Liability Under Section 20(a) of the Exchange Act of 1934
*(Against Bannon and Epshteyn)*

417. Plaintiff realleges and incorporates by reference the allegations of Counts I and II, and the allegations incorporated therein.

418. Throughout the Class Period, Bannon and Epshteyn each acted as a controlling person of Abdul, FJB App LLC, Patriot Pay LLC, 354 Nod Hill, and TWinds within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Bannon also controlled Warroom LLC. Through their ownership of the Recipients, their "full control of the Coin" under the Payment Agreement, their allocation of the contract and wallet keys, their payment agreement with Abdul, and their "final say" over the project's decisions, Bannon and Epshteyn had the power to control—

**Moved (insertion) [3]**
**Deleted:** Control Person Liability under Section 15 of the Securities Act of 1933¶
**Deleted:** *the Executive Defendants*
**Deleted:** ¶¶ 1–329
**Deleted:** , except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to …
**Deleted:** that Defendants acted "knowingly," "intentionally," "recklessly," or with "conscious design," if such
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Deleted:** are construed as sounding in fraud
**Deleted:** relevant period, the Executive Defendants
**Deleted:** persons of the Entity Defendants
**Deleted:** 15 of the Securities Act. Because of their executive positions and control
**Deleted:** day-to-day operations of $FJB/$PPY, the Executive Defendants
**Deleted:** ability and
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by

and did in fact control—Abdul and those entities, including with respect to the content and dissemination of the materially misleading statements and omissions alleged herein.

419. Bannon and Epshteyn exercised actual control over the primary violations by directing wallet permissions, promotional messaging, investor communications, and the timing and manner of Token sales, and by approving the rebrand and the use of their names. Bannon and Epshteyn were culpable participants in those violations and did not act in good faith.

420. Accordingly, Bannon and Epshteyn are liable to Plaintiff and the other Class members, jointly and severally with the persons they controlled, pursuant to Section 20(a) of the Exchange Act.

**COUNT IV**

Misrepresentation in Connection with the Purchase or Sale of Securities in Violation of the D.C. Securities Act, D.C. Code § 31-5606.05(a)(1)(B)

*(On Behalf of the D.C. Securities Act Subclass)*

(*Against* *Bannon, Epshteyn, Abdul, Patriot Pay LLC, and FJB App LLC*)

421. Plaintiff realleges and incorporates by reference the allegations in the sections of this Complaint titled "Parties," "Jurisdiction and Venue," "General Allegations," "Class Allegations," "D.C. Law Applies to the Entire Class," "$FJB/$PPY Tokens Are Securities Subject to the Securities Laws," and "Loss Causation." To the extent this Count proceeds on a theory of negligent misrepresentation, Plaintiff does not incorporate any allegation that any Defendant acted knowingly, intentionally, or recklessly, and disclaims any allegation of fraud. The allegations in the section titled "Concealment and Tolling" are incorporated only as they bear on the timeliness of this Count. To the extent this Count proceeds in the alternative on a theory of knowing misrepresentation, Plaintiff also incorporates the section titled "Fraud-Based Securities and State Law Claims (Pled in the Alternative)."

422. The D.C. Securities Act, D.C. Code § 31-5606.05(a)(1)(B), makes liable a person who "offers or sells a security by means of an untrue statement of a material fact or an omission



**Deleted:** the Entity Defendants

**Deleted:** their agents

**Deleted:** offer and sale of $FJB/$PPY Tokens

**Deleted:** The Executive Defendants

**Deleted:** Token issuance,

**Deleted:** the Executive Defendants

**Deleted:** 15

**Deleted:** Securities

**Moved up [3]:** Control Person Liability Under Section 20(a) of the Exchange Act of 1934

**Moved down [4]: COUNT V**

**Moved down [5]: COUNT VI**

**Deleted:** (*Against the Executive Defendants*)
Plaintiff realleges and incorporates ¶¶ 1–329 by reference, except ¶¶ 303–304 and any other paragraph to the extent such allegations are expressly limited to strict liability, negligence, fiduciary duty, or other non-scienter-based theories and are construed as alleging negligence exclusive of scienter.
Throughout the relevant period, the Executive Defendants acted as controlling persons of the Entity Defendants within the meaning of Section 20(a) of the Exchange Act. By reason of their executive positions and control over the day-to-day operations of $FJB/$PPY, the Executive Defendants had the ability and power to control—and did in fact control—the Entity Defendants and their agents, including with respect to the content and dissemination of the materially misleading statements, information, and omissions alleged herein.
The Executive Defendants exercised actual control ov ... [10]

**Deleted:** Unregistered Offer and Sale of Securities in ... [11]

**Deleted:** in Violation of the

**Deleted:**

**Deleted:** *All Defendants*

**Deleted:** ¶¶ 1–329

**Deleted:** , except ¶¶ 33, 96, 132, 136, 163, 209, 235, ... [12]

**Deleted:** that Defendants acted "knowingly," "intenti ... [13]

**Deleted:** fraud. Such allegations are excluded only ir ... [14]

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Deleted:** .

**Deleted:** fraudulent

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Deleted:** realleges and incorporates ¶¶ 33, 96, 132, 1 ... [15]

**Deleted:**

to state a material fact necessary in order to make the statement made, in the light of the circumstances under which made, not misleading, the buyer does not know of the untruth or omission and the offeror or seller does not sustain the burden of proof that the offeror or seller did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."

423. $FJB/$PPY Tokens are investment contracts within the meaning of D.C. Code § 31-5601.01(31), and are therefore securities under that Act.

424. Bannon, Epshteyn, Abdul, Patriot Pay LLC, and FJB App LLC offered and sold $FJB/$PPY Tokens by means of the untrue statements and omissions alleged herein, including through *War Room*, Bannon's and Epshteyn's personal social-media accounts, FJBCoin.org, PatriotPay.org, the Tokens' official channels, and Abdul's status calls.

425. Each of these Defendants solicited the purchases of Plaintiff and other members of the D.C. Securities Act Subclass, motivated at least in part by his, her, or its own financial interest. On February 13, 2023, Epshteyn twice reposted to holders the assurance that he and Bannon "haven't sold, and are not selling," and on February 15, 2023, Bannon told *War Room* viewers that he remained a "huge supporter" who had "only bought coins." In 2024, Patriot Pay LLC promoted $PPY on PatriotPay.org and Instagram. Through January 31, 2025, Abdul promoted the Token to holders in her status calls and updates. FJB App LLC and Patriot Pay LLC received the transaction fees from those purchases; Bannon and Epshteyn held, through the Recipients, two billion fee-exempt Tokens whose value rose with each purchase; and Abdul was paid under "a payment agreement with B&B."

426. Those statements misrepresented material facts about $FJB/$PPY Tokens, and omitted material facts necessary to make them not misleading, including facts concerning

**Deleted:** <#>Defendants perpetrated a fraud on Plaintiff and other Class members in connection with the sale of $FJB/$PPY Tokens, including through a course of conduct that concealed material information required to be disclosed to permit informed investment decisions.¶
In addition, Defendants…

**Deleted:** their statements

centralized control, the fee-funded acquisition, fee exemptions, the use of transaction-based fees, OTC sales, wallet authority, and trading restrictions.

427. These offers and sales, including OTC transactions, were conceived, authorized, and directed from Washington, D.C., and disseminated to Plaintiff and other investors from the District of Columbia.

428. The Defendants named in this Count knew, or in the exercise of reasonable care could have known, of the untrue statements and material omissions described herein.

429. Plaintiff and the other members of the D.C. Securities Act Subclass did not know of the untruths and omissions when they purchased. Plaintiff brought this claim within one year after discovering the violation and within three years after the contracts of sale at issue. *See* D.C. Code § 31-5606.05(f).

430. As a direct and proximate result, Plaintiff and the other members of the D.C. Securities Act Subclass suffered damages, and the Defendants named in this Count are liable for the consideration paid for the Tokens, with interest, costs, and reasonable attorneys' fees, upon tender of the Tokens, or for damages as to Tokens no longer held. *See* D.C. Code § 31-5606.05(b).

## COUNT V

Control Person Liability Under the D.C. Securities Act, D.C. Code § 31-5606.05(c)
*(On Behalf of the D.C. Securities Act Subclass)*
(*Against* *Bannon, Epshteyn, 354 Nod Hill, and TWinds*)

431. Plaintiff realleges and incorporates by reference the allegations in the sections of this Complaint titled "Parties," "Jurisdiction and Venue," "General Allegations," "Class Allegations," "D.C. Law Applies to the Entire Class," "$FJB/$PPY Tokens Are Securities Subject to the Securities Laws," and "Loss Causation," and the allegations of Count IV. To the extent this Count proceeds on a theory of negligent misrepresentation, Plaintiff does not incorporate any allegation that any Defendant acted knowingly, intentionally, or recklessly, and disclaims any

**Deleted:** insider compensation,
**Deleted:** Defendants' unlawful
**Deleted:** and wallet-based distributions
**Deleted:** in
**Deleted:** engaged
**Deleted:** these fraudulent activities knowingly,
**Deleted:** should
**Deleted:** Class
**Deleted:** were ignorant
**Deleted:** Defendants' fraudulent scheme and
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Deleted:** false and misleading nature of their material ... [16]
**Deleted:** . But for the fraud perpetrated by Defendants,
**Deleted:** would not have
**Deleted:** $FJB/$PPY Tokens.
**Deleted:** of Defendants' misconduct
**Deleted:** Class
**Deleted:** damages or rescission, as well as costs,
**Deleted:** and interest.
**Moved (insertion) [4]**
**Moved down [6]: COUNT VII**
**Deleted:**
**Deleted:** *the Executive Defendants*
**Deleted:** ¶¶ 1–329
**Deleted:** , except ¶¶ 33, 96, 132, 136, 163, 209, 235, ... [17]
**Deleted:** that Defendants acted "knowingly," "intenti ... [18]
**Deleted:** fraud. Such allegations are excluded only in ... [19]
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Deleted:** Count proceeds on theories of failure to regi ... [20]
**Deleted:** negligent misrepresentation in violation of D ... [21]
**Formatted:** Ligatures: None
**Formatted:** Not Expanded by / Condensed by
**Deleted:** fraudulent misrepresentation in violation of ... [22]
**Deleted:** realleges and
**Formatted:** Not Expanded by / Condensed by

allegation of fraud. The allegations in the section titled "Concealment and Tolling" are incorporated only as they bear on the timeliness of this Count. To the extent this Count proceeds in the alternative on a theory of knowing misrepresentation, Plaintiff also incorporates the section titled "Fraud-Based Securities and State Law Claims (Pled in the Alternative)."

432. Throughout the relevant period, Bannon and Epshteyn, and 354 Nod Hill and TWinds, controlled Abdul, Patriot Pay LLC, and FJB App LLC within the meaning of D.C. Code §§ 31-5601.01(7) and 31-5606.05(c). Under the Payment Agreement, the Recipients assumed "full control of the Coin"; Bannon and Epshteyn allocated the contract and wallet keys, paid Abdul under a payment agreement, and held "the final say" over the project's decisions, including with respect to the content and dissemination of the materially misleading statements, information, and omissions alleged herein.

433. Bannon, Epshteyn, 354 Nod Hill, and TWinds exercised actual control over the primary violations by directing wallet permissions, promotional messaging, investor communications, and the timing and manner of Token sales, and had the power to prevent or correct the violations alleged herein. They knew, or in the exercise of reasonable care could have known, of the facts by reason of which the controlled persons are liable.

434. Accordingly, Bannon, Epshteyn, 354 Nod Hill, and TWinds are liable to Plaintiff and the other members of the D.C. Securities Act Subclass, jointly and severally with the persons they controlled, pursuant to D.C. Code § 31-5606.05(c).

## COUNT VI

Violation of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq.*

*(Against Bannon, Epshteyn, Abdul, Patriot Pay LLC, FJB App LLC, and Warroom LLC)*

435. Plaintiff realleges and incorporates by reference the allegations in the sections of this Complaint titled "Parties," "Jurisdiction and Venue," "General Allegations," "Class Allegations," "D.C. Law Applies to the Entire Class," and "Loss Causation," except, for purposes

Deleted: ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–329, as well as all other allegations sounding in fraud, solely as applicable to that alternative theory.
Formatted: Not Expanded by / Condensed by
Deleted: the Executive Defendants acted as controlling persons of the Entity Defendants
Deleted: the D.C. Securities Act,
Formatted: Ligatures: None
Deleted:
Deleted: –
Deleted: By reason of their executive positions and
Formatted: Ligatures: None
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Deleted: day-to-day operations of $FJB/$PPY, the Executive Defendants had the ability and power to control—and did in fact control—the Entity Defendants and their agents
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Deleted: The Executive Defendants
Deleted: Token issuance,
Deleted: the Executive Defendants
Deleted: Class
Deleted: pursuant to
Deleted: ,
Deleted:
Moved (insertion) [5]
Deleted: COUNT VIII
Deleted:
Moved down [7]: *(Against All Defendants)*
Deleted: ¶¶ 1–329
Deleted: , except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to …
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by

of liability under this Count, any allegation that any Defendant acted knowingly, intentionally, or recklessly, or with intent to deceive. The allegations in the section titled "Concealment and Tolling" are incorporated only as they bear on the timeliness of this Count. This Count does not sound in fraud. The D.C. Consumer Protection Procedures Act ("CPPA") imposes liability "whether or not any consumer is in fact misled, deceived, or damaged." D.C. Code § 28-3904, and does not require proof of intent.

436. The CPPA is a remedial statute that is to be broadly construed.

437. The CPPA prohibits unfair and deceptive trade practices in connection with the offer, sale, and supply of consumer goods and services, and establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia.

438. Each Defendant named in this Count is a "person" subject to D.C. Code § 28-3904 and a "merchant" that, in the ordinary course of business, directly or indirectly, sold, offered, advertised, or supplied "goods and services" within the meaning of D.C. Code § 28-3901(a)(3) and (a)(7). The Tokens were marketed to lay consumers as "digital money" to "buy stuff with" and "donate to causes you believe in," not only as investments; the FJB and Patriot Pay apps and wallets were consumer payment and storage services; every on-chain transaction required the consumer to pay a transaction fee represented to fund marketing and charitable donations; the Patriot Pay app included a marketplace through which consumers could pay merchants in $PPY for goods; and the project sold $FJB gift cards and distributed branded merchandise. Warroom LLC advertised the Token and the app to its audience; on information and belief, scheduled *War Room*'s promotion of $PPY through its chief executive officer; and displayed the Token's branding alongside its own.

**Deleted:** Defendants

**Deleted:** "

**Deleted:** ," "

**Deleted:** ," "

**Deleted:** ,"

**Deleted:** "conscious design," if such

**Deleted:** construed

**Deleted:** sounding

**Deleted:** ¶

**Formatted:** Not Expanded by / Condensed by

**Deleted:** It establishes an enforceable right to truthful information....

**Deleted:** <#>Defendants are "merchants" that provide "goods and services" within the meaning of the CPPA. *See* D.C. Code § 28-3901(a)(3), (7). Crypto apps, wallets, and tokens marketed to lay users are "goods and services" within the meaning of the Act. In addition, Defendants offered and sold non-fungible tokens ("NFTs") and branded merchandise to consumers, which also constitute "goods and services" within the meaning of the CPPA.¶

439. Plaintiff and the Class are "consumers" within the meaning of the CPPA. *See* D.C. Code § 28-3901(a)(2).

Deleted:

440. The Defendants named in this Count violated D.C. Code § 28-3904, including subsections (a), (e), (f), and (f-1), by representing that the Tokens, apps, and transaction fees had characteristics, uses, and benefits they did not have; and by misrepresenting and failing to state material facts, and using innuendo and ambiguity as to material facts, in a manner that tended to mislead.

**Deleted:** <#>Defendants violated the CPPA by engaging in unfair, misleading, and deceptive trade practices.¶ Defendants'…

441. These acts and practices tended to mislead reasonable consumers in the District of Columbia, including by creating the false impression that $FJB/$PPY was decentralized, secure, and suitable for ordinary consumer use, and that transaction fees labeled as "marketing" and "charity" would be used for those stated purposes. In reality, insiders retained centralized control over the Token's smart contract, wallets, and trading, and used fee-funded wallets at their discretion, including to pay for Bannon's and Epshteyn's acquisition, to pay Epshteyn's friends at VFT Solutions, and for insider and preferential sales.

**Deleted:** Defendants

442. Solely in support of the request for punitive damages under D.C. Code § 28-3905(k)(2)(C), and not as an element of liability under this Count, Plaintiff alleges that the Defendants named in this Count acted in willful disregard of the rights of Plaintiff and the Class. They continued to charge consumers a transaction fee represented to fund charitable donations after holders repeatedly questioned where the charity funds had gone, after Abdul told a holder on September 11, 2023 that there were "no plans of donating," and while $PPY was promoted as "donating all transaction fees" to the family of Corey Comperatore even as the contract sent most of each fee to the operations wallet. They continued to promote the Token as free from "freezing of your account" while the project "block listed" holders' wallets and retained the power to disable

trading. And less than two weeks after Abdul announced on January 31, 2025 that Bannon would promote $PPY on *War Room*, trading was disabled, leaving thousands of consumers unable to sell their Tokens at any price.

443. As a result, Plaintiff and the Class are entitled to all forms of relief provided under D.C. Code § 28-3905(k)(2), including treble damages or statutory damages of $1,500 per violation, whichever is greater; punitive damages; reasonable attorneys' fees; an injunction against the unlawful trade practices; and any other relief the Court determines proper.

**COUNT VII**
Fraud
*(Against All Defendants)*

444. Plaintiff realleges and incorporates by reference the allegations in the sections of this Complaint titled "Parties," "Jurisdiction and Venue," "General Allegations," "Class Allegations," "D.C. Law Applies to the Entire Class," "Loss Causation," and "Fraud-Based Securities and State Law Claims (Pled in the Alternative)."

445. As set forth herein, Bannon, Epshteyn, and Abdul made material false representations of fact, and concealed material facts they had a duty to disclose, about the $FJB/$PPY Tokens to Plaintiff, other members of the proposed Class, and the investing public generally.

446. Bannon, Epshteyn, and Abdul knew that those material representations were false when made.

447. Bannon, Epshteyn, and Abdul intended for Plaintiff and other investors to rely on their false representations, and they intended to defraud them thereby.

448. Plaintiff and other members of the Class relied on these false representations and omissions to purchase the $FJB/$PPY Tokens at artificially inflated prices, and their reliance was justifiable.



Deleted: is
Deleted: ).
Moved (insertion) [6]
Moved down [8]: COUNT IX
Moved (insertion) [1]
Deleted: *(Against All Defendants)*
Deleted: ¶¶ 1–329
Deleted: , except ¶¶ 303–304 and any other paragraph to the extent such
Deleted: are expressly limited to strict liability, negligence, fiduciary duty, or other non-scienter-based theories and are construed as alleging negligence exclusive of scienter.
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Deleted: Defendants
Deleted: to
Deleted: Defendants
Deleted: Defendants
Deleted: reasonably
Deleted: Defendants'

449. As a direct result, Plaintiff and other members of the Class suffered damages.

450. Bannon and Epshteyn made these representations and omissions as the owners of 354 Nod Hill and TWinds, respectively, and within the scope of those companies' business of acquiring, holding, controlling, and promoting the Tokens. Abdul made the representations and omissions attributed to her as the administrator of FJB App LLC and, later, as the operator of Patriot Pay LLC, within the scope of those companies' business of issuing, operating, and promoting the Tokens. Bannon made the representations and omissions attributed to him on *War Room* as its host, within the scope of Warroom LLC's business of producing and distributing that program, on which the Token was promoted, its branding was displayed alongside *War Room*'s, and viewers were directed to the Token's website. 354 Nod Hill, TWinds, FJB App LLC, Patriot Pay LLC, and Warroom LLC are vicariously liable for them.

451. The misconduct of Bannon, Epshteyn, and Abdul involved high moral turpitude and was aimed at the public generally.

452. Plaintiff and other Class members are entitled to damages and punitive damages in amounts to be determined at trial, along with interest, attorneys' fees, and litigation costs, and such other relief as may be available.

**COUNT VIII**
Negligent Misrepresentation
*(In the Alternative to Count VII)*
*(Against All Defendants)*

453. Plaintiff realleges and incorporates by reference the allegations in the sections of this Complaint titled "Parties," "Jurisdiction and Venue," "General Allegations," "Class Allegations," "D.C. Law Applies to the Entire Class," and "Loss Causation," except any allegation that any Defendant acted knowingly, intentionally, or recklessly, or with intent to deceive. The allegations in the section titled "Concealment and Tolling" are incorporated only as they bear on

Deleted: Defendants'

Deleted: X

Deleted: *IX, Against All Defendants*

Formatted: Space After: 0 pt

Moved (insertion) [7]

Deleted: ¶¶ 1–329

Deleted: , except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to ...

Formatted: Not Expanded by / Condensed by

Formatted: Not Expanded by / Condensed by

Formatted: Not Expanded by / Condensed by

Deleted: Defendants

Deleted: "

Deleted: ," "

Deleted: ," "

Deleted: ,"

Deleted: "conscious design," if such

Deleted: are construed as sounding

the timeliness of this Count. This Count does not sound in fraud and is pleaded in the alternative to Count VII.

454. Bannon, Epshteyn, and Abdul publicly represented that they possessed expertise in and specialized knowledge about digital assets, token launches, crypto investing, and the $FJB/$PPY Token, and they controlled information about the Token that was unavailable to investors. By so doing, they incurred a corresponding common law duty to impart accurate information about the $FJB/$PPY Token to Plaintiff and other Class members, the Token holders to whom they spoke directly on *War Room*, in the Token's Discord and Telegram channels, on holder calls, and in individual communications.

455. Bannon, Epshteyn, and Abdul violated that duty by providing false information about material aspects of $FJB/$PPY, upon which Plaintiff and other members of the proposed Class reasonably relied to purchase the Token at artificially inflated prices. As a direct result, Plaintiff and other members of the Class suffered damages.

456. Bannon, Epshteyn, and Abdul failed to exercise reasonable care in the course of providing and communicating false information about material aspects of $FJB/$PPY to Plaintiff and the proposed Class.

457. Bannon and Epshteyn made these statements as the owners of 354 Nod Hill and TWinds, respectively, and within the scope of those companies' business of acquiring, holding, controlling, and promoting the Tokens. Abdul made the statements attributed to her as the administrator of FJB App LLC and, later, as the operator of Patriot Pay LLC, within the scope of those companies' business of issuing, operating, and promoting the Tokens. Bannon made the statements attributed to him on *War Room* as its host, within the scope of Warroom LLC's business of producing and distributing that program, on which the Token was promoted, its branding was

Formatted: Not Expanded by / Condensed by

Deleted: Defendants

Deleted: and intentionally

Deleted: .

Deleted: Defendants

Deleted: , other Class members, and all other non-insider potential investors in $FJB/$PPY

Deleted: Defendants

Deleted: Defendants

displayed alongside *War Room*'s, and viewers were directed to the Token's website. 354 Nod Hill, TWinds, FJB App LLC, Patriot Pay LLC, and Warroom LLC are vicariously liable for them.

458. Plaintiff and other members of the Class are entitled to damages in an amount to be determined at trial, along with interest, attorneys' fees, and litigation costs, and such other relief as may be available.

**COUNT IX**
Breach of Fiduciary Duty
(*Against Bannon, Epshteyn, and Abdul*)

459. Plaintiff realleges and incorporates by reference the allegations in the sections of this Complaint titled "Parties," "Jurisdiction and Venue," "General Allegations," "Class Allegations," "D.C. Law Applies to the Entire Class," and "Loss Causation," except any allegation that any Defendant acted knowingly, intentionally, or recklessly, or with intent to deceive. The allegations in the section titled "Concealment and Tolling" are incorporated only as they bear on the timeliness of this Count. This Count does not sound in fraud.

460. At all relevant times, Bannon, Epshteyn, and Abdul **owed Plaintiff and the Class** fiduciary duties arising from a relationship of trust and confidence and from their custody and control of the fees taken from holders' own transactions.

461. Bannon, Epshteyn, and Abdul assumed such duties by taking exclusive and discretionary control over funds belonging to, and paid by, Token holders—including the "marketing" and "charity" fees collected from every transaction and held in wallets whose keys they controlled—and over the Token's smart contract, the Token supply available for sale, liquidity, and the ability to restrict or disable trading.

462. Bannon, Epshteyn, and Abdul also held themselves out publicly as stewards and protectors of the Token and its community, representing that they were acting in the best interests of Token holders; that they were safeguarding holders against financial exclusion and political



**Moved (insertion) [8]**
**Deleted:** COUNT XI¶
**Deleted:** *the Executive Defendants*
**Deleted:** ¶¶ 1–329
**Deleted:** , except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to …
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Deleted:** Defendants
**Deleted:** "
**Deleted:** ," "
**Deleted:** ," "
**Deleted:** ,"
**Deleted:** "conscious design," if such
**Deleted:** construed
**Deleted:** sounding
**Formatted:** Not Expanded by / Condensed by
**Deleted:** Defendants Steve
**Deleted:** Boris
**Deleted:** Sarah
**Deleted:** , and Grant Tragni
**Formatted:** Strong
**Deleted:** , or at minimum fiduciary-like duties
**Deleted:** , to Plaintiff and the Class
**Deleted:** Defendants
**Deleted:** exercising
**Deleted:** critical aspects of the $FJB/$PPY ecosystem, including but not limited to: the Token's smart contract; transaction-fee routing;
**Deleted:** funded by investor transactions; token
**Deleted:** ;
**Deleted:** ;
**Deleted:** Defendants

persecution; and that transaction fees would be used for marketing, charitable causes, and ecosystem growth rather than insider benefit.

463. Plaintiff and the Class reasonably placed trust and confidence in Bannon, Epshteyn, and Abdul based on their representations of expertise, leadership, alignment of interests, and exclusive control over investor-funded wallets and Token operations, while investors themselves lacked access to the Token's code, internal wallet controls, or the ability to independently monitor or govern the use of funds.

464. By virtue of this relationship, Bannon, Epshteyn, and Abdul owed duties of loyalty, care, and full and fair disclosure, including a duty to act in the best interests of Token holders; a duty to refrain from self-dealing and conflicted transactions; and a duty to disclose material facts concerning their control, compensation, and use of investor funds.

465. Bannon, Epshteyn, and Abdul breached these duties by, among other things:

a. engaging in self-interested and conflicted conduct, including conducting undisclosed over-the-counter Token sales from insider-controlled tax and charity wallets, and coordinating the timing and source of such sales to manage price impact and confer preferential pricing on favored purchasers;

b. misusing investor-funded wallets, including selling Tokens from wallets represented as charitable or marketing-related, and exercising discretion over those wallets in a manner inconsistent with their public representations;

c. failing to disclose material conflicts of interest, including the investor-funded nature of the acquisition, Bannon's and Epshteyn's exemption from transaction fees, Abdul's payment agreement with Bannon and Epshteyn, and the payments to Epshteyn's friends at VFT Solutions;

**Deleted:** Defendants
**Deleted:** Defendants'
**Deleted:** Defendants'
**Deleted:** Defendants
**Deleted:** Defendants
**Deleted:** Engaging
**Deleted:** token
**Deleted:** Misusing
**Deleted:** tokens
**Deleted:** Defendants'
**Deleted:** Concealing
**Deleted:** Defendants'
**Deleted:** compensation, insiders'
**Deleted:** Defendants' ability to control liquidity
**Deleted:** trading

d. exercising centralized control over the Token while simultaneously representing it as decentralized, censorship-resistant, and immune from insider interference;

e. failing to act with due care by neglecting promised promotional efforts, ecosystem development, and transparency, despite repeated assurances that they were actively and continuously working to build and support the Token; and

f. disabling trading and access to liquidity without adequate disclosure or procedural safeguards, while retaining control over investor-funded assets.

466. Bannon, Epshteyn, and Abdul also breached their fiduciary duties by failing to disclose material facts that they had a duty to disclose by virtue of their position of trust and exclusive control, including facts concerning wallet control, fee usage, insider sales, and their unilateral authority over trading and liquidity.

467. As a direct and proximate result of these breaches of fiduciary duty, Plaintiff and the Class suffered substantial damages, including loss of investment value, loss of liquidity, and deprivation of the benefit of their bargain.

468. Bannon, Epshteyn, and Abdul were unjustly enriched by their breaches of fiduciary duty through the receipt and retention of fee-exempt Tokens, transaction fees, consulting fees, Token proceeds, and other benefits derived from investor-funded wallets and insider-controlled transactions.

469. Plaintiff and the Class are entitled to damages, disgorgement, restitution, imposition of a constructive trust over improperly obtained assets, and such other equitable and legal relief as the Court deems just and proper.

Deleted: Exercising

Deleted: Failing

Deleted: Defendants'

Deleted: Disabling

Deleted: Defendants

Deleted: Defendants

Deleted: Defendants'

Deleted: Defendants'

Deleted: Defendants

Deleted: token

**COUNT X**
Unjust Enrichment
(*Against All Defendants*)

470. Plaintiff realleges and incorporates by reference the allegations in the sections of this Complaint titled "Parties," "Jurisdiction and Venue," "General Allegations," "Class Allegations," and "D.C. Law Applies to the Entire Class," except any allegation that any Defendant acted knowingly, intentionally, or recklessly, or with intent to deceive. The allegations in the section titled "Concealment and Tolling" are incorporated only as they bear on the timeliness of this Count. This Count does not sound in fraud and is pleaded in the alternative to any claim for which an adequate remedy at law exists.

471. As a result of the misconduct alleged herein, each Defendant was enriched at the expense of Plaintiff and other Class members. Bannon, Epshteyn, 354 Nod Hill, and TWinds received two billion fee-exempt Tokens paid for with investors' fees; Epshteyn received consulting fees paid from the project's funds; Abdul received Tokens and compensation from the tax wallets and proceeds of OTC sales; FJB App LLC and Patriot Pay LLC received the transaction fees and the proceeds of Token sales; and Warroom LLC received the benefit of the Token's promotion of, and association with, *War Room*.

472. Defendants directly profited from the misconduct alleged herein, causing significant losses to Plaintiff and other members of the Class.

473. These benefits were obtained at the direct expense of Plaintiff and the proposed Class, who paid transaction fees on their purchases and provided valuable consideration based on materially misleading representations regarding the Token's control, fees, stability, liquidity, and value.

**Deleted:** XII

**Deleted:** ¶¶ 1–329

**Deleted:** , except ¶¶ 33, 96, 132, 136, 163, 209, 235, 302, and 305–29, and any other paragraph to the extent it alleges knowledge, scienter, intent, recklessness, concealment, fraudulent scheme, or deliberate deception, including but not limited to …

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Deleted:** Defendants

**Deleted:** "

**Deleted:** ," "

**Deleted:** ," "

**Deleted:** ,"

**Deleted:** "conscious design," if such

**Deleted:** construed

**Deleted:** sounding

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Deleted:** Defendants'

**Deleted:** Defendants were wrongfully

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Deleted:** , whom they exposed to multiple violations of law and significant financial losses

**Deleted:** Defendants' profits from these deceptive practices

**Deleted:** achieved

**Deleted:** cryptocurrency assets

**Formatted:** Condensed by 0.65 pt

**Deleted:** false price information and

**Deleted:** token

**Deleted:** profitability,

**Deleted:** market valuation

474. It would violate principles of equity and good conscience for Defendants to retain these benefits. Accordingly, Defendants must disgorge them to Plaintiff and other Class members.

475. Plaintiff and other Class members are entitled to restitution of the full amount wrongfully obtained by Defendants, along with interest, attorneys' fees, litigation costs, and such other equitable relief as the Court may deem just and proper.

**COUNT XI**
Aiding and Abetting
(*Against Abdul*)

476. Plaintiff realleges and incorporates by reference the allegations of Count VII, and the allegations incorporated therein.

477. As alleged above, Bannon and Epshteyn committed common law fraud by knowingly making materially false and misleading statements and omissions in connection with the promotion and sale of the Token.

478. Abdul had actual knowledge of the primary fraud, or acted with conscious disregard of it, and was aware of her role in it.

479. Abdul, acting as Bannon's and Epshteyn's senior administrator and spokesperson under the aliases "sundevil28" and "Sarah (Will never DM you first)," was aware of undisclosed OTC sales, insider wallet activity, the payments to VFT Solutions, the misuse of marketing and charity wallets, and Bannon's and Epshteyn's February 2023 decision to exit, and communicated directly with investors in a manner designed to conceal those facts.

480. Abdul knowingly provided substantial assistance to the fraud by, among other things:

a. administering and controlling wallets used to collect and sell Tokens;

b. facilitating undisclosed OTC sales and preferential transactions;

**Deleted:** keep the profits they gained from their misconduct.
**Deleted:** those profits
**Deleted:** XIII
**Deleted:** *and Tragni*
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Deleted:** ¶¶ 1–329
**Formatted:** Not Expanded by / Condensed by
**Deleted:** , except ¶¶ 303–304 and any other paragraph to
**Formatted:** Not Expanded by / Condensed by
**Deleted:** extent such
**Deleted:** are expressly limited to strict liability, negligence, fiduciary duty, or other non-scienter-based theories and are construed as alleging negligence exclusive
**Deleted:** scienter.
Under D.C. law, a cause of action for aiding and abetting requires that "(1)
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Deleted:** party or parties Defendants aided committed [a tort], (2) Defendants were generally aware of their role in the tortious activity, and (3) Defendants knowingly and substantially assisted in the [tort]." *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 50 (D.D.C. 2019).
**Formatted:** Not Expanded by / Condensed by
**Formatted:** Not Expanded by / Condensed by
**Deleted:** Defendants Steve
**Deleted:** , Boris
**Deleted:** , and the Entity Defendants
**Deleted:** Defendants Sarah
**Deleted:** and Grant Tragni
**Deleted:** .
**Deleted:** <#>Tragni, as the original lead developer of the Token and its smart contract, knew that the Token was falsely marketed as decentralized, charitable, and utility-driven, while insiders retained centralized control over wallets, transaction fees, and trading.
**Deleted:** <#>a
**Deleted:** <#>alias
**Deleted:** <#>,"
**Deleted:** <#>and
**Deleted:** and Tragni

c. advising on how to sell Tokens to avoid price impact;

d. providing reassurances to investors designed to lull them into holding or purchasing Tokens;

e. concealing the true use of marketing and charity fees; and

f. reinforcing false narratives of decentralization, stability, and insider commitment.

481. Abdul's conduct was a substantial factor in causing Plaintiff's and the Class's injuries. As a direct and proximate result, Plaintiff and the Class suffered damages.

Deleted: and Tragni's

Deleted: were

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully requests that this Court enter judgment in their favor, and against Defendants, awarding the following relief:

Deleted: request

A. Determine that this action is a proper class action and certify Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's undersigned counsel as Class counsel;

Deleted: certifying

B. Declare that Defendants violated the federal securities laws, the D.C. Securities Act, and the D.C. Consumer Protection Procedures Act;

C. Enjoin Defendants from further violations of the securities laws and the D.C. Consumer Protection Procedures Act;

Deleted: from offering or selling digital assets without proper registration or disclosure

D. Order Defendants to disgorge all ill-gotten gains, including proceeds from Token sales, transaction fees, and insider benefits;

E. Rescind the sales of $FJB/$PPY Tokens to Plaintiff and the D.C. Securities Act Subclass and order restitution of all consideration paid, or award rescissory damages;

Deleted: Defendants' unlawful

Deleted: by Plaintiff and the Class

F. Award Plaintiff and the Class compensatory damages in an amount to be proven at trial, together with pre- and post-judgment interest;

G. Award Plaintiff and the Class exemplary or punitive damages, and treble or statutory damages under D.C. Code § 28-3905(k)(2);

H. Award Plaintiff and the Class reasonable costs and attorneys' fees; and

I. Award such equitable, injunctive, or other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands that this case be tried to a jury.

Dated: September 29, 2026

Respectfully submitted,

*/s/ Constantine P. Economides*
Constantine P. Economides (*pro hac vice*)
Eric S. Rosen (D.C. Bar No. NY0671)
Yusef Al-Jarani (*pro hac vice*)
**DYNAMIS LLP**
1 SE 3rd Avenue, Suite 1000
Miami, Florida 33131
(305) 985-2959
ceconomides@dynamisllp.com
erosen@dynamisllp.com
yaljarani@dynamisllp.com

*Counsel to Plaintiff and the Proposed Class*

Deleted: ;
Deleted: February 12
Moved down [10]: NY0671)
Deleted: *Rosen*
Eric S. Rosen (SBN
Formatted: Font: Not Italic, No underline, Not Expanded by / Condensed by
Formatted: Font: Italic, Underline, Condensed by 0.2 pt
Deleted: forthcoming
Moved (insertion) [10]
Formatted: Font: Not Italic, No underline, Not Expanded by / Condensed by
Deleted: forthcoming
Deleted: 175 Federal Street
Deleted: 1200
Deleted: Boston, Massachusetts 02110

**Page i: [1] Deleted** **Author**

**Page 2: [2] Deleted** **Author**

**Page 123: [3] Deleted** **Author**

**Page 123: [4] Deleted** **Author**

1.

**Page 123: [5] Deleted** **Author**

2.

**Page 123: [6] Deleted** **Author**

3.

**Page 123: [7] Deleted** **Author**

4.

**Page 123: [8] Deleted** **Author**

5.

**Page 123: [9] Deleted** **Author**

6.

**Page 129: [10] Deleted** **Author**

**Page 129: [11] Deleted** **Author**

**Page 129: [12] Deleted** **Author**

7.

**Page 129: [13] Deleted** **Author**

8.

| Page 129: [14] Deleted | Author |
|---|---|

9.

| Page 129: [15] Deleted | Author |
|---|---|

10.

| Page 131: [16] Deleted | Author |
|---|---|

11.

| Page 131: [17] Deleted | Author |
|---|---|

12.

| Page 131: [18] Deleted | Author |
|---|---|

13.

| Page 131: [19] Deleted | Author |
|---|---|

14.

| Page 131: [20] Deleted | Author |
|---|---|

15.

| Page 131: [21] Deleted | Author |
|---|---|

16.

| Page 131: [22] Deleted | Author |
|---|---|

17.